IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORDIS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 97-550 (SLR) |
| v. | ) | |
| | ) | |
| MEDTRONIC VASCULAR, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| MEDTRONIC VASCULAR, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 97-700 (SLR) |
| v. | ) | |
| | ) | |
| CORDIS CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEDTRONIC VASCULAR, INC.'S OPENING BRIEF IN
SUPPORT OF ITS MOTION FOR A NEW TRIAL**

MORRIS, NICHOLS, ARSHT & TUNNELL
Karen Jacobs Louden (#2881)
Leslie A. Polizoti (#4299)
1201 N. Market Street
OF COUNSEL:                              P.O. Box 1347
Raphael V. Lupo                          Wilmington, DE 19899-1347
Donna M. Tanguay                         (302) 658-9200
Mark G. Davis                            Attorneys for Medtronic Vascular, Inc.
D. Michael Underhill
Michael W. Connelly
McDERMOTT, WILL & EMERY
600 13th St., NW
Washington, DC 20005-3096
(202) 756-8000

April 19, 2005

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDINGS   1

SUMMARY OF ARGUMENT   1

STATEMENT OF FACTS   3

    I.    THE ASSERTED PATENTS AND ACCUSED PRODUCTS   3

    II.    EVIDENTIARY RULINGS   5

ARGUMENT   6

    I.    A NEW TRIAL SHOULD BE GRANTED BECAUSE OF THE MISLEADING AND INCOMPLETE RECORD CONCERNING THE "SUBSTANTIALLY UNIFORM THICKNESS" LIMITATION   7

        A.    Cordis's Closing Arguments Left the Jury With a Mistaken Impression About What Constitutes a "100 percent" Variation   7

        B.    Cordis' Arguments Were Flatly Inconsistent With The Federal Circuit Decision And the File History   11

        C.    Cordis Argued that the Federal Circuit's Method of Identifying the "Thickness" of the Walls of the Stent Is a "Big Trick"   14

        D.    AVE Was Not Permitted to Introduce Evidence About the Clinical Significance of Its Variably Thick Crowns   16

    II.    A NEW TRIAL SHOULD BE GRANTED BECAUSE CORDIS'S COUNSEL MADE A NUMBER OF IMPROPER ARGUMENTS THAT LIKELY INFLUENCED THE JURY   17

        A.    Counsel Introduced a Number of Irrelevant and Extraneous Arguments about the Witnesses and the Parties   17

ii.

## TABLE OF CONTENTS (continued)

Page

B.    Counsel's Representations to the Court Led to the Exclusion of Evidence Relevant to Rebut Cordis's Secondary Considerations                    23

III.    A NEW TRIAL SHOULD BE GRANTED BECAUSE THE JURY'S INFRINGEMENT AND NON-OBVIOUSNESS VERDICTS ARE NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE                    29

CONCLUSION                    32

<u>TABLE OF CITATIONS</u>

<u>Page(s)</u>

<u>Cases</u>

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001) ............................................ 18, 19

*Ayoub v. Spencer*,
    550 F.2d 164 (3d Cir. 1977) ............................................ 21

*Choy v. Bouchelle*,
    436 F.2d 319 (3d Cir. 1970) ............................................ 12, 16

*Cordis Corp. v. Medtronic AVE, Inc.*,
    339 F.3d 1352 (Fed. Cir. 2003) ............................................ passim

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*,
    807 F.2d 955 (Fed. Cir. 1986) ............................................ 28

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
    851 F.2d 1387 (Fed. Cir. 1988) ............................................ 26

*Falkowski v. Johnson*,
    148 F.R.D. 132 (D. Del. 1993) ............................................ 17

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ............................................ 28

*In re Fulton*, 391 F.3d 1195
    (Fed. Cir. 2004) ............................................ 19

*Petree v. Victor Fluid Power, Inc.*,
    887 F.2d 34 (3d Cir. 1989) ............................................ 17, 29

*Roebuck v. Drexel Univ.*,
    852 F.2d 715 (3d Cir. 1988) ............................................ 29, 30

*Simmons Fastener Corp. v. Illinois Tool Works, Inc.*,
    739 F.2d 1573 (Fed. Cir. 1984) ............................................ 26, 28

*Stratoflex, Inc. v. Aeroquip Corp.*,
    713 F.2d 1530 (Fed. Cir. 1983) ............................................ 26

*Sulzer Textil A.G. v. Picanol N.V.*,
    358 F.3d 1356 (Fed. Cir. 2004) ............................................ 12, 13, 15

iv.

*Tee Air, Inc. v. Denso Mfg. Michigan, Inc.*,
192 F.3d 1353 (Fed. Cir. 1999)                                    19

*Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326 (Fed. Cir.
1998)                                                            27

*WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir.
1999)                                                          26, 28

<u>Statutes</u>

Fed. R. Civ. P. 59(a)                                             6

## NATURE AND STAGE OF PROCEEDINGS

Following a trial in 2000, the Federal Circuit in 2003 remanded the case back to this Court. *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003). On March 14, 2005, after a one-week retrial, the jury found the asserted claims of the '762 and '984 patents infringed and non-obvious. (D.I. 1358.) Pursuant to the verdict, this Court on March 31, 2005, entered judgment in favor of Cordis Corporation ("Cordis") and against Medtronic Vascular, Inc. ("AVE"). (D.I. 1374.)

AVE filed a timely motion for new trial on April 14, 2005. (D.I. 1383). Pursuant to the stipulation by the parties and as ordered by this Court, (D.I. 1378), AVE files this brief in support of its new trial motion.

## SUMMARY OF ARGUMENT

AVE should be granted a new trial for at least six different reasons.

1.      The Court instructed the jury that "[a] wall that varies in thickness by as much as 100 percent cannot be said to be of substantially uniform thickness." This construction is based on the '762 reexamination file history and the Federal Circuit decision in this case, which equated the "100 percent" variation language with a wall that is twice as thick in some areas as it is in others. At trial, Cordis sandbagged AVE by successfully urging the jury in closing argument to effectively read this limitation out of the claim, arguing, *inter alia*, that AVE's position – and the Federal Circuit's holding – that a stent having a double thickness does not infringe, was a "mathematical trick" that cannot occur. The Court declined AVE's request for a curative instruction on this issue.

2.      The Federal Circuit held that the "wall surface" of a tubular member is formed by a series of imaginary circles intersecting the outermost points of the

tubular member and that the "thickness" at any point along the wall surface is the distance between one of these intersections and a corresponding intersection where a cylindrical surface meets the inside of the tubular member. Consistent with the Federal Circuit opinion, AVE used imaginary circles to define the thickness of its stents. In response, Cordis disparaged AVE's methodology, calling it, *inter alia*, a "big trick." Because the Court ruled that AVE could not refer to the Federal Circuit opinion and that the jury would not be instructed about the Federal Circuit methodology, AVE was not able to effectively respond to Cordis's attacks. The jury was not permitted to hear that – far from being a "big trick" – AVE followed the "imaginary circle" methodology that the Federal Circuit outlined in interpreting this limitation or that Cordis's approach was inconsistent with the Federal Circuit methodology.

3.     AVE was prejudiced by the Court's exclusion of evidence related to the clinical significance of the AVE stents' variably thick crowns. This evidence was relevant to the sole issue on infringement – whether each of the walls of the AVE stents have a "substantially uniform thickness" – and should have been admitted.

4.     AVE was prejudiced by a series of irrelevant, inflammatory, and extraneous arguments that Cordis's counsel made throughout the trial. Among other things, Cordis extensively relied upon whether certain individuals or entities ever personally thought of the claimed inventions; it questioned the motives of several persons not based on any evidence of record; and it relied on the upcoming expiration date of the '762 patent as a ploy to sway the jury in its favor. These improper remarks were made to elicit a favorable verdict based upon emotion, not reason.

5.      AVE was prejudiced by the fact that Cordis reneged on its promise to the Court that it would not rely on the AVE stents for evidence of secondary considerations of non-obviousness, and that it would not refer to the "essence" of the Palmaz invention.   Contrary to its representations, Cordis repeatedly argued that the "entire" stent industry (which, of course, includes AVE) was built on Palmaz, and extolled the virtues of the Palmaz-Schatz stent, calling it the "gold standard."  The Court precluded AVE from effectively rebutting these assertions by limiting the evidence AVE could offer about the problems with the Palmaz-Schatz stents, the superiority of the AVE stents, and AVE's own patents.

6.      The jury verdict that the asserted claims are infringed and non-obviousness is against the clear weight of the evidence.

### STATEMENT OF FACTS

I.      THE ASSERTED PATENTS AND ACCUSED PRODUCTS

Cordis asserted two patents at trial:  the '762 patent and the '984 patent. The '762 patent is directed to a slotted tube stent.  (PX-3.)  The '984 patent is directed to flexibly connecting the prior art slotted tube stents with a single connector member parallel to the longitudinal axis.  (PX-6.)  The preferred embodiments in both patents each have a wall with a "uniform thickness."  (PX-3 at 6:41-44 & 7:30-33; PX-6 at 5:64-67, 6:51-54 & 10:36-41.)  Therefore, the thickness of the walls along the length of each preferred stent embodiment does not vary.   The asserted claims all recite a tubular member, or plurality of tubular members, with a wall having a "substantially uniform thickness."  (PX-3 and PX-4, claims 23, 51 and 54; PX-6, claims 1 and 3.)

During the reexamination of the '762 patent, Cordis and its consultant, Dr. Andros, represented that if some portions of the wall of an implant are twice as thick as other areas, then the wall thickness is not "substantially uniform":

> The Ersek fixation sleeve does not have a substantially uniform wall thickness, nor is it thin walled. The expanded metal sleeve is twice as thick in some areas as in others, and the thickness of the wall varies throughout.

(PX-13 at PWRAP 003079 SUB; *see also id.* at PWRAP 003055 SUB.)  Cordis also characterized this double thickness as a "100% variance."  (*Id.* at PWRAP 003049 SUB.)

The AVE stents accused of infringing these patents are the MicroStent II, the GFX, and the GFX2.  (D.I. 1358.)  These stents are the subject of numerous patents that AVE owns, including U.S. Patent Nos. 5,292,331 and 5,800,509 to Boneau ("the '331 patent" and "the '509 patent"); and U.S. Patent No. 5,817,152 to Birdsall ("the '152 patent").  (Attachments A - C.)

The AVE stents consist of a series of rings that have been laser fused together.  (D.I. 1389, 3/9/05 Tr. at 1009:1-1012:6.)  As shown in the figure below, each of the rings is of "a sinusoidal design characterized by a series of peaks and valleys called 'crowns' interconnected by substantially straight portions called 'struts.'"  (D.I. 1128 at 19; *See also* D.I. 1389, 3/9/05 Tr. at 1002:20-1003:2 & 1006:2-8)



The thickness of the material along the length of each ring varies. (D.I. 1389, 3/9/05 Tr. at 1109:21-1111:11 & 1120:1-9.) The thickness of the struts is more than double the thickness at the ends of the crowns. (*Id.*).

II.    <u>EVIDENTIARY RULINGS</u>

Based upon the Court's rulings prior to and during trial, AVE was precluded from introducing several categories of evidence:

- AVE's witnesses could not offer their interpretation of the Federal Circuit's construction of the "substantially uniform thickness" limitation (D.I. 1337 at 5);

- AVE could not offer testimony about the clinical significance of the variably thick crowns of its stents (D.I. 1390, 3/10/05 Tr. at 1513:17-24; D.I. 1337 at 8-9, sections 4(k) and 4(m));

- AVE could not compare the various stents on the market, including offering testimony about the superiority of the AVE stents or the safety (or lack thereof) of the patented devices (D.I. 1337 at 7-9, sections 4(h) – 4(k), 4(m); D.I. 1387, 3/7/05 Tr. at 246:24-247:3);

- AVE could not play a portion of a videotape of a multi-implant procedure performed by Dr. Schatz, which lasted several hours, without playing the entire videotape (D.I. 1337 at 8, section 4(k));

- AVE could not introduce its patents into evidence unless Cordis expressly accused AVE of copying (D.I. 1337 at 8-9, section 4(l)); and

- AVE could not reference Cordis's request for injunctive relief (D.I. 907, Tr. at 65-66; D.I. 1337 at 10, section 4(s)).

Cordis also was precluded from offering certain evidence by both Court order and stipulation:

- The Court ordered Cordis not to introduce "evidence, argument, or testimony as to whether any witness thought of the apparatus claimed in the Cordis patents."  (D.I. 1337 at 12.)

- Cordis represented that "it does not intend to rely on arguments concerning the 'essence of the invention.'"  (D.I. 1300, Tab 5 at 2.)

- Cordis represented that it was not relying on "the secondary considerations of the success of the AVE stent," to show, for example, commercial success or copying.  (D.I. 1336 at 2; D.I. 1345 at 2,5; Attachment D, 2/28/05 e-mail from Balick to Court).

<u>ARGUMENT</u>

Pursuant to Federal Rule of Civil Procedure 59(a), a new trial may be granted "in an action in which there has been a trial by jury for any of the reasons for which new trial have heretofore been granted in actions at law in the courts of the United States . . . ."  Fed. R. Civ. P. 59(a).

A new trial may be awarded where the verdict is against the manifest weight of the evidence.  *See, e.g., Fineman v. Armstrong World Indus.*, 980 F.2d 171, 206 (3d Cir. 2003).  Another basis for granting a new trial is counsel misconduct involving improper attorney argument that unfairly influences the verdict.  *See, e.g., Blanche Road Corp. v. Bensalem Township*, 57 F.3d 253, 264 (3d Cir. 1995), *overruled on other grounds by UA Theatre Circuit v. Twp. Of Warrington,* 316 F.3d 392, 400-01 (3d Cir. 2003); *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 206-07 (3d Cir. 1992); *Lucent*

*Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 251 (D. Del. 2001); *Draper v. Airco, Inc.*, 580 F.2d 91, 94 (3d Cir. 1978). In determining whether to grant a motion for a new trial, the Court need not view the evidence in the light most favorable to the verdict winner. *Bullen v. Chaffinch*, 336 F. Supp. 2d 342, 347 (D. Del. 2004).

In this case, Cordis's counsel's trial presentation was littered with prejudicial statements calculated to distract the jury from the relevant issues. In many instances, the Court's evidentiary rulings and charge to the jury magnified the prejudice. In addition, the jury verdict is against the great weight of evidence. As a result, a new trial should be granted on non-infringement and invalidity.

I.     A NEW TRIAL SHOULD BE GRANTED BECAUSE OF THE MISLEADING AND INCOMPLETE RECORD CONCERNING THE "SUBSTANTIALLY UNIFORM THICKNESS" LIMITATION

      A.     Cordis's Closing Arguments Left the Jury With a Mistaken Impression About What Constitutes a "100 Percent" Variation

The sole infringement issue at trial was whether the AVE stents literally meet the "substantially uniform thickness" limitation. (D.I. 1357 at 16.) The Court instructed the jury that the following definition of "substantially uniform thickness" "must be applied":

> The wall of a tubular member must be of largely or approximately uniform thickness. A wall that varies in thickness by as much as 100 percent cannot be said to be of substantially uniform thickness.

(D.I. 1357 at 22-23.) The second sentence of the instruction frames the crucial non-infringement issue: whether the AVE stents have walls that vary in thickness by as much as 100%.

At trial, AVE presented unrebutted testimony that the walls of its stents are twice as thick in some areas as others and, therefore, the thickness of the walls of AVE's stents vary by more than 100%. (D.I. 1389, 3/9/05 Tr. at 1109:21-1111:11 & 1120:1-9.) While Cordis's experts argue that this is not the appropriate comparison, they never disputed that the wall thickness of the AVE stents in the area of the struts varies by more than 100% as compared to the wall thickness of the stents near the ends of the crowns. Cordis left that job to its counsel.

Although Cordis never raised the issue in its expert reports, and Cordis's witnesses did not adopt it, Cordis's counsel hinted for the first time on cross-examination of Medtronic's expert that it is "impossible" to have 100% variation in the AVE stents because in order to do so, the thickness would have to vary between the maximum thickness at the struts to a measurement of zero, where "there is no stent." (D.I. 1389, 3/9/05 Tr. at 1167:13-1168:1 & 1174:3-1175:11.) And in its closing argument, Cordis's counsel argued for the first time that the 100% variance language was meaningless and could be ignored. He argued that to find a 100% variance in the wall thickness of an AVE stent, the wall thickness of the stent would have to drop to zero at some point on the wall.[1] Counsel argued that:

- "[T]here is a variation here at the end, . . . but it goes downward, it's a negative deviation. It doesn't go down a hundred percent. If it went down a hundred percent, there wouldn't be any stent." (D.I. 1391, 3/11/05 Tr. at 1766:20-1767:2.)

- "You can't have a hundred percent deviation." (*Id.* at 1767:9-10.)

---

[1] This argument was made more confusing by the fact that the AVE stents gradually taper from a maximum down to nothing and would, therefore, satisfy Cordis's test.

- "A variation is a deviation.  They're talking about the same thing."  (*Id.* at 1767:13-14.)

- "[AVE's one hundred percent variance test] is a mathematical trick and I think Dr. Wagoner was probably embarrassed by the mathematical trick . . . ."  (*Id.* at 1767:15-17.)

- "[Y]ou can't have a negative hundred percent deviation or variation."  (Id. at 1767:20-21.)

Counsel went even farther during his rebuttal closing.  He continued his assault on the Federal Circuit construction by arguing that AVE's theory was "phoney" and impossible:

> The AVE way relies on *phoney* math and no documents. Phoney math, what's that?  A hundred percent variation. Did you hear Mr. Underhill, he said that if you sell milk at $2 and then go up to $4, that's a hundred percent.  He's right.  If you go down to zero, then you're not selling milk anymore.  And that's the problem with their phoney math. Dr. Wagoner agreed, you can't go down a hundred percent. *You cannot have a negative deviation of a hundred percent.* He agrees with that.

(D.I. 1391, 3/11/05 Tr. at 1855:9-20.[2]

Next, Cordis's counsel argued not only that AVE's theory is mathematically impossible, but that the 100% limitation is *virtually irrelevant*:

> And I think you can use your common sense and realize that the negative deviation is the same as a negative variation.  Mr. Underhill said, well, if that's the case, *then what's the hundred percent limitation mean*?  *It doesn't mean very much.*

(D.I. 1391, 3/11/05 Tr. at 1855:21-1856:2).  Indeed, he concluded his 100% variation remarks by telling the jury not only that a "negative deviation" of 100% is impossible, but also that "*you can't have a stent that goes up a hundred percent*."  (*Id.* at 1856:3-10).

---

[2]     Emphasis in the quoted material is added unless otherwise noted.

AVE requested a side-bar during Cordis's closing argument in attempt to foreclose Cordis's grossly misleading arguments. (D.I. 1391, 3/11/05 at 1766:18-1767:6). That request was denied. (*Id.*) AVE then requested a curative instruction following the argument that would have informed the jury that "double thickness" was all that was required to fall within the "100 percent" variation exclusion. (*Id.* at 1902:7-1904:12.) The Court also declined that request. (*Id.*).

Contrary to what Cordis's counsel told the jury, it was Cordis's math that was "phoney." A wall does not have to fall to a zero thickness for there to be a 100% variation in thickness; rather, all that is necessary to produce a 100% variation in thickness is for one portion of the wall to be double the thickness of another part of the wall. In fact, a wall that falls to a thickness approaching zero would have a variation in thickness approaching infinity, not 100% as Cordis's counsel suggests.

Taking the figure to the right as an example, it has double thickness (a "1" to "2" ratio of thickness at points "a" and "b"). Mathematically, then, its thickness varies by 100%:



Percentage variation = (b – a)/a times 100

Percentage variation = (2 – 1)/1 * 100 = (1)/(1) * 100 = 100%.


Similarly, if the thinner wall area were one-fourth the thickness of the thinner area, the percentage variation in thickness would be 300%; if it were one tenth the thickness, the percentage variation in thickness would be 900%:

Percentage variation = (2 -.5)/(.5) * 100 = (1.5)/(.5) * 100 = 300%

Percentage variation = (2-.2)/(.2) * 100 = (1.8)/(.2) * 100 = 900%

If one were to adopt the interpretation of 100% variation urged by Cordis's counsel, even the Ersek device, which was expressly described in the prosecution history as having a 100% variation in thickness, would not qualify because the thickness of the walls of the Ersek device never falls to zero.

Under Cordis's theory there is not a 100% variation until the thinner wall area falls to a thickness of zero. But, as noted above, Cordis never disclosed this theory in its expert reports and its experts certainly never adopted it. In short, the argument was used to sandbag AVE and to confuse the jury, and is simply wrong.

B.     Cordis's Arguments Were Flatly Inconsistent With
       The Federal Circuit Decision And the File History

Most importantly, this attorney-created theory is squarely at odds with the Federal Circuit decision in this case and the file history of the asserted patents on which that decision is based. The Federal Circuit held that "a wall that varies in thickness by as much as 100 percent cannot be said to be of 'substantially uniform thickness' either literally or by equivalents." *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1362 (Fed. Cir. 2003). By urging the jury to construe this language in a fashion that made it "impossible" for a stent to vary in thickness by 100%, Cordis urged the jury to ignore and render meaningless that critical portion of the Federal Circuit decision.

The Federal Circuit equated "100 percent" with "double thickness." *Id.* at 1361-62. Indeed, in coming to its conclusion that a wall with a 100% variance was not

covered by the claims, the Federal Circuit quoted the remarks Cordis made to the Patent Office about the alleged double thickness of Ersek:

> The Ersek fixation sleeve does not have a substantially uniform wall thickness, nor is it thin walled. The expanded metal sleeve is *twice as thick in some areas as in others*, and the thickness of the wall varies throughout.

*Id.* at 1362 (quoting PX-13 at PWRAP 003079 SUB); *see also* PX-13 at PWRAP 003009, 0030049, 0030050, 0030055, 0030100 SUB. Counsel's new interpretation of the 100% variation directly conflicts with Cordis's statements to the PTO. Taken together with counsel's statement that "*you can't have a stent that goes up a hundred percent,*" would mean that all stents, including the Ersek stent Cordis sought to distinguish, would satisfy the substantially uniform thickness limitation. (D.I. 1391, 3/11/05 Tr. at 1856:3-10).

In light of the emphasis Cordis placed on this plainly incorrect construction of the claim, the failure to provide a curative instruction was error.[3] Although the Court did recite a portion of the Federal Circuit claim construction, nevertheless, because Cordis was permitted to vitiate the portion of the construction relating to the 100% variation, the charge to the jury was not "*adequate to ensure that the jury fully underst[ood] the court's claim construction rulings* and what the patentee covered by the claims." *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004); *see also Choy v. Bouchelle*, 436 F.2d 319, 325 (3d Cir. 1970) (finding that district court committed "plain error" in failing to elaborate on abstract instructions so as

---

[3] "The question of whether a jury instruction on an issue of patent law is erroneous is a matter of Federal Circuit law . . . ." *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004)

to put the factual issues in controversy in "their proper perspective").  In short, the jury was left to guess as to whether the "100 percent" variation language was relevant or not.

The sole remaining issue is whether the error was "prejudicial," *i.e.*, whether it was not harmless.  *See Sulzer*, 358 F.3d at 1364 (citing *Weinar v. Rollform Inc.*, 744 F.2d 797, 808 (Fed. Cir. 1984) (defining "prejudicial" error in context of jury instruction as one that is not "harmless")).  "When the error in a jury instruction 'could not have changed the result, the erroneous instruction is harmless.'" *Id.* (citation omitted).  In light of Cordis's counsel's repeated misstatements of the 100% variation exclusion during closing, the prejudice is clear.  *Id.* at 1363 (instructions should be analyzed in "the context of what happened at trial, including how the parties tried the case and their arguments to the jury") (citation omitted).

Counsel's *sole* strategy in closing with respect to this issue was to make the jury believe that AVE's double thickness analysis was a "trick" and an irrelevancy, which was wrong as a matter of law.  Counsel's remarks cannot be reconciled with the patent, the '762 reexamination, or with the Federal Circuit opinion.  Counsel undoubtedly recognized that this is so – as it was not until closing arguments that it sprung this infringement theory on AVE.  A new trial should be ordered because of the prejudicial statements made by counsel, the sandbagging on AVE, and the Court's failure to clarify the "100 percent" variation language to the jury.

C.     Cordis Argued that the Federal Circuit's Method of
Identifying the "Thickness" of the Walls of the
Stent Is a "Big Trick"

In order to determine whether the "substantially uniform thickness" limitations is met, one must understand how wall thickness was defined by the Federal circuit.

According to the Federal Circuit, the thickness of a tubular member is identified by drawing imaginary circles intersecting with the outermost points along the length of the tubular member. *Cordis*, 339 F.3d at 1362. The "thickness" is then identified by measuring the distance between the circle and an imaginary cylindrical wall on the inside of the stent. *Id.*[4]

AVE faithfully applied this construction in its infringement analysis. Cordis did not. Instead, Cordis told the jury that AVE's method of identifying the wall involved "magic circles," was a "big trick," and was a "phony look at the issue." (D.I. 1391, 3/11/05 Tr. at 1767:23-1768:2 & 1770:22-1771:11; *see generally id.* at 1768:1-1771:16.)

Cordis's statements to the jury were both incorrect and misleading. First, the "circle within a circle" methodology is effectively part of the Federal Circuit's claim construction. And even if it could somehow be characterized as not being part of claim construction, it is the mandatory method of analysis by which infringement of this limitation is to be determined.

---

[4]     Dr. Andros, who submitted a declaration to the PTO on Cordis's behalf during the '762 reexamination, agrees that imaginary circles can be used to measure the wall thickness. (D.I. 1391, 3/11/05 Tr. at 1724:20-1725:3.)

Yet, Cordis was able to make these sweeping and derogatory characterizations about the Federal Circuit methodology because it knew that the jury would not be told that the use of the circles to define "thickness" is the law of this case. Indeed, prior to trial, the Court ruled that AVE's experts could not say that they had relied on the Federal Circuit opinion (D.I. 1329 at 5); and the Court had declined to adopt AVE's proposed instruction about the use of the imaginary circles to measure thickness. (D.I. 1319 at 26; D.I. 1357 at 22-23.)  AVE should have been permitted to point out to the jury -- through the testimony of its own witnesses, cross examination of Cordis's witnesses, and in closing argument -- that the approach used and results obtained by Cordis's experts were inconsistent with the Federal Circuit's methodology, but was prevented from doing so.  (D.I. 1337 at 5; D.I. 1319 at 26, § 3.4; D.I. 1304, Tab 2 at 2-3.)

AVE understands that Cordis has argued that the Federal Circuit methodology was permissive and not mandatory.  Cordis's position, however, cannot be squared with the Federal Court opinion, which described how the thickness of the walls is measured, not how they can be measured.  Whether or not mandatory, however, AVE still should be granted a new trial.  AVE could not point out to the jury that its methodology had been endorsed by the Federal Circuit, and was not "phony" or a "trick," and that the approach used and results obtained by Cordis's experts were inconsistent with that methodology (and that Cordis lacked any such endorsement itself).

In light of Cordis's misstatements (attacks), the Court's decision to preclude AVE from explaining the meaning of the "thickness" term in the "substantially uniform thickness" limitation was erroneous and prejudicial.  *See, e.g., Sulzer*, 358 F.3d at 1366 (charge should be "adequate to ensure that the jury fully understands the court's

claim construction rulings and what the patentee covered by the claims"); *Choy*, 436 F.2d at 325 (in granting a new trial, Third Circuit finds that district court committed "plain error" in failing to elaborate on abstract instructions so as to put the factual issues in controversy in "their proper perspective").

D.    AVE Was Not Permitted to Introduce Evidence About the Clinical Significance of Its Variably Thick Crowns

Cordis also argued to the jury that the variation in thickness near the ends of the AVE stents is insignificant for purposes of infringement.  (*See, e.g.*, D.I. 1391, 3/11/05 Tr. at 1765:10-1768:17.)

The Court prevented AVE from presenting some of the most crucial evidence to rebut this point – namely, that the variations in thickness near the ends of the AVE stents are clinically significant.  (D.I. 1390, 3/10/05 Tr. at 1513:17-24; D.I. 1337 at 8-9, sections 4(k) and 4(m); *see also* D.I. 1337 at 7-8, sections 4(h)-4(j)).[5]  AVE's expert on this issue, Dr. Heuser, would have testified that the variable thickness of the crown is "substantial," as evidenced by the clinical benefits it provides:  *e.g.*, improved treatment of calcified and tortuous lesions; improved trackability and conformability; and improved side branch access.  (D.I. 1305, Ex. H, 10/29/04 Heuser Report at ¶¶ 22, 25, 28, 30, 31.)

---

[5]    One of the pieces of evidence was a videotape demonstrating a procedure by Richard Schatz, where he marveled at an AVE stent's ability to "pass [where] nothing else will go" due to its "round" edge.  (Attachment F (EGPV67) at 14:7-14.)  Contrary to Cordis's representations to the Court, the portion of the tape that AVE wanted to play at trial is not even arguably misleading.  (Compare Attachment F (EGPV67) at 10-14 with entire transcripts at Attachments E (EGPV68) - F (EGPV67).)  Yet the Court precluded AVE from playing it unless the entire tape of the multi-implant procedure (which lasted several hours) was played (See D.I. 1337 at 8).

How the AVE stents perform when implanted clearly is relevant whether the "substantially uniform thickness" limitation is satisfied.  Indeed, the Federal Circuit recognized the relationship between this limitation and the performance of the stent. *Cordis*, 339 F.3d at 1360.  ("Accordingly, the 'substantially uniform' limitation also requires that the thickness of the wall surface be sufficiently uniform along its length and between members to allow uniform expansion of the stent.")

Because this relevant clinical evidence almost certainly would have influenced the jury's infringement analysis, a new trial should be granted.  *See Petree v. Victor Fluid Power, Inc.*, 887 F.2d 34, 41 (3d Cir. 1989) (exclusion of evidence is "harmless only if it is highly probable that the error did not affect the outcome of the case").

II.     A NEW TRIAL SHOULD BE GRANTED BECAUSE CORDIS'S COUNSEL MADE A NUMBER OF IMPROPER ARGUMENTS THAT LIKELY INFLUENCED THE JURY

A.     Counsel Introduced a Number of Irrelevant and Extraneous Arguments about the Witnesses and the Parties

Cordis counsel's trial presentation was littered with irrelevant, inflammatory, and extraneous arguments, which warrant a new trial.  *See, e.g., Falkowski v. Johnson*, 148 F.R.D. 132, 135-37 (D. Del. 1993) (new trial ordered because counsel introduced several extraneous remarks during closing arguments).

For example, Cordis elicited testimony from both sides' experts that neither AVE, Dr. Palmaz, Dr. Gianturco, nor others personally came up with the idea claimed in the '984 patent.  (*See, e.g.*, D.I. 1390, 3/10/05 Tr. at 1508:21-1509:8; D.I.

1388, 3/8/05 Tr. at 823:6-19, and at 828:19-829:8.)     In closing, Cordis counsel

emphasized this testimony in discussing the '984 patent:

> What's the real truth?  The real truth is there were two giants in stent development, Dr. Palmaz whose balloon-expandable stent transformed history, and Dr. Gianturco was a brilliant scientist, and he designed two vastly less successful ideas, the springy Z stent and the coil stent, which largely failed in the marketplace.

> But after Dr. Palmaz published his ideas on balloon-expandable stenting, Gianturco, the man who knew all about the Z stents didn't say oh, it's obvious to use the Z stent connector with Palmaz and make Schatz, he did something completely different, he created the coil stents. And the coil stents largely avoid the gap problem, also.

> So the two intellectual leaders in stent design in 1986 rejected Schatz's thinking and instead went elsewhere.

(D.I. 1391, 3/11/05 Tr. at 1896:21-1897:15 .)

First, Cordis made these arguments in violation of the Court's ruling on

the motions in limine (See D.I. 1337 at 12, Section 5(l)) (precluding Cordis from offering

evidence, argument or testimony as to whether any witness thought of the apparatus

claimed in the Cordis patents).   Cordis violated the letter of this order in arguing that Dr.

Palmaz – a witness – did not personally think of the design.  It violated the spirit in

making the same argument with respect to non-witnesses.

Second, for the reasons explained in AVE's motion in limine on this topic,

these arguments are irrelevant.  (D.I. 1292).  The relevant inquiry is what the hypothetical

person would have understood from the references and not what any actual person

subjectively realized at the time.  *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239

F.3d 1343, 1364 (Fed. Cir. 2001) (relevant inquiry is what a "hypothetical ordinarily

skilled artisan" would have understood from references, not what one person subjectively realized at the time).

In response to AVE's objections to this inquiry, Cordis argued that, contrary to the *Amazon.com* case, the fact that others went to "another solution, rather than the one that's said to be obvious as reflected in the literature" is a "classic teaching away." (D.I. 1390, 3/10/05 Tr. at 1511:1-5.) Cordis is wrong.

First, Cordis made this argument in its opposition to AVE's motion in limine. (D.I. 1300, Tab 8.) The Court rejected it in granting AVE's motion. (D.I. 1337 at 12, section 5(h).)

Second, using Cordis's logic, there necessarily would be a "teaching away" in every case, since an obviousness defense involves a situation where no single prior art reference teaches all of the claimed features.

Third, the mere fact that Palmaz, Gianturco, or any others chose one alternative over another is not a teaching away. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference" or where "the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." *Tec Air, Inc. v. Denso Mfg. Michigan, Inc.*, 192 F.3d 1353, 1359-60 (Fed. Cir. 1999) (citations omitted). The fact that Palmaz and Gianturco did not come up with Schatz's invention does not mean that they disparaged it or thought it would not work. Cordis's argument, and the Court's ruling, ignored this. AVE should be granted a new trial on the obviousness of the '984 patent based upon these facts alone.

Cordis's counsel, however, made a number of other prejudicial statements. It questioned AVE's motives in defending the suit; and it questioned the integrity of Dr. Ersek, Mr. Hammerslag, and even of Cordis (before Cordis was purchased by Johnson & Johnson).

Cordis's counsel repeatedly accused AVE of "doing things the wrong way," and implied that Cordis offered, and AVE refused, to pay it money:

- "Ladies and gentlemen, at core this is nothing more than a case about right and wrong. The right way of doing things and the wrong way of doing things. If you want to use someone's intellectual property, the right way is to get their permission and to pay for it." (D.I. 1391, 3/11/05 Tr. at 1851:5-11.)

- "What we have in this courtroom is *a defendant who wants to avoid paying for the right to use Dr. Palmaz's work*, which Johnson & Johnson owns. It's just as simple as that. That is what we have been fighting about. *That is what has caused the desperation of the arguments you've heard from Mr. Underhill*, the effort to avoid paying for the right to use someone else's property. That's all we're talking about." (*Id.* at 1852:4-13.)

- "And the other force in play, unfortunately, is that *there are companies like AVE, they're interested in using brilliant ideas without paying for them* and have an interest, therefore, in challenging pioneering work by others. *They would rather invest in a litigation than invest in paying for the right to use the technology*. That's not everybody. That's not everybody." (*Id.* at 1885:14-22.)

These arguments are irrelevant, based upon purported facts not in evidence, and are clearly intended to elicit a favorable verdict based upon emotion, not reason. There can be no doubt that these arguments warrant a new trial. Indeed, Cordis filed a motion in limine in 2000 to prohibit AVE from referring to Cordis's request for injunctive relief, arguing that such arguments would engender "unfair prejudice." (D.I. 836, Tab 1 at 2-3.) Having successfully urged the Court to preclude AVE from referring to one of the available patent remedies, Cordis cannot credibly argue that its references to

the other available remedy, money damages, were harmless.  (D.I. 907, Tr. at 65-66; D.I. 1337 at 10, section 4(s).)

Cordis also attacked the inventors of two key prior art patents, Mr. Hammerslag and Dr. Ersek, espousing conspiracy theories and, more importantly, presented "facts" to the jury not of record.  *See Ayoub v. Spencer*, 550 F.2d 164, 170-71 (3d Cir. 1977) (ordering new trial based on counsel's reference to evidence not in the record).  Moreover, Cordis largely sprung these arguments on AVE during closing, when AVE's ability to respond to them was limited:

- "The [wrong] way [to do business] involves investing in potential lawsuits. And *I'm very embarrassed* to say that the Cordis company before it was owned by Johnson & Johnson invested in Mr. Hammerslag.  They licensed the Hammerslag *nutty* idea, the liner made from an unimaginable substance based on no idea useful in the treatment of restenosis *in the theory that it would give them some position in the stent patent fights*."  (D.I. 1391, 3/11/05 Tr. at 1886:15-24.)[6]

- "Johnson & Johnson wanted to buy Cordis and that was time when the old Cordis, not the Johnson & Johnson Cordis went back to Hammerslag and said okay, enough is enough, now we're going to get the real stuff.  So when Johnson & Johnson was buying Cordis, they bought out Hammerslag's *nutty* idea for $300,000, *which is what you might pay for a nutty idea you might use to challenge a world breaking pioneering invention*, but it's not the $30 million that went to Dr. Fischell and it's not the hundreds of millions that went to Dr. Palmaz for real inventions.  *It's a litigation investment you can conclude from the evidence by the old Cordis prior to Johnson & Johnson*."  (*Id.* at 1887:7-22.)

- "And Dr. Ersek, Dr. Ersek is *I think* a sad story.  He's obviously a talented

---

[6]    If Cordis had intended to try to establish these facts at trial, it would have had to waive any attorney/client privilege attached to documents relating to the Hammerslag license so that proper discovery could have been taken as to Cordis' motives in entering into the license.  By "springing" these statements during closing, Cordis counsel effectively used the privilege as both a sword and a shield, offering what effectively amounts to evidence while preventing AVE from obtaining (let alone offering) any rebuttal evidence.  This tactic is not only improper, it also clearly constitutes a belated waiver of the privilege.

man, but he has become somewhat delusional about his role in science." (*Id.* at 1887:23-1888:2.)

- "What's that, World Medical Company?  It doesn't sound like an academic institution.  It doesn't sound like a society. Well, it actually was a business.  It was interested in attacking the Palmaz patent.  So they gave Dr. Ersek an award for being a great inventor of the stent in order to bolster his credentials you can conclude to challenge the Palmaz patent." (*Id.* at 1888:15-23.)

- "But paying $300,000 to Hammerslag and $540,000 to Ersek is the ugly side of some parts of corporate America.  It's just there, but it's not a reason to think what Dr. Julio Palmaz did in 1985 was obvious." (*Id.* at 1890:19-23.)

Moreover, the arguments about the Hammerslag patent were particularly misleading, as AVE did not focus upon Hammerslag's teaching of the allegedly "nutty" liner, but instead relied primarily on Hammerslag's teaching of balloon deliverability. Cordis never disputed that Hammerslag taught this feature.

After asking the jury to ignore the teachings of the prior art for immaterial and extrinsic reasons, Cordis's counsel asked the jury, this time in rebuttal closing, to "honor" Dr. Palmaz based upon additional irrelevant reasons:

> I'm about done.  I have a final thought.  Julio Palmaz has been here through much of this trial.  We're honored to have him in the room.  His invention was filed November 7, 1985.  Under U.S. law, his invention will expire twenty years later, November 7, 2005.  This year.  Once it expires, anyone is free to use its ideas without payment.  That's the bargain you make with the patent office when you disclose your invention.  You have a limited period to profit exclusively, and then you share your ideas with the world.
>
> * * * *
>
> I ask you with your verdict to honor Dr. Palmaz's work under the law and the charge as the Judge will give it. We're not asking for any favors here.  We're asking for the justice of the American court system.  We're asking to ask that this infringer be found responsible for what it has done.

(*Id.* at 1900:3-1901:8.).  This, of course, is a call to pure emotion, since AVE is no more or less likely to infringe simply because the '762 patent is due to expire.  The jury also

could have been misled to believe that the damages that Cordis might seek are limited to the period between the verdict and the expiration of the patent, which Cordis has made more than clear is not the case to AVE and the Court (but not the jury).

Counsel's extensive reliance on these improper arguments during closing is amenable to only one reasonable explanation: Cordis believed the assertions were necessary to the success of its case. *Blanche*, 57 F.3d at 264 (upholding district court's finding that counsel's "pattern of misconduct" demonstrated the importance of the misconduct to the success of the case). Counsel's improper arguments made it reasonably probable that the verdict was influenced by the prejudicial statements.[7] *Id.* A new trial should be granted on all issues.

> **B.**     Counsel's Representations to the Court Led to the Exclusion of Evidence Relevant to the Rebut of Cordis's Secondary Considerations

Counsel also made misleading representations to the Court that ultimately caused the Court to preclude evidence relevant to secondary considerations of non-obviousness.

Before trial, the Court ruled that certain evidence related to the significance and novelty of the features of the AVE stents could not be introduced for purposes of infringement, but that it "may be appropriate in the context of validity . . . ." (D.I. 1337 at 8, section 4(h); *see also id.* at 7-9, sections 4(h)–4(k), 4(m)). Such evidence

---

[7]     Counsel's repeated efforts to equate the patent claims to the balloon expandable stent also warrant a new trial. (*See, e.g.*, D.I. 1386, 3/4/05 Tr. at 119:16-20, 120:7-8, 121:24-122:3, 126:18-127:4, 128:18-20; 132:24-133:5, and 144:20-145:14) (*See* PX-3 claim 23; PX-6, claims 1 and 3.) Claim 23 of the '762 patent, and claims 1 and 3 of the '984 patent, do not even claim a balloon expandable stent.

included product-to-product comparisons, concerns about the safety of the Palmaz-Schatz stent and AVE's patents.  At trial, the Court precluded AVE from introducing much of this evidence – even for invalidity purposes.  (D.I. 1387, 3/7/05 Tr. at 246:24-247:3; D.I. 1390, 3/10/05 Tr. at 1513:17-24.).

The rulings at trial were based on Cordis's repeated arguments that AVE's evidence was irrelevant to validity because Cordis allegedly would not rely on AVE's stents in support of secondary considerations of non-obviousness.  (D.I. 1336 at 2; D.I. 1345 at 2, 5; Attachment D, 2/28/05 e-mail from Balick to Court.)  Indeed, Cordis's counsel represented to the Court on March 4 that:

> [W]e are not relying our validity case on the secondary consideration of the success of the AVE stent which we otherwise could have.  We are not alleging that AVE is copying.

(D.I. 1386, 3/4/05 Tr. at 216:9-13.)

Incredibly, Cordis's counsel reneged on this representation right in his opening, where he argued that the success of the "entire industry" is due to the Palmaz invention:

- "Probably everyone in this courtroom has a friend, a relative, or even one's self who has been treated with a stent to overcome the problems of narrowing of the arteries.  The man who is responsible for that pioneering invention is Dr. Julio Palmaz."  (*Id.* at 119:21-120:3.)

- "The *entire industry* has been created based on the work of Dr. Julio Palmaz.  There are dozens of stent designs.  They get better all the time. It's a very, very exciting field.  Thousands of people work in it.  Millions of patients benefit from it, *all because of Dr. Palmaz's ideas*.  The defendant, *AVE, is using those ideas* without permission."  (*Id.* at 129:1-10.)

- Before Dr. Palmaz, "there weren't any stents, there weren't any balloon expandable stents . . . ."  (*Id.* at 126:18-127:4.)

- "Dr. Palmaz is the man who invented the balloon expandable stent.  Dr. Palmaz has won praise and acclaim from his colleagues. . . .  Dr. Palmaz and

Dr. Schatz created an industry . . . ." (*Id.* at 145:4-24.)

Cordis's counsel also made these arguments after it represented to the Court that "it does not intend to rely on arguments concerning the 'essence of the invention.'" (D.I. 1300, Tab 5 at 2.) But again, that is precisely what Cordis did. It ignored the claims and focused on Palmaz's "balloon expandable stent" (*i.e.*, the "essence") – a feature not even recited in three of the five asserted claims. (*See, e.g.*, D.I. 1386, 3/4/05 Tr. at 119:16-20, 120:7-8, 121:24-122:3, 126:18-127:4, 128:18-20; 132:24-133:5, 144:20-145:14; *cf.* PX-3 claim 23; PX-6, claims 1 and 3.)

Despite Cordis's continued representations to the Court on February 7, February 28 and March 4, that it would not rely on the success of the AVE stents or copying, these arguments continued. (D.I. 1336 at 2; D.I. 1345 at 2, 5; Attachment D, 2/28/05 e-mail from Balick to Court; D.I. 1386, 3/4/05 Tr. at 216:9-13.) Cordis argued that Palmaz invented the balloon expandable stent, that this stent became the "gold standard," that no stents until the drug-eluting stents were proven superior in efficacy or safety to the Palmaz-Schatz commercial stent, that entire handbooks on coronary stents are based on the Palmaz design, and that the entire industry adopted Palmaz's balloon expandable stent design. (D.I. 1387, 3/7/05 Tr. at 276:14-277:2, 284:16-19, 290:4-6; D.I. 1388, 3/8/05 Tr. at 664:15-16, 665:12-23, 667:8-18, 669:18-24, 732:20-733:7, 734:5-735:4, 738:14-21.)

During closing arguments, Cordis counsel repeated the same arguments, stating:

- "So when you hear about the *commercial success* of Cordis' Cipher stent, or Cordis' BX Velocity stent or Cordis' Palmaz-Schatz stent from the beginning, those are capturing these three ideas, longitudinally slotted stent. And indeed *an entire industry is built upon it*, 98 percent of the coronary stents in the country." (D.I. 1391, 3/11/05 Tr. at 1866:12-20.)

- "The balloon-expandable stent has transformed the practice of cardiology with 98 percent of them being the longitudinal design captured in Claim 23." (*Id.* at 1867:11-15.)

The only possible relevance these arguments have is to "secondary considerations" (*i.e.*, "objective indicia/evidence") of non-obviousness. But for secondary considerations to be given weight, Cordis had the burden of demonstrating a nexus between the considerations and the claims. *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999); *see also Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed. Cir. 1984) (nexus between "the claimed invention and the evidence of secondary considerations is required"). AVE, in turn, is permitted to refute any nexus by demonstrating that secondary considerations are due to factors extraneous to the patent – for example, due to "*superior workmanship*." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988).

Yet AVE was effectively prevented from disputing Cordis's blanket assertions of a nexus. *Cf. Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983) (patentee's argument that the "entire industry" practices the invention is not entitled to weight because of a lack of a nexus). Dr. Heuser, AVE's expert cardiologist, was not permitted to testify the variably thick crowns of AVE's stents were the reason for AVE's clinical success. (D.I. 1390, 3/10/05 Tr. at 1513:17-1514:2.) AVE was not permitted to compare the Palmaz commercial stents to the AVE stents to demonstrate that certain features not patented in the Cordis patents contributed to AVE's success or to rebut Cordis's allegations that its stent was the "gold standard." (D.I. 1337 at 7-9, sections 4(h)-(k), 4(m); D.I. 1387, 3/7/05 Tr. at 246:24-247:3 and 229:12-231:24.) AVE was not permitted to rely on its patents to demonstrate that the success and praise for its products was due to the proprietary, patented features in its stents. (D.I. 1337 at 8-9,

section 4(l).)  *Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1334 (Fed. Cir. 1998) (upholding district court determination that no nexus because success attributable mostly to prior art patent).  AVE also was not permitted to use its patents to rebut Cordis's argument that "no one thought" stents "were going to work" until 1994.  (D.I. 1391, 3/11/05 Tr. at 1876:1-8.)  AVE was not able to raise concerns about the safety of the Palmaz-Schatz stent to rebut Cordis's argument that no stent (other than drug eluting) was found to be safer or more effective.

In short, the Court permitted Cordis to make sweeping statements about the "entire stent" industry and about how no stent was ever proven to be superior without fear of rebuke.

Cordis provided its sole justification for making the misleading representations in its May 6 brief:

> Cordis' assertion that Dr. Palmaz created the stent industry is *not* an assertion that all stents practice his patent.  Rather, it is a legitimate secondary consideration reflecting praise for, and acceptance of, Dr. Palmaz's invention.

(D.I. 1345 at 4-5 (emphasis in original).)  This is yet another misdirection, however, because first, in its closing, Cordis clearly argued that the success of the "entire industry" is due to the Cordis patents.  In the context of claim 23 of the '762 patent, Cordis's counsel stated:

> So when you hear about the *commercial success* of Cordis' Cipher stent, or Cordis' BX Velocity stent or Cordis' Palmaz-Schatz stent from the beginning, those are capturing these three ideas, longitudinally slotted stent.
>
> And indeed *an entire industry is built upon it*, 98 percent of the coronary stents in the country.

(D.I. 1391, 3/11/05 Tr. at 1866:12-20.)

Cordis repeated the argument just a few moments later:

> The balloon-expandable stent has transformed the practice
> of cardiology with 98 percent of them being the
> longitudinal design captured in Claim 23.

(*Id.* at 1867:11-15.)  Indeed, Cordis contended prior to trial that the fact that the "'762 patent gave rise to an entire industry" was related to commercial success.  (D.I. 1300, Tab 6 at 1.)  Moreover, if, as Cordis contends, its argument "that Dr. Palmaz created the stent industry is *not* an assertion that all stents practice his patent," then the assertion is entirely irrelevant.  It is only if the later stents practice the patents that there is a nexus.

Second, even if Cordis's "entire industry" argument were to relate to "praise for" Dr. Palmaz's invention and not to commercial success, Cordis must still establish a nexus.  A nexus is required for all categories of secondary considerations:

> Objective evidence of nonobviousness may include
> commercial success, long-felt but unsolved need, and
> licenses showing industry respect. . . . .  The patentee bears
> the burden of showing that a nexus exists between the
> claimed features of the invention and the objective
> evidence offered to show non-obviousness.

*WMS Gaming*, 184 F.3d at 1359; *see also Simmons Fastener*, 739 F.2d at 1575 (nexus between "the claimed invention and the evidence of secondary considerations is required").  Therefore, even assuming that Cordis's "entire industry" argument  was relevant to the "praise" of Dr. Palmaz's "invention," AVE should have been permitted to explain that the praise was tied to features unrelated to the claimed inventions.[8]

---

[8]     AVE also should have been permitted to introduce its secondary considerations evidence for an additional reason.  Secondary considerations are relevant to both the nonobviousness *and obviousness* of the claims.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) ("secondary considerations"  are relevant "indicia of *obviousness or nonobviousness*").  *But see Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 960 (Fed. Cir. 1986) (absence of secondary
(continued . . .)

In short, contrary to Cordis's representations to the Court, Cordis clearly relied on the AVE stents to prove:

- Commercial success (*e.g.*, the "entire industry" is built upon the Palmaz patents);

- Copying (*e.g.*, the "entire industry" adopted the design); and

- Praise for Dr. Palmaz's invention (*see, e.g.*, Cordis admission at D.I. 1345 at 4-5).

Cordis's repeated reliance on these arguments demonstrates their importance. By excluding some of AVE's most powerful evidence in rebuttal to these points, the Court allowed the jury to hear an entirely one-sided story. There can be no doubt that the exclusion of AVE's rebuttal evidence was prejudicial. *See Petree*, 887 F.2d at 41 (exclusion of evidence is "harmless only if it is highly probable that the error did not affect the outcome of the case"). The Court should order a new trial.

III. **A NEW TRIAL SHOULD BE GRANTED BECAUSE THE JURY'S INFRINGEMENT AND NON-OBVIOUSNESS VERDICTS ARE NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE**

A new trial also should be granted because the verdict is contrary to the great weight of the evidence, and the grant is necessary to prevent a miscarriage of justice. *See Roebuck v. Drexel Univ.*, 852 F.2d 715, 736 (3d Cir. 1988) (new trial should be granted if "the verdict is contrary to the great weight of the evidence, thus making a new trial necessary to prevent a miscarriage of justice").

_____

(. . . continued)

considerations is a neutral factor). Cordis cannot pick and choose which evidence is used.

The verdict of infringement is against the weight of evidence for at least the reasons detailed in AVE's Opening Brief in Support of Its Renewed Motion for Judgment as a Matter of Law (filed herewith). Moreover, a new trial on infringement is particularly needed here, where, as described above, Cordis relied upon numerous irrelevant and prejudicial arguments in support of its case. *Id.* at 737 (although evidence sufficient to preclude grant of JMOL, court affirms grant of new trial, "particularly given the substantial emphasis placed at trial on the arguments which we view as unsupportable").

The verdict of non-obviousness also is against the weight of the evidence. AVE presented a detailed obviousness analysis with respect to the '762 and '984 patents. (*See, e.g.*, D.I. 1389, 3/9/05 Tr. at 1209:11-1258:22 (Dr. Ersek); D.I. 1390, 3/10/05 Tr. at 1367:3-1384:8 & 1414:17-11425:11 (Dr. Piehler), at 1426:20-1474:22 (Dr. van Breda), at 1524:4-1566:3 & 1615:23-1620:24 (Dr. Heuser).) AVE's experts focused on the relevant obviousness inquiries – *e.g.*, the teachings in the prior art, a comparison of the claims to the prior art, the motivation to combine the prior art, and the alleged secondary considerations. (*Id.*).

In contrast, Cordis counsel's and single obviousness expert relied extensively on irrelevant arguments. As described above, they relied on the alleged fact that particular individuals or entities allegedly never personally thought of the claimed inventions; they questioned the motives of several persons based on purported evidence not of record; and they relied on the irrelevant fact of the upcoming expiration date of the '762 patent as a ploy to sway the jury in its favor. They also relied on alleged secondary considerations that are unconnected to the claimed inventions. Indeed, Cordis *never even*

*made* the three segment stent recited in claim 3 of the '984 patent.  (D.I. 1390, 3/10/05 Tr. at 1640:15-17.)   As described above, AVE was not permitted to effectively rebut many of these secondary considerations.

In sum, the jury verdict was based on irrelevant prejudicial arguments and evidence.  The great weight of the material evidence supports AVE.  A new trial should be granted.

CONCLUSION

For the foregoing reasons, AVE's motion for a new trial should conditionally be granted on non-infringement and invalidity.

MORRIS, NICHOLS, ARSHT & TUNNELL

/s/ *Karen Jacobs Louden*
Karen Jacobs Louden (#2881)
Leslie A. Polizoti (#4299)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899
(302) 658- 9200

*Attorneys for Medtronic Vascular, Inc.*

Of Counsel:

Raphael V. Lupo
Donna M. Tanguay
Mark G. Davis
D. Michael Underhill
Michael W. Connelly
McDERMOTT, WILL & EMERY
600 13th Street, NW
Washington, DC 20005
(202) 756-8000

461338

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on April 19, 2005 I electronically

filed the foregoing with the Clerk of the Court using CM/ECF which will send

notification of such filing to the following:

>Steven J. Balick
>**Ashby & Geddes**
>222 Delaware Ave., 17th Flr.
>P.O. Box 1150
>Wilmington, DE  19899

>Josy W. Ingersoll
>**Young, Conaway, Stargatt & Taylor LLP**
>1000 West Street, 17th Floor
>P.O. Box 391
>Wilmington, DE  19899

>MORRIS, NICHOLS, ARSHT & TUNNELL

>/s/Karen Jacobs Louden
>_____
>Karen Jacobs Louden (#2881)
>Leslie A. Polizoti (#4299)
>1201 North Market Street
>P.O. Box 1347
>Wilmington, Delaware  19899
>(302) 658-9200
>Attorneys for Medtronic Vascular, Inc.

>klouden@mnat.com