Westlaw.

Not Reported in F.Supp.2d
2004 WL 1622442 (D.Del.)
(Cite as: 2004 WL 1622442 (D.Del.))

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION and U.S. Philips Corporation,
Plaintiffs,
v.
CONTEC CORPORATION, Compo Micro Tech,
Inc., Seoby Electronics Co., Ltd., Remote
Solution Co., Ltd., F/K/A Hango Electronics Co.,
Ltd., Hango Remote Solution,
Inc., Defendants.
No. Civ.A. 02-123-KAJ.

July 12, 2004.

Richard L. Horwitz, Potter Anderson & Corroon
LLP, Wilmington, Delaware, for plaintiffs.

Julia Heaney, Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware, for defendant Compo Micro
Tech, Inc.

David L. Finger, Wilmington, Delaware, for
defendants Remote Solution Co., Ltd. f/k/a Hango
Electronics Co., Ltd. and Hango Remote Solution,
Inc.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

**\*1** Plaintiffs Philips Electronics North America
Corporation and U.S. Philips Corporation
(collectively, "Philips") and defendant is Compo
Micro Tech, Inc. ("CMT") are before me following
trial in this patent infringement case because they are
unable to agree on the form of judgment to be
entered. (*See* Docket Item ["D.I."] 430.) As set forth
below, this opinion addresses six disputed issues .
[FN1]

FN1. Even though the parties proceeded by
way of informal letter briefing on these

issues, I will address them as being Philips'
various motions, as Philips initially raised
the issues with the court. (*See* D.I. 430.)

II. BACKGROUND

Philips filed an action on February 12, 2002, alleging
that Contec Corporation ("Contec") was infringing
U.S. Patent Nos. 4,703,359 ("the '359 patent") and
5,872,562 ("the '562 patent"), both owned by Philips.
(D.I.1.) On September 17, 2002, Philips filed an
amended complaint joining CMT, Seoby Electronics
Co., Ltd. ("Seoby"), Remote Solution Co., Ltd. f/k/a
Hango Electronics Co., Ltd. ("Remote Solution") and
Hango Remote Solution, Inc. ("Hango"). (D.I.41, 42.)
Defendants Contec and Seoby Electronics
submitted to a Consent Judgment on
August 28, 2003. (D.I.258.) CMT's Motion to Sever
Remote Solution and Hango and for Separate Trials
was granted on March 12, 2004. [FN2] (D.I.352,
353.) As a result, only Philips and CMT proceeded to
trial on April 12, 2004.

FN2. Philips, Remote Solution, and Hango
are currently on track to try their case
sometime in the Spring of 2005.

The technology disclosed in the '359 and '562
patents is directed to remote control units, commonly
known as "universal" remote controls, for controlling
various home appliances from different
manufacturers. *See* '359 patent, col. 1, lns. 15-17;
'562 patent, col. 1, lns. 13-16 (attached to D.I. as Exs.
A and B). The '359 patent discloses methods and an
apparatus for a remote control that stores multiple
signal structures for different appliances and uses a
search or scanning method to identify the proper
signal structure for a particular appliance. *Philips
Elecs. N. Am. Corp. v. Contec Corp.,* 312 F.Supp.2d
592, 595 (D.Del.2004) (claim construction). The '562
patent discloses methods and an apparatus for a
remote control that stores multiple signal structures
for different appliances and uses a direct entry
method to identify the proper signal structure for a
particular appliance. *Id.*

Before trial, CMT's motion for summary judgment
of invalidity of the '359 and '562 patents was denied,
see *Philips Elecs. N. Am. Corp. v. Contec Corp.,* 312
F.Supp.2d 632 (D.Del.2004); Philips' motion for
summary judgment of infringement was granted to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1622442 (D.Del.)
(Cite as: 2004 WL 1622442 (D.Del.))

Page 2

the extent that CMT was found to be literally infringing claims 1, 3, and 4 of the '359 patent, *see Philips Elecs. N. Am. Corp. v. Contec Corp.,* 312 F.Supp.2d 642 (D.Del.2004); CMT's motion for summary judgment of noninfringement was granted to the extent that it was found to be not infringing, literally or under the doctrine of equivalents, the asserted claims of the '562 patent, *see id.;* and CMT's motion to limit Philips' damages for failure to mark its remote controls was granted to the extent that Philips' damages were limited to those accruing after September 19, 2002; *see Philips Elecs. N. Am. Corp. v. Contec Corp.,* 312 F.Supp.2d 649 (D.Del.2004). After a six day trial, the jury returned a verdict in favor of Philips, awarding it a $1.00 royalty per remote control sold by CMT that embodied the scan programming method claimed by the '359 patent. (*See* D.I. 419.)

III. DISCUSSION

*2 With respect to the form of judgment to be entered in this case, the parties disagree about the following issues: (1) the award of interest on the judgment amount; (2) whether CMT should pay the award by certified check; (3) whether Philips is entitled to an accounting and audit of CMT's infringing sales in 2004; (4) how to define the infringing remote control units covered by a proposed injunction; (5) whether CMT should be required to maintain books and records; and (6) the award of costs. (D.I.430.) I will address each of those issues in turn.

1. *The Award of Interest on the Judgment Amount*

Philips is seeking prejudgment and postjudgment interest, pursuant to 35 U.S.C. § 284 [FN3] and 28 U.S.C. § 1961, [FN4] respectively, on damages suffered through the date of payment. (D.I. 431 at 1.) Philips argues that it is entitled to a prejudgment interest rate based on the prime rate, compounded annually. (*Id.* at 2.) While agreeing with annual compounding, CMT says that, if prejudgment interest is awarded, I should apply the U.S. Treasury Bill rate, as opposed to the prime rate. (D.I. 432 at 5; D.I. 434 at 1-2.)

FN3. Title 35 of the United States Code, section 284, provides, in relevant part: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the

infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284 (2004).

FN4. Title 28 of the United States Code, section 1961, provides, in relevant part: "Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.... Interest shall be computed daily to the date of payment ... and shall be compounded annually." 28 U.S.C. § 1961 (2004).

Prejudgment interest is ordinarily awarded in patent infringement cases when it is necessary to fully compensate patent owners for losses resulting from infringement. *See General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655-57 (1983). CMT has not demonstrated that Philips should be denied prejudgment interest. *See IPPV Enterprises, LLC v. Echostar Communications Corp.,* 2003 WL 72260 at *3 (D.Del. Feb. 27, 2003) CMT mentions that prejudgment interest may be denied when the patent owner has delayed in bringing suit, but CMT does not argue that Philips did so. (D.I. 432 at 5.) As a threshold matter, I find that Philips is entitled to an award of prejudgment interest in this case.

"The Federal Circuit has given district courts great discretion" when determining the applicable interest rate for an award of prejudgment interest. *IPPV Enterprises,* 2003 WL 72260 at *3 (citation omitted). As Philips points out, courts sometimes apply a prejudgment interest rate based on the prime rate, to account for the cost of borrowing money. (D.I. 431 at 2 (citing *TA Instruments, Inc. v. Perkin-Elmer Corp.,* 277 F.Supp.2d 367, 380-81 (D.Del.2003) (other citations omitted)). However, as noted by CMT, courts may also apply the Treasury Bill rate set forth in the statute authorizing postjudgment interest, 28 U.S.C. § 1961. (D.I. 432 at 5 (citing *Laitram Corp. v. NEC Corp.,* 115 F.3d 947, 955 (Fed.Cir.1997) (other citations omitted)).

CMT argues that Philips has not come forward with any proof that it is entitled to prejudgment interest at the prime rate. (D.I. 432 at 5.) However, "[t]he Federal Circuit has made it clear that a patentee need not 'demonstrate that it borrowed at the prime rate in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1622442 (D.Del.)
(Cite as: 2004 WL 1622442 (D.Del.))

order to be entitled to prejudgment interest at that rate." ' *Phillips Petroleum Co. v. Rexene Corp.,* 1997 WL 781856 at *28 (D. Del Sept. 4, 1997 (quoting *Uniroyal, Inc. v. Rudkin-Wiley Corp.,* 939 F.2d 1540, 1545 (Fed.Cir.1991)). The basis for applying the prime rate is that it represents the cost of borrowing money and, "[t]he cost of borrowing money--and not the rate of return on investing money--provides a better measure of the harm plaintiff suffered as a result of the loss of the use of money over time." *IPPV Enterprises,* 2003 WL 72260 at *3. I am satisfied that the appropriate prejudgment interest rate should be the Federal Reserve average prime rate, compounded annually, as set forth in the Declaration of Kerry Ruoff, Philips' damages expert. (*See* D.I. 431 at 2 and Ex. D.) Philips' motion for prejudgment interest will be granted, and Philips will be permitted to update Ms. Ruoff's calculations to reflect prejudgment interest as of the date of judgment.

*3 Philips also asserts, and CMT does not dispute, that postjudgment interest is granted as a matter of right, pursuant to 28 U.S.C. § 1961. (D.I. 431 at 2.) Therefore, Philips motion for postjudgment interest will be granted. The postjudgment interest will be calculated from the date of judgment, using the formula set forth in the statute. *See* 28 U.S.C. § 1961.

### 2. Requirement that CMT Pay by Certified Check

Philips proposes that CMT be required to pay the award by certified check immediately upon the expiration of any stay entered pursuant to Federal Rule of Civil Procedure 62(b). (*See* D.I. 430, Ex. A at 2-3.) Philips argues that this requirement is necessary in order to make sure that the judgment is enforced, particularly "[i]n view of the informal way in which Mr. Park [FN5] runs his corporations and keeps his financial records," a subject which was addressed in testimony at trial. (D.I. 431 at 3.) CMT says that Philips has not come forward with any authority to support its position that CMT pay the judgment by certified check and within a certain period of time. (D.I. 434 at 2.) In response, Philips asserts that, were I to issue a stay of the judgment pending the disposition of post-trial motions, CMT should be required to post a bond for the amount of the judgment. (*See* D.I. 432 at 7; D.I. 433 at 8.)

> FN5. Mr. Park is the president of CMT and testified at length about his business operations during the trial.

CMT has requested that any enforcement of the judgment be stayed pending the disposition of its post-trial motions, indicating that it intends to renew its motion for judgment as a matter of law on invalidity of the '359 patent and to move for judgment as a matter of law on certain issues raised during the trial. (*See* D.I. 432 at 7.) Therefore, pursuant to Federal Rule of Civil Procedure 62(b), [FN6] CMT's motion to stay enforcement of the judgment pending the disposition of post-trial motions will be granted. CMT will be required to post a bond in the amount of the judgment, as updated with Philips' calculations of prejudgment interest, within thirty days from the date of this opinion. Philips' motion to require CMT to pay the judgment by certified check will be denied.

> FN6. "In its discretion and on such conditions for the security of the adverse party as are proper, the court may stay the execution of or any proceedings to enforce a judgment pending the disposition of [certain post-trial motions]...." Fed.R.Civ.P. 62(b) (2004).

### 3. Accounting and Audit of 2004 Infringing Sales

Philips argues that it is entitled to an accounting and audit of CMT's remote control sales in 2004, because Mr. Park testified at trial that CMT continued to sell infringing products after December 31, 2003. (D.I. 431 at 3.) Philips also requests that I order CMT to pay royalties of $1.00 on its sales of infringing products made after that date. (*Id.*) In response, CMT says that Philips did not request an accounting in its Complaint or its Amended Complaint, nor did CMT agree to a post-trial accounting of sales beyond the sales presented at trial. (D.I. 432 at 6.) CMT also points out that "[t]he only quantity of infringing sales Philips put before the jury for which damages were sought was the 5,793,879 units sold through December 31, 2003" and that Philips should not be permitted to recapture, through an accounting, that which it could have but failed to establish at trial. (D.I. 434 at 3.)

*4 I am persuaded by CMT's argument, which is supported by this court's opinion in *Tristrata Tech., Inc. v. ICN Pharmaceuticals, Inc.,* 2004 WL 769357 at *2 (D.Del. Apr. 7, 2004). In *Tristrata,* the plaintiff "put directly before the jury, and ... the jury deliberated and decided, the question of the amount of ... sales [of the infringing product]." 2004 WL 769357 at *2. Because the plaintiff intended to have the jury decide, and the jury so decided, the amount

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1622442 (D.Del.)
(Cite as: 2004 WL 1622442 (D.Del.))

Page 4

of sales, the plaintiff's motion for a post-verdict accounting was denied. *Id.* In this case, Philips went one step further than the plaintiff in *Tristrata* by stipulating to the exact number of infringing units sold (here, 5,793,879) and then asking the jury to determine a reasonable royalty based on that specific number of units. Based on that, I conclude that Philips was seeking "a final determination on the issue" of royalties, *see id.,* and, now that a verdict has been rendered, Philips is not entitled to revisit the issue and obtain an accounting of CMT's 2004 sales. Philips' motion for a post-verdict accounting will be denied.

### 4. *Definition of Infringing Units Contained in the Injunction*

Philips' proposed judgment enjoins CMT from making, using, offering for sale, selling, licensing, importing, distributing, servicing or repairing "any product that incorporates or that is programmed by a method that falls within the admitted or adjudicated scope of Claims 1, 3 and 4 of the '359 patent" which CMT was found to infringe. (D.I. 431 at 4.) CMT argues that it may continue to sell remote control units that may incorporate or be programmed according to the scan method claimed by the '359 patent, so long as it does not sell the remote controls with instruction manuals or other directions referring to the scan programming method. (*Id.;* D.I. 434 at 4.)

Essentially, CMT argues that its remote controls are not infringing the '359 patent, even though they embody the scan method of programming claimed by the '359 patent, because (1) consumers are no longer instructed on how to employ the scan method of programming and (2) the remote controls also embody the noninfringing direct entry method of programming. (D.I. 434 at 4-5.) CMT further argues that it is sufficient for it to remove any reference to the scan programming method from its instruction manuals, rather than actually removing the method itself from its remote controls. (*Id.*)

CMT's arguments are not well founded, since [a]dditional functions in a device that practices a patented method does not diminish direct infringement and, therefore, the fact that the device sold has other functions which are performed simultaneously with the patented method does not otherwise substantiate a noninfringing use for the purposes of § 271(c). This rule flows directly from the logic of the patent laws. To hold to the contrary would allow sellers of products that are clearly intended to infringe a patented method to avert

liability simply by adding functions to that device.

*5 *Imagexpo, L.L.C. v. Microsoft Corp.,* 284 F.Supp.2d 365, 368 (E.D.Va.2003) (quoting *Oak Industries, Inc. v. Zenith Electronics Corp.,* 697 F.Supp. 988, 995 (N.D.Ill.1988)). Here, there is no question that CMT's remote controls embody the scan programming method claimed by the '359 patent. The fact that the remote controls also employ the direct entry method of programming does not ameliorate the fact that they also embody an infringing method of programming, whether consumers are instructed or know how to use it or not. Furthermore, Mr. Park testified at trial that, technically, removing the scan programming method from its remote control units was "very simple" and that his "engineer says it takes one day at the most to make that change." (D.I. 433 at 2 (citing Trial Transcript ["Tr."] at 707).) CMT's technical expert testified that changing CMT's remote controls to remove scan programming "can [be] easily implement[ed]" without "additional costs" beyond software changes. [FN7] (*Id.* (citing Tr. at 1082-83).)

> FN7. CMT now asserts that modifying the remote controls "takes a significant period of time to accomplish." (D.I. 432 at 3.) Because this bald statement is contrary to Mr. Park's and the technical expert's sworn trial testimony, I give it little weight.

Under the facts of this case, I find that it is appropriate for CMT to remove the infringing scan programming method from its remote controls, and it will be ordered to do so. The scope of Philips' proposed injunction is therefore appropriate for the final form of judgment. (*See* D.I. 430, Ex A. at 3.)

### 5. *Requirement That CMT Maintain Books and Records*

Philips requests that CMT maintain sufficient books and records to allow Philips to determine whether CMT is in compliance with the judgment. (D.I. 431 at 6.) This, says Philips, is particularly appropriate in this case, given that Mr. Park testified that he kept "sloppy" records in the course of his business and did "not maintain tabs on how much I make monthly or a quarterly basis." (*Id.* at 6-7 (citing Tr. at 545-46).) CMT's asserts that such a requirement would place it "in the untenable position of having to maintain books and records in a form it may not ordinarily maintain them." (*See* D.I. 432 at 5-6.)

CMT's argument is undermined by Mr. Park's trial testimony, when he said that CMT "installed a new

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1622442 (D.Del.)
(Cite as: 2004 WL 1622442 (D.Del.))

computer system" to assist in record keeping. (Tr. at 539, 548.) As I stated during a discussion with counsel at trial, I find it hard to believe that a company like CMT, which generates $25 million in gross sales annually, does not maintain a set of books and records from which it calculates profits and other financial data. (See Tr. at 784.) Be that as it may, CMT's new computer system should make it possible to maintain sufficient records to ensure compliance with the injunction. In order to effectuate the injunction, CMT will be required to maintain such records.

### 6. Award of Costs

Philips requests an award for the costs of litigating the '359 patent, pursuant to Federal Rule of Civil Procedure 54(d)(1) [FN8] and 35 U.S.C. § 284 [FN9] as the prevailing party in this lawsuit. (D .I. 431 at 7.) CMT argues that Philips is not entitled to costs because CMT, and not Philips, is the prevailing party in this lawsuit. (D.I. 434 at 6.) In support of this argument, CMT asserts that Philips was awarded $8 million less than it actually sought in damages at trial and certain of CMT's motions for summary judgment were granted, including its motion to limit Philips' damages. (Id.) CMT argues that it prevailed on a majority of issues and should be entitled to recover costs, or alternatively, that this case ended in a draw, and neither party is entitled to recover costs. (Id. at 7; D.I. 432 at 4.)

> FN8. "... [C]osts other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs...." Fed.R.Civ.P. 54(d)(1) (2004).

> FN9. See supra, n. 3.

*6 A party prevails "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." Manildra Milling Corp. v. Ogilvie Mills, Inc., 76 F.3d 1178, 1182 (Fed.Cir.1996) (citation omitted). "A prevailing party is the party which, although it might not sustain all of its claims, receives a favorable judgment." Devex Corp. v. General Motors Corp., 494 F.Supp. 1369, 1390 (D.Del.1980), aff'd, 667 F.2d 347 (3d Cir.1981). Looking at this case as a whole, see E.I. duPont de Nemours & Co. v. Monsanto Corp., 1997 WL 361615 at *1 (D.Del. Feb. 20, 1997), I find that Philips is the prevailing party in this case. Not only did Philips receive a favorable jury verdict of a $1.00 royalty per infringing remote

control unit, but the outcome of the trial has materially altered the legal relationship between Philips and CMT. As previously discussed, CMT will be enjoined from selling any remote control units that embody the scan programming method claimed by the '359 patent, which results in a direct benefit to Philips. For these reasons, Philips is entitled to an award of costs, and should follow the appropriate procedure for filing a bill of costs in this district. See D. Del. L.R. 54.1; see also 28 U.S.C. § 1821.

### IV. CONCLUSION

For the reasons set forth, Philips' motion for an award of prejudgment and postjudgment interest will be granted; Philips' motion that CMT be required to pay the amount of the judgment by certified check will be denied; Philips' motion for a post-verdict accounting will be denied; Philips' motion for an injunction to prevent CMT from making, using, offering for sale, selling, licensing, importing, distributing, servicing or repairing any product that incorporates or that is programmed by a method that falls within the admitted or adjudicated scope of claims 1, 3, and 4 of the '359 patent will be granted; Philips' motion to require CMT to maintain books and records will be granted; and Philips' motion for an award of costs will be granted.

An appropriate order will issue.

### ORDER

For the reasons set forth in the Memorandum Opinion issued today, it is hereby ORDERED that:
1. Philips' motion for an award of prejudgment interest is GRANTED. Philips shall update its calculation of the prejudgment interest according to the Federal Reserve average prime rate, compounded annually, as of the date of judgment. Philips' motion for an award of postjudgment interest is also GRANTED, to be calculated in the manner set forth in 28 U.S.C. § 1961.
2. Pursuant to Federal Rule of Civil Procedure 62(b), CMT's motion to stay enforcement of the judgment pending the disposition of post-trial motions is GRANTED. CMT is ORDERED to post a bond in the amount of the judgment, as updated with Philips' calculations of prejudgment interest, within thirty days from the date of this Order. Philips' motion to require CMT to pay the amount of the judgment by certified check is DENIED.
*7 3. Philips' motion for a post-verdict accounting is DENIED.
4. Philips' motion for an injunction to prevent CMT from making, using, offering for sale, selling,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1622442 (D.Del.)
(Cite as: 2004 WL 1622442 (D.Del.))

licensing, importing, distributing, servicing or repairing any product that incorporates or that is programmed by a method that falls within the admitted or adjudicated scope of claims 1, 3, and 4 of the '359 patent is GRANTED. CMT is ORDERED to remove the infringing scan programming method from its remote controls.

5. Philips' motion to require CMT to maintain books and records to ensure CMT's compliance with the injunction is GRANTED in that CMT shall maintain such sufficient records to permit verification that it has complied with the injunction; and

6. Philips' motion for an award of costs is GRANTED.

7. The parties are ORDERED to submit to the court a final form of judgment that complies with the conclusions reached in this opinion and order no later than July 26, 2004.

2004 WL 1622442 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

- 1:02CV00123                    (Docket)
(Feb. 12, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
2004 WL 1305849 (D.Del.)
(Cite as: 2004 WL 1305849 (D.Del.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
UNION CARBIDE CHEMS. & PLASTICS TECH.
CORP. and Union Carbide Corp.,
Plaintiffs, Counter-Defendants,
v.
SHELL OIL CO., Shell Chemical Co., and CRI
Catalyst Co., Defendants, Counter-
Plaintiffs.
SHELL OIL CO., Plaintiff,
v.
UNION CARBIDE CHEMS. & PLASTICS TECH.
CORP. and Union Carbide Corp.,
Defendants.
No. Civ. 99-CV-274-SLR, Civ. 99-846-SLR.

June 9, 2004.

Jeffrey B. Bove, Connolly, Bove, Lodge & Hutz,
Wilmington, DE, for Plaintiffs/Counter-Defendants.

Allen M. Terrell, Jr., Jeffrey L. Moyer, Richards,
Layton & Finger, Wilmington, DE, for
Defendants/Counter-Plaintiffs.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On May 3, 1999 plaintiffs Union Carbide
Chemicals & Plastics Technology Corporation
("UCC/PTC") and Union Carbide Corporation
("UCC" and collectively "Union Carbide") [FN1]
filed this action against defendants Shell Oil
Company, Shell Chemical Company, and CRI
Catalyst Company (collectively "Shell"), alleging
infringement of three United States patents owned by
plaintiff. [FN2] In early 2001, the case was tried by a
jury who found in favor of defendants on the issues
of infringement and invalidity. Following the verdict,
the court considered numerous motions by the parties
for judgment as a matter of law. Union Carbide v.
Shell Oil Co., 163 F.Supp.2d 426 (D.Del.2001). The
case was subsequently appealed and, in November
2002, the United States Court of Appeals for the

Federal Circuit affirmed in part and reversed in part
the judgment and remanded the case for further
proceedings. Union Carbide Chemicals & Plastics
Tech. Corp. v. Shell Oil Co., 308 F.3d 1167
(Fed.Cir.2002).

> FN1. The court notes that all parties in their
> briefs, evidence, and arguments have largely
> treated the two plaintiffs and the two
> defendants as single entities. Consequently,
> except in the court's discussion of damages
> where the separate corporate existence is
> relevant, the court will similarly not
> distinguish.

> FN2. U.S. Patent No. 4,908,343 ("the '343
> patent"); U.S. Patent No. 4,916,243 ("the
> '243 patent"); and U.S. Patent No. 5,057,481
> ("the '481 patent").

Between October 27 and November 3, 2003, a jury
trial was held on the remanded issues. Submitted to
the jury were Union Carbide's claims that Shell
infringed claim 4 of the '243 patent and Shell's
affirmative defenses of invalidity. The jury returned a
verdict finding that Shell directly infringed claim 4
when it used its S-880 and S-882 catalysts in the
production of ethylene oxide ("EO"). The jury also
found that Shell's subsidiary, CRI, contributorily
infringed claim 4 by selling to third parties Shell's S-
863, S-880 and S-882 catalysts. The jury found that
claim 4 was not invalid due to non-enablement,
anticipation by prior art, or obviousness in light of
the prior art. Finally, the jury awarded damages in the
amount of $112,198,893. Presently before the court
are the parties' twenty-four post-trial motions, as well
as the court's findings of fact and conclusions of law
with respect to Shell's equitable defenses of laches
and estoppel.

II. BACKGROUND

A. The Patent-in-Suit and Asserted Claim

The '243 patent is the only patent remaining in the
present case. The '243 patent was a continuation of
prior U.S. application Ser. No. 763,273 filed August
7, 1985, which was a continuation of application Ser.
No. 497,231 filed May 23, 1983, now abandoned,
which was a continuation of application Ser. No.
116,292 filed February 13, 1980, now abandoned,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 2
2004 WL 1305849 (D.Del.)
(Cite as: 2004 WL 1305849 (D.Del.))

which was a continuation-in-part of Ser. No. 021,727 filed March 20, 1979, now abandoned. As described in the specification, the '243 patent comprises a process for the commercial production of EO with a supported silver catalyst containing

> a combination of (a) cesium and (b) at least one other alkali metal selected from the group consisting of lithium, sodium, potassium and rubidium, wherein (a) and (b) are present in amounts in relation to the amount of silver therein sufficient to increase the efficiency of the ethylene oxide manufacture to a value greater than the efficiencies obtainable under common operating conditions from respective catalysts which are the same as said catalyst except that instead of containing both (a) and (b), one contains the respective amount of (a), and the other contains the respective amount of (b).

*2 ('243 patent, col. 1, 11. 19-28) In short, this patent is directed to improved silver catalysts for the production of EO. EO is a chemical intermediate product, meaning it is a compound primarily used in the production of other chemical products. (D.I. 624 at 199-200) In the case of EO, it is a gas used in the production of ethylene glycol which is subsequently used in the production of synthetic substances such as polyester fiber, resin and film, and it is created when ethylene reacts with oxygen. [FN3] (Id. at 200-204)

> FN3. While ethylene glycol has more than one form, it is most commonly and profitably used in monoethylene glycol ("MEG"). Approximately 7.2 billion pounds of EO are produced each year, most of which is converted into MEG. Union Carbide and its parent corporation, Dow Chemical, produces approximately 1.4 billion pounds or twenty-five percent of the annual MEG domestic market. The average price of MEG is approximately $0.25 per pound although that price is not stable. MEG sales are a growth market with about six percent annual domestic growth. (D.I. 624 at 204-08) As MEG is a fungible commodity, there is incentive for MEG manufacturers to reduce their cost structures. (D.I. 626 at 606-09)

EO is produced through a highly exothermic reaction between ethylene and oxygen. [FN4] This process also results in the production of water and carbon dioxide. It is known in the art, however, that if certain catalysts, such as the one claimed in the patent, are present during this process, a lower reaction temperature may be employed. [FN5] A lower

reaction temperature reduces the amount of oxygen and water byproducts and results in greater production efficiency. Production efficiency, sometimes referred to as "selectivity", is defined by the percentage of ethylene that is converted to EO. (D.I. 624 at 245)

> FN4. In the case of the EO production process described in the '243 patent, the temperature range is from 200 to 300 degrees celsius. ('243 patent, col. 29, ln. 56)

> FN5. A catalyst is a chemical that increases the rate of a chemical reaction without being consumed or altered. (D.I. 625 at 241-42, 381)

It was understood in the prior art that one such catalyst that enhances reaction efficiency is silver. Prior to 1971, EO reaction efficiencies using silver as a catalyst had an efficiency of no greater than 65 percent. In 1971, a Shell scientist determined that small amounts of alkali metals had a promotional effect on silver-catalyzed EO reactions. These alkali metals when present in catalyzed EO reactions are referred to as "promoters." [FN6] ('243 patent, col. 3, 11. 43-61) In particular, it was learned that cesium when properly optimized could achieve an efficiency in the range of seventy-eight to eighty-two percent. (D.I. 625 at 304-06)

> FN6. These promoters are not themselves catalysts but act both to increase the efficiency of the reaction and to prolong the life span of the catalyst itself. It is also understood in the art that certain materials function as "inhibitors" in the EO reaction process by serving to reduce the amount of carbon dioxide produced. (D.I. 624 at 245-46; '243 patent, col. 3, ln. 30--col. 4, ln. 47)

The '243 patent claims a process in which silver, cesium and at least one other alkali metal are combined to produce a synergistic effect, this synergistic effect being that the catalytic reaction efficiency is greater with the three materials present than with only silver and either cesium or one other alkali metal. ('243, col. 8, 11. 11-30; D.I. 625 at 270)

Claim 4, which is dependent on claim 1, is the only claim at issue in the case before the court and concerns a catalytic process in which silver, cesium and lithium are present. It claims:

> 1. In the continuous process for the production of ethylene oxide by the vapor phase oxidation of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1305849 (D.Del.)
**(Cite as: 2004 WL 1305849 (D.Del.))**

ethylene with molecular oxygen provided as an oxygen-containing gas at a temperature of from about 200 C. to 300 C. in the presence of at least about one mole percent of carbon dioxide and an organic chloride in the gaseous feed stream and in the presence of a supported, silver-containing catalyst in a fixed bed, tubular reactor used in commercial operations to form ethylene oxide, wherein said supported, silver-containing catalyst contains 2 to 20 weight percent silver deposited on a support which is in a form and size for use in the reactor, wherein (i) the specific reaction conditions of the ethylene oxide process; (ii) the specific catalyst support characteristics and (iii) the specific silver deposition method comprise an ethylene oxide production system, the improvement in which the catalyst comprises silver deposited on an alpha-alumina macroporous support in a first amount having a surface area less than 10 m2/g and contains a combination of (a) cesium in a second amount and (b) at least one other alkali metal selected from the group consisting of lithium, sodium, potassium and rubidium in a third amount, which combination comprises (a) and (b) in amounts in relation to the amount of silver in the catalyst sufficient to provide an efficiency of ethylene oxide manufacture that is greater than the efficiencies obtainable in the same ethylene oxide production system, including the same conversions, than (i) a second catalyst containing silver in the first amount and cesium in the second amount, and (ii) a third catalyst containing silver in the first amount and the alkali metal in the third amount, wherein the combination of silver, cesium and alkali metal in said catalyst is characterizable by an efficiency equation:

$$\text{efficiency } \% = b_0 + b_1(BG) + b_2(BCs) + \sum_{1}^{4} b_{13j} BAj\% + b_4(BG)2 + b_5(BCs)2 + \sum_{1}^{4} b_{6j} BAj\,2 + b_7(BG \cdot BCs) + (BG)\sum_{1}^{4} b_{8j} BA_j + (BCs)\sum_{1}^{4} b_{9j} BA_j,$$

**\*3** where $BA_1 = BRb$,

$BA_2 = BK$,
$BA_3 = BNa$,
$BA_4 = BLi$, and where the coefficient $b_0$ through $b_{9j}$ and BG, BRb, BK, BNa, BLi and BCs are determined from a composite design set of experiments using the same ethylene oxide production system for the independent variables silver, cesium and alkali metal, and wherein BG is the difference of the average value of the silver content from the silver content used in the design set, BCs is the difference of the average value of the cesium content from the cesium content used in the design set ... and BLi is the difference of the average value of the lithium content from the lithium content used in the design set.

4. The process of claim 1 wherein said alkali metal is lithium.

('243 patent, col. 29, ln. 53--col. 30, ln. 54)

In summary, claim 4 has four basic limitations, each containing various requirements: [FN7] (1) an EO process operated at specific reaction conditions; [FN8] (2) the catalyst used in the EO process comprises silver in a first amount, cesium in a second amount, and lithium in a third amount; (3) the efficiency obtainable from the EO process using the catalyst is greater than the efficiency of a process using (a) a second catalyst containing silver in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1305849 (D.Del.)
(Cite as: 2004 WL 1305849 (D.Del.))

Page 4

the first amount and cesium in the second amount (but no lithium) and (b) a third catalyst containing silver in the first amount and lithium in the third amount (but no cesium), when operated in the same EO production system (the "comparison test"); and (4) the combination of silver, cesium and lithium is characterizable by the efficiency equation set fourth in claim 1 (the "characterizable test"). [FN9]

FN7. The court notes that while claim 4 is the only claim at issue, its limitations are substantially defined by claim 1. Consequently, throughout this memorandum the court's analysis frequently refers to claim 1.

FN8. The '243 patent lists ten specific commercial reaction conditions. (D.I. 625 at 410-13)

FN9. The characterizable test is an example of a statistical approach to comprehensive catalyst optimization. (D.I. 625 at 310; PTX 1079) Union Carbide's expert explained the efficiency equation as "a mathematical relationship between the amount of cesium and the amount of lithium that predicts the efficiency, correlates, actually, the change in efficiency with variations of cesium and lithium." (D.I. 625 at 419-20; '243 patent, col. 8 ln. 65--col. 9 ln. 5)

B. Federal Circuit's Claim Construction

The Federal Circuit describes the equation outlined in claim 1, upon which claim 4 depends, as "not a patented process for developing a synergistic catalyst but rather a descriptive tool that defines the scope of the patented invention: silver catalysts containing cesium and lithium in a combination that provides a synergistic, rather than an antagonistic or additive, effect." Union Carbide, 308 F.3d at 1178. Consequently, the Federal Circuit construed claim 1's limitation that the catalyst be "characterizable by an efficiency equation" to mean that "the claim limitation covers those catalysts that are described by the efficiency equation" or "capable of being described by an efficiency equation." Id. at 1178-79.

III. MOTIONS FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL.

Prior to submission of the case to the jury, Union Carbide and Shell each entered numerous motions, both oral and by written brief, for judgment as a matter of law. Where the jury's verdict was unfavorable, both parties have renewed post-trial their motions for judgment as a matter

of law. These motions include the following: (1) Shell's motion for judgment as a matter of law and alternative motion for new trial on Union Carbide's claim of direct infringement (D.I. 605; D.I. 647-1; D.I. 647-2); (2) Shell's motion for judgment as a matter of law and alternative motion for new trial on Union Carbide's claim of contributory infringement (D.I. 609; D.I. 645-1; D.I. 645-2); (3) Union Carbide's motion for judgment as a matter of law on wilfulness (D.I.662); (4) Shell's renewed motion for judgment as a matter of law and alternative motion for new trial on its invalidity defenses of anticipation and obviousness (D.I. 617; D.I. 651-1; D.I. 651-2); (5) Shell's motion for judgment as a matter of law and alterative motion for new trial on Shell's invalidity defense of indefiniteness (D.I. 611; D.I. 653-1; D.I. 653-2); (6) Shell's motion for judgment as a matter of law and alternative motion for a new trial on its invalidity defense of non-enablement (D.I. 613; D.I. 657-1; D.I. 657-2); and (7) Shell's motion for judgment as a matter of law on UCCPTC's claims for damages and alternative motion for a new trial or remittitur on the jury's damages verdict (D.I. 607; D.I. 655-1; D.I. 655-2).

A. Standards of Review

1. Judgment as a Matter of Law

*4 To prevail on a renewed motion for judgment as a matter of law following a jury trial, the moving party " 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings." ' Pannu v. Iolab Corp., 155 F.3d 1344, 1348 (Fed.Cir.1998) (quoting Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed.Cir.1984)). " 'Substantial' evidence is such relevant evidence from the record taken as a whole as might be acceptable by a reasonable mind as adequate to support the finding under review." Perkin-Elmer Corp., 732 F.2d at 893. In assessing the sufficiency of the evidence, the court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1348 (3d Cir.1991); Perkin-Elmer Corp., 732 F.2d at 893. The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." Perkin-Elmer Corp., 732 F.2d at 893. In sum, the court must determine whether the evidence reasonably supports the jury's verdict. See Dawn Equip. Co. v. Ky. Farms Inc., 140 F.3d 1009, 1014 (Fed.Cir.1998).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1305849 (D.Del.)
(Cite as: 2004 WL 1305849 (D.Del.))

Page 5

2. Motion for a New Trial

Federal Rule of Civil Procedure 59(a) provides, in pertinent part:

A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

Fed.R.Civ.P. 59(a). The decision to grant or deny a new trial is within the sound discretion of the trial court and, unlike the standard for determining judgment as a matter of law, the court need not view the evidence in the light most favorable to the verdict winner. See *Allied Chem. Corp. v. Darflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980); *Olefins Trading, Inc. v. Han Yang Chem. Corp.,* 9 F.3d 282 (3d Cir.1993); *LifeScan Inc. v. Home Diagnostics, Inc.,* 103 F.Supp.2d 345, 350 (D.Del.2000), *aff'd per curiam,* Nos. 00-1485, 00-1486, 2001 WL 345439 (Fed.Cir. Apr.6, 2001) (citations omitted). Among the most common reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly-discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. See *Zarow-Smith v. N.J. Transit Rail Operations,* 953 F.Supp. 581, 584 (D.N.J.1997) (citations omitted). The court must proceed cautiously, mindful that it must not substitute its own judgment of the facts and the credibility of the witnesses for those of the jury. The court should grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand. See *Williamson,* 926 F.2d at 1352; *EEOC v. Del. Dep't of Health and Soc. Servs.,* 865 F.2d 1408, 1413 (3d Cir.1989).

B. Direct Infringement

*5 Shell filed a motion for judgment as a matter of law or, in the alternative, for a new trial, contending that Union Carbide failed to provide a legally sufficient evidentiary basis for a reasonable jury to conclude that Shell literally infringed claim 4 of the '245 patent directly. [FN10] Shell alleges the following basis for its motion on direct infringement: (1) Union Carbide did not conduct its tests of Shell's catalysts at the "same conversions;" (2) Union Carbide did not vary silver in the design set of experiments; (3) Union Carbide did not conduct the characterizable test and comparison test in the "same ethylene oxide production system;" (4) Union Carbide failed to prove infringement because the differences in efficiencies are within experimental error; (5) Union

Carbide did not properly prepare Shell's catalysts; and (6) Union Carbide did not properly test Shell's rhenium catalysts.

FN10. Shell originally filed a motion for judgment as a matter of law on direct infringement on November 3, 2003, prior to submission of the case to the jury. (D.I.605) Shell filed its renewed motion on December 22, 2003. (D.I.647)

1. Same Conversion

The comparison test of claim 1 of the '243 patent requires "an efficiency of ethylene oxide manufacture that is greater than the efficiencies obtainable in the same ethylene oxide production system, including the same conversions." ('243 patent, col. 30, ll. 9-12) Union Carbide's expert testified that he maintained the same conversion by measuring EO in the outlet. (D.I. 626 at 562- 569) Based upon the specification's definition of conversion, Shell contends that Union Carbide's expert should have conducted his experiment by measuring whether ethylene conversion was constant rather than measuring EO in the outlet. (D.I. 648 at 9-10) It is not disputed that the '243 patent, its prosecution history and the prior art recognize that catalyst efficiencies may be compared at constant EO in the outlet, constant oxygen conversion, or constant ethylene conversion. ('243 patent, col. 11, ll. 14-21; JTX 4 at 112-13, 128-29; JTX 7 at 101, 113-15, 534-35; D.I. 625 at 509-10; D.I. 648 at 9) Moreover, as Union Carbide's infringement expert explained, once efficiency is determined by any of these three measurements, obtaining the conversion rate of the other two is a matter of basic stoichiometry. [FN11] (D.I. 526 at 512) Union Carbide's use of EO in the outlet was not improper and was evidence by which a reasonable jury could find direct infringement.

FN11. In presenting its defense, Shell itself argued the propriety of performing such calculations. (D.I. 627 at 857, 859, 917-19)

2. Variance of Silver

The plain language of the claim at issue requires that the combination of silver, cesium and lithium in a catalyst used in an accused process be "characterizable" by a particularly defined efficiency equation. Claim 1 further requires that the coefficients of the efficiency equation be determined by testing catalysts in a composite design set of experiments which must include, as independent variables, silver, cesium and lithium. ('243 patent, col. 30, ll. 16-54) Shell contends that claim 1 requires that the amounts of silver be varied to determine the silver-related

Not Reported in F.Supp.2d
2004 WL 1305849 (D.Del.)
(Cite as: 2004 WL 1305849 (D.Del.))

Page 6

coefficients of the efficiency equation. (D.I. 648 at 13) Shell did not seek a jury instruction that claim 1 required that silver actually be varied to prove literal infringement. Conversely, Union Carbide contends that, as the actual amount of silver in the Shell catalysts was a known factor, it was not necessary for purposes of proving infringement to use varying amounts of silver. The plain language of claim 1 does not require silver to actually be varied. The jury heard conflicting expert testimony from both parties concerning this issue. The court finds that there was sufficient evidence by which a reasonable jury could conclude that proof of infringement did not require that silver actually be varied in order to satisfy the characterizable test limitation.

3. Appropriate Reaction Conditions

**6** Claim 1 requires that the comparison test and characterizable test be conducted in the "same ethylene oxide production system" which, as the court instructed the jury, means "the laboratory or experimental 'conditions and parameters' which define the ethylene oxide production system which ultimately will be used commercially." ('243 patent, col. 30, 11. 4-54; D.I. 601) Shell contends that this should mean the "specific reaction conditions of each commercial ethylene oxide process." (D.I. 648 at 15) As Shell's own brief reflects, its argument rests upon its interpretation of claim 1. (D.I. 696 at 11) The plain language of claim 1 and this court's construction thereof do not require that the specific reaction conditions of each commercial process be tested, only that the laboratory conditions and parameters define the process ultimately used. In the present case, sufficient evidence is in the record by which a reasonable jury could conclude that Union Carbide's expert's testing procedures were consistent with the requirements of "same ethylene oxide production system." (D.I. 625 at 444-57; D.I. 626 at 578-87; PTX 1101)

4. Range of Experimental Error

Shell contends that the differences in efficiency with respect to tests performed on Shell's catalysts by Union Carbide's expert were less than 1.31% and were within the range of experimental error for the comparative efficiency test. (D.I. 648 at 20) Consequently, Shell contends that the efficiency differences relied upon were not statistically significant. Statistical significance, however, is a question of fact for the jury as it is an issue of evidentiary weight. The jury heard evidence by which they could conclude that the efficiency differences achieved were statistically significant. (PTX 2227; D.I. 625 at 473) Consequently, the court finds the records reasonably supports the jury's findings.

5. Preparation of Shell Catalysts

Shell contends that the Union Carbide expert's test catalysts were not representative of Shell's cesium-optimized catalysts and, therefore, no jury could conclude that the Shell catalysts infringe the '243 patent. The jury heard evidence that the amount of cesium used by Union Carbide's infringement expert was the optimum amount. (D.I. 625 at 438-439; PTX 331; D.I. 627 at 887- 88; D.I. 628 at 1383-84) This was, therefore, an issue of disputed fact for the jury to resolve. Consequently, the court finds that there was sufficient evidence for a reasonable jury to conclude that the Union Carbide expert's tests were properly performed. Shell is not entitled to judgment as a matter of law.

6. Testing of Shell's Rhenium Catalysts

Shell contends that, with respect to the rhenium catalysts, Union Carbide's expert failed to properly optimize the chloride inhibitor and failed to properly pretreat the catalysts. (D.I. 648 at 21-22) The jury, however, heard testimony that the amount of chloride inhibitor used with the catalysts depends primarily on the amount of rhenium present. Union Carbide's expert testified that he optimized this amount consistent with the catalyst's requirements. (D.I. 628 at 1386; D.I. 625 at 450; D.I. 629 at 1387-88) Union Carbide's expert also testified that the pretreatment of rhenium catalysts with nitrogen was not required under the conditions at which his tests were performed. (D.I. 628 at 1380) Consequently, the jury heard sufficient evidence to support their finding that the Union Carbide expert's testing of the rhenium catalysts was proper and, therefore, supporting of a finding of infringement.

**7** Accordingly, the court finds that Shell has failed to meet its burden with respect to its judgment as a matter of law on the claim of direct infringement. For the reasons stated above, the court also declines to find that the jury's verdict was against the clear weight of the evidence such that it shocks the court's conscience and, therefore, a new trial is not warranted. Shell's motions for judgment as a matter of law, or in the alternative, for a new trial will be denied. (D.I. 605; D.I. 647-1; D.I. 647-2)

C. Contributory Infringement

The jury returned a verdict finding Shell liable for contributory infringement of the '243 patent. (D.I.602) Shell, in its motion for judgment as a matter of law, asserts the following arguments: (1) failure of proof with respect to a predicate act of direct infringement; (2) failure of proof with respect to the absence of substantial noninfringing use; (3) failure of proof with respect to CRI's knowledge of customers infringing uses of the

Not Reported in F.Supp.2d
2004 WL 1305849 (D.Del.)
(Cite as: 2004 WL 1305849 (D.Del.))

catalysts. Alternatively, Shell moves for a new trial on the following bases: (1) the jury verdict form was erroneous; (2) the jury instructions were erroneous; and (3) the exclusion of U.S. Patent No. 5,057,481 ("the '481 patent") was substantially prejudicial. (D.I.646)

Section 271(c) provides for secondary liability for infringement of a United States Patent. To prove contributory infringement a plaintiff must demonstrate the following: (1) an offer to sell, sale, or import; (2) a component or material for use in a patented process constituting a material part of the invention; (3) knowledge by the defendant that the component is especially made or especially adapted for use in an infringement of such patent; and (4) the component is not a staple or article suitable for substantial noninfringing use. 35 U.S.C. § 271(c). Further, contributory infringement generally requires proof of actual direct infringement by a customer of the defendant. See *Novartis Pharmaceuticals Corp. v. Eon Labs Mfg., Inc.,* 363 F.3d 1306, 1308 (Fed.Cir.2004). However, if use of the component by the defendant's customers necessarily infringes the patent, actual proof of an instance of direct infringement is not required. *Dynacore Holdings Corp. v. U.S. Philips Corp.,* 363 F.3d 1263, 1275-76 (Fed.Cir.2004).

1. Predicate Act of Direct Infringement

In its motion and brief related to contributory infringement, Shell renews its arguments pertaining to direct infringement of the '243 patent. For the reasons discussed above, the court finds that a reasonable jury could conclude that there was an occurrence of a predicate act of direct infringement. See *infra* Part IV.B.

2. Substantial Noninfringing Use

Shell contends that the tests conducted by Union Carbide's expert cannot be proof of the absence of substantial noninfringing use, as Union Carbide's expert did not test the catalysts at the specific reaction conditions used in the commercial process at issue. (D.I. 646 at 26) Union Carbide's expert testified that his tests demonstrated that the processes actually used by CRI customers would infringe the '243 patent. (D.I. 625 at 456-57) Union Carbide's expert explained that at different process conditions than those he used, the accused catalysts would still have an increased efficiency as required by the claims and would still meet the efficiency equation. (*Id.* at 479-80) The testimony of Union Carbide's expert is evidence that there is not a substantial noninfringing use of the Shell catalysts. Shell asserts that there are numerous conditions under which the catalysts may be used commercially and would not infringe but

offered no evidence to the jury to that effect. Substantial noninfringing use is a question of fact for the jury and the Union Carbide expert's unrefuted testimony was sufficient evidence thereof.

3. CRI's Knowledge of Customers' Infringing Uses

**\*8** Shell contends that Union Carbide failed to offer proof of the requisite knowledge for liability under 34 U.S.C. § 271(c). (D.I. 646 at 27) In so arguing, Shell renews arguments previously made at trial and rejected by the court. Shell contends that to be liable for contributory infringement, the law requires that CRI knew when it sold its catalysts to customers that the use of the catalysts in its customers' processes would infringe the '243 patent. [FN12] (D.I. 646 at 11)

> FN12. Union Carbide admitted that if "the law requires that Shell had knowledge that their catalysts met the efficiency equation there is no evidence that they had that knowledge." (D.I. 629 at 1466-67)

In *Hewlett-Packard Co. v. Bausch & Lomb Inc.,* the Federal Circuit Court of Appeals described § 271(c) as requiring "proof of a defendant's *knowledge,* not *intent,* that his activity cause[s] infringement." 909 F.2d 1464, 1469 (Fed.Cir.1990) (emphasis in original). This knowledge, according to the Court of Appeals, is a knowledge of both the component's particular use and "knowledge of the patent which proscribed that use." *Id.* at 1469 n. 4. Consistent with the court's interpretation of controlling authority, the jury was instructed that a finding of contributory infringement required proof that CRI acted "with knowledge that the component was especially made for use in a manner that infringes claim 4 of the '243 patent." (D.I. 601 at 21) Consequently, to the extent Shell's motion depends upon an interpretation of § 271(c) inconsistent with this court's jury instructions, its motion for a judgment as a matter of law will be denied. (D.I.609, D.I.645-1)

In the alternative, Shell moves for a new trial contending that the jury verdict form was erroneous, the jury instructions were erroneous and that the exclusion of the '481 patent was substantially prejudicial. The '481 patent was an issue determined by the court during pretrial evidentiary rulings. ((D.I.561) The verdict form was the subject of oral argument during the charge conference. (D.I. 628 at 1451-56; D.I. 629 at 1471-72) As Shell's motion depends upon arguments already rejected by the court, its motion for a new trial is denied. (D.I.647-2)

D. Willfulness

Not Reported in F.Supp.2d                                                                 Page 8
2004 WL 1305849 (D.Del.)
(Cite as: 2004 WL 1305849 (D.Del.))

Prior to submission of the case to the jury, Union Carbide orally moved for judgment as a matter of law on the issue of willful infringement. (D.I. 628 at 1396) The court declined to consider the motion and submitted it to the jury. The jury returned a verdict finding that Union Carbide had not shown by clear and convincing evidence that Shell had willfully infringed the '243 patent. On December 22, 2003, Union Carbide renewed its motion for judgment as a matter of law on willful infringement. (D.I.662)

As grounds for its motion, Union Carbide asserts that it was undisputed that Shell had knowledge of the '243 patent prior to beginning to use or sell the Shell catalysts and that Shell lacked a good faith basis to believe that its uses or sales were not infringements thereof. (*Id.*) The jury heard evidence that Dr. Clendenen, a Ph.D. chemical engineer and patent attorney, was responsible for monitoring the technical aspects of Shell's catalyst business. (D.I. 625 at 360, 366, 790, 1092) Dr. Clendenen testified that he reviewed PTO publications for patents issued in the area for which he was responsible. He also reported patents which might require a legal opinion with respect to noninfringement. Dr. Clendenen testified that he reviewed the '243 patent and, in his opinion, determined that it did not require further action by Shell. (*Id.* at 371-72) Dr. Clendenen never sought further action on the ' 243 patent and never told any other business person or decision maker at Shell about his belief. (*Id.* at 369-70; D.I. 627 at 1108, 1111) Shell, therefore, did not seek a legal opinion on the '243 patent. In light of Dr. Clendenen's testimony, the court finds there to be sufficient evidence by which a reasonable jury could conclude that Union Carbide did not meet its burden of proof. Union Carbide's motion for judgment as a matter of law on willfulness will be denied. (D.I.662)

E. Non-Enablement

**\*9** At the close of evidence and before submission of the case to the jury, Shell moved for judgment as a matter of law on its invalidity defense that claim 4 of the '243 patent is not enabled. (D.I.613) The court declined to rule on Shell's motion and the jury returned a verdict finding the '243 patent to be valid. Post-trial, Shell renewed its motion for judgment as a matter of law that the '243 patent is invalid for lack of enablement. (D.I.657) Shell contends that claim 4 of the '243 patent is not enabled for two reasons: (1) it requires undue experimentation to practice; and (2) it is inoperable. (D.I.658)

Section 112 of the Patent Act states:
The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms

as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same.
35 U.S.C.A. § 112. A patent is not enabled if it does not teach a person skilled in the art "to make and use the invention without undue experimentation." *In re Wands,* 858 F.2d 731, 737 (Fed.Cir.1988). "The determination of what constitutes undue experimentation in a given case requires the application of a standard of reasonableness, having due regard for the nature of the invention and the state of the art." *Id.* Several factors may be considered in determining whether experimentation is undue, including: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the art; and (8) the breadth of the claims. *See id.* (quotations omitted).

Shell contends that the '243 patent requires undue experimentation because, "[t]o fully enable the invention of claim 4, one would have to conduct the requisite tests to determine whether [the comparison test and characterizable test] were met and would have to conduct those requisite tests at every possible combination of reaction condition variables within the broad ranges of the preamble of claim 1." (D.I. 658 at 9) The jury, however, was presented with evidence that undue experimentation was not required. (D.I. 625 at 306-09, 460-62; D.I. 626 at 825-32)

Shell also contends claim 4 is inoperable, alleging that the "efficiency of an EO process using a catalyst containing silver, cesium, and lithium can never be greater than the efficiency of a process using a silver and cesium-only catalyst, or a silver and lithium-only catalyst, as required by claim 4." (D.I. 658 at 12) Shell's argument is one of fact that was resolved by the jury. The jury heard substantial evidence that Shell's catalysts showed that lithium increases efficiency. (D.I. 625 a 460-62) While Shell's experts dispute the conclusions of Union Carbide's expert, the jury resolved the dispute in Union Carbide's favor.

**\*10** Consequently, the court finds that there was legally sufficient evidence for a reasonable jury to conclude that Shell did not prove its defense of nonenablement by clear and convincing evidence. Further, for the reasons stated above, the jury's verdict is not against the clear weight of the evidence such that it shocks the conscience of the court. Therefore, Shell's motion for judgment as a matter of law and, in the alternative, for a new trial will be denied. (D.I. 613; D.I. 657-1; D.I. 657-2)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1305849 (D.Del.)
(Cite as: 2004 WL 1305849 (D.Del.))

Page 9

F. Indefiniteness

At the close of evidence, Union Carbide, by oral motion, moved for judgment as a matter of law on Shell's defense of indefiniteness. (D.I. 628 at 1397) Shell also moved for judgment as a matter of law that claim 4 of the '243 patent was indefinite as a matter of law. (D.I.611) That motion was renewed post-trial by Shell or, in the alternative, for a new trial. (D.I.653)

After the presentation of evidence was completed, the court found that Shell had failed to adduce direct evidence creating a disputed issue of fact as to whether claim 4 is indefinite. [FN13] (D.I. 628 at 1447) Consequently, the court declined to send Shell's defense of claim indefiniteness to the jury. (*Id.* at 1450) In so concluding, the court granted Union Carbide's oral motion for judgment as a matter of law that the '243 patent is not invalid for reason of claim indefiniteness and implicitly denied Shell's motion. [FN14] Consequently, the court shall construe Shell's renewed motion for judgment as a matter of law as a motion for reconsideration. (D.I. 612 at 2)

> FN13. Shell's enablement and indefiniteness defense, however, largely relied upon DTX 14, which the court precluded from evidence when it granted one of Union Carbide's motions in limine. (D.I. 561 at ¶ 18; D.I. 488)

> FN14. The court notes that the record is unclear as initially the court stated that it would reserve judgment and did not make it explicit on the record that the oral motion was granted. (D.I. 628 at 1400, 1450)

A motion for reconsideration may be entertained to "correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Café ex-rel. Lou-Ann, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999). Accordingly, a court may alter or amend its judgment if the movant demonstrates at least one of the following: (1) a change in the controlling law; (2) availability of new evidence not available when summary judgment was granted; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice. *See id.*

The Patent Act requires patent claims to "particularly point out and distinctly claim the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. Indefiniteness is a question of law. *See Personalized Media Communications v. Int'l Trade Comm'n,* 161 F.3d 696, 705 (Fed.Cir.1998). In a jury trial, if there are disputed factual issues related to indefiniteness, they may be submitted to the jury for resolution. *See e.g., BJ*

*Services Co. v. Halliburton Energy Serv., Inc.,* 338 F.3d 1368, 1372 (Fed.Cir.2003). As a patent is presumed valid, a party asserting a defense of invalidity on the basis of claim indefiniteness has the burden of proof by clear and convincing evidence. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc. ., 806* F.2d 1565, 1575-76 (Fed.Cir.1986).

*11 Shell presents three arguments for indefiniteness: (1) the use of a catalyst can simultaneously infringe or not infringe depending on the reaction conditions to test for infringement; (2) the test results of any catalyst would vary depending on the interpretation of conversion; (3) the absence of a criterion to determine whether a combination of silver, cesium and lithium is characterizable by the efficiency equation. (D.I.654)

1. Effect of Reaction Conditions

In its first argument for indefiniteness, Shell asserts that the comparison test can be met using any set of reaction conditions within the broad range set forth in the preamble of claim 1 and, therefore, infringement will exist or not exist depending upon the particular reaction conditions selected by the party seeking to examine infringement. (D.I. 654 at 6-7) Union Carbide's evidence showed that, while the absolute value of efficiency measurements would change based upon the reaction conditions, the relative efficiencies would not. (D.I. 625 at 330-31, 478-80) Consequently, although a catalyst's absolute efficiency value may change at different test conditions, its comparative efficiency would not. (*Id.*) Shell, which bore the burden of proof on this issue, presented no evidence to contradict Union Carbide and, as a consequence, its defense of indefiniteness on these grounds fails as a matter of law.

2. Interpretation of Conversion

Shell next argues that claim 1, upon which claim 4 depends, is indefinite because test results of a catalyst would vary depending upon the measurement of conversion. (D.I. 654 at 12-14) Shell's argument, in this regard, regurgitates an argument it makes relating to direct infringement. For those reasons already discussed, the court finds Shell's defense of indefiniteness on these grounds fails. *See infra* Part III.B.1 (discussing measurement of conversion for purposes of determining infringement).

3. Criterion to Determine Whether Characterization Test Is Met

Shell's final argument for claim indefiniteness asserts that claim 1, upon which claim 4 depends, is indefinite

Not Reported in F.Supp.2d
2004 WL 1305849 (D.Del.)
(Cite as: 2004 WL 1305849 (D.Del.))

Page 10

because one of ordinary skill in the art would not know how to determine whether a combination of cesium, lithium and silver would meet the characterizable test. (D.I. 654 at 14-15) Union Carbide's expert explained that using widely known statistical regression analysis, in particular R-squared, a person may determine how well test data is represented by a mathematical equation. (D.I. 625 at 423-24) Union Carbide's expert used this form of statistical analysis to determine whether Shell's catalysts were characterizable by the efficiency equation in claim 1. (D.I. 625 at 465-68) Moreover, the '243 patent itself discloses the use of such methods in the written description and describes them as routine. ('243 patent, col. 11, ll. 28-41) Failure to specify a particular means of measurement does not render a claim indefinite where a person of ordinary skill in the art would, nevertheless, be able to practice the invention. *See PPG Industries, Inc. v. Guardian Industries Corp.,* 75 F.3d 1558, 1563 (Fed.Cir.1996). Shell presented no evidence to contradict the Union Carbide expert's assertion that R-squared provides an appropriate means of determining infringement or even to suggest that another method would be more appropriate. Consequently, the '243 patent's failure to specify a particular measurement method does not render it invalid.

*12 Shell bore the burden of proof on its invalidity defense of claim indefiniteness, a burden which was not met. Therefore, the court's granting of judgment as a matter of law in favor of Union Carbide on this issue during the charging conference was proper as a matter of law. As Shell's arguments fail to show a clear error of law in the court's decision, Shell's motion for reconsideration shall be denied. (D.I.653)

**G. Anticipation and Obviousness**

At the close of evidence, Shell moved for judgment as a matter of law on its invalidity defenses of anticipation and obviousness. (D.I.618) The court declined to rule on Shell's motion and the case was submitted to the jury. The jury found that Shell did not prove by clear and convincing evidence that the '243 patent is invalid due to anticipation or obviousness. Shell has renewed its motion for judgment as a matter of law or, in the alternative, for a new trial. (D.I.651)

**1. Anticipation**

Shell argues that the '243 patent is anticipated by United States Patent No. 4,212,772, and Belgium Patent No. 867,045 (collectively "the Mross patents"). The defense of invalidity due to anticipatory prior art requires proof by clear and convincing evidence that a single prior art reference discloses all of the limitations of the claim at issue. *See* 35 U.S.C. § 102; *Minnesota Mining & Mfg. Co. v. Johnson & Johnsons Orthopaedics, Inc.,* 976 F.2d 1559, 1565 (Fed.Cir.1992). Even where the prior art reference does not expressly disclose a limitation of a claim at issue, a jury may find that the prior art inherently discloses the limitation. *See Atlas Powder v. IREOCO Inc.,* 190 F.3d 1342, 1347 (Fed.Cir.1999).

In the present case, in order to find that the Mross patents anticipated the '243 patent, a jury would have to find that the catalyst disclosed in the Mross patent (the "L1 catalyst") was an inherent disclosure of claim 1's characterizable test limitation. The jury heard evidence that, from Shell's expert's own results, the L1 catalyst is not characterizable by the efficiency equation. (D.I. 627 at 1051, 1090-91; D.I. 628 at 1389-90) As there was legally sufficient evidence for a reasonable jury to conclude that there was not clear and convincing evidence that the Mross patents anticipate the '243 patent, Shell's motion for judgment as a matter of law on anticipation will be denied. (D.I. 617; D.I. 651-1)

**2. Obviousness**

The defense of invalidity due to obviousness under the prior art requires proof by clear and convincing evidence that the differences between the claimed invention and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the relevant field. 35 U.S.C. § 103(a). In determining whether a claimed invention is obvious, the finder of fact considers the following four factors: (1) scope and content of the prior art; (2) differences between the prior art and the claimed invention; (3) level of ordinary skill in the pertinent field; and (4) secondary considerations such as commercial success, long felt but unsolved needs, failure of others that may shed light on the circumstances surrounding the origin of the subject matter sought to be patented. *See Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). *See also Ryko Mfg. Co. v. Nu-Star, Inc.,* 950 F.2d 714, 716 (Fed.Cir.1991). Where obviousness is based on a single prior art reference, a party seeking to invalidate a patent must show a "suggestion or motivation to modify the teachings of that reference." *In re Kotzab,* 217 F.3d 1365, 1370 (Fed.Cir.2000).

*13 Shell argues that even if the Mross patents do not anticipate the '243 patent, they are proof that the '243 patent is obvious. According to Shell, the prior art teaches that lithium is an effective promoter; therefore, it would have been obvious to a person skilled in the art that using lithium in combination with cesium on the L1 catalyst would result in an EO process of a higher efficiency than

Not Reported in F.Supp.2d                                                     Page 11
2004 WL 1305849 (D.Del.)
**(Cite as: 2004 WL 1305849 (D.Del.))**

that of an EO process using a silver/cesium or a silver/lithium catalyst. (D.I. 652 at 19)

As there was no evidence of an express suggestion in the prior art, whether the prior art contained an inherent suggestion was an issue of fact for the jury. While Shell offered evidence that efficiency was the central objective of EO catalysts and that a person skilled in the art with knowledge of the Mross patents could have created a catalyst that satisfied the limitations of claim 4, the jury also heard evidence regarding the unexpected results, long-felt need and commercial success of the claimed invention. (D.I. 624 at 204-06, 246- 67; D.I. 625 at 266, 270, 275-78; D.I. 626 at 674-76, 750-51) Consequently, the court finds that there was legally sufficient evidence by which a reasonable jury could conclude that Shell failed to prove by clear and convincing evidence that the '243 patent was invalid due to obviousness. (D.I. 611; D.I. 653-1) Further, to the extent that Shell's motion depends upon arguments already discussed and rejected by the court, its motion for a new trial is denied. (D.I.653-2)

H. Damages

Prior to submission of the case to the jury, Shell moved for judgment as a matter of law on Union Carbide's claims for damages. (D.I.607) The court declined to rule on Shell's motion and the jury returned a verdict finding infringement and awarding $112,198,893 in damages as a reasonable royalty. Shell has renewed its motion for judgment as a matter of law or, in the alternative, for a new trial or, in the alternative, for remittitur. (D.I.655)

The parties agree that the appropriate measurement of damages in the present case is a reasonable royalty. A reasonable royalty is the amount a willing licensor and willing licensee would agree to in a hypothetical negotiation at the time infringement begins. *See Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116 (S.D.N.Y.1970).* The *Georgia-Pacific* factors include a wide variety of relevant factors which reasonable parties would take into consideration in a hypothetical negotiation. *Id.* at 1120.

The jury was given evidence that Shell's catalysts resulted in substantial savings on raw materials due to increased selectivity. (D.I. 625 at 682-83) The jury also heard evidence that Shell had used 5,102,436 pounds of the infringing catalysts internally. (D.I. 625 at 674-75; PTX 1094) At its own plants, this savings translated into approximately $31 per pound of catalyst. (D.I. 625 at 674-75) The jury heard testimony showing that Shell realized a ten to thirty percent increase in production capacity, due to Shell's use at its own plants of the infringing catalysts. (*Id.* at 683-84) This increased production capacity

resulted in a profit of approximately $133 million or $26 per pound of catalyst. Union Carbide's damages expert testified that at a hypothetical negotiation in 1993, the parties would have used the most conservative estimates of these savings and anticipated profits to reach a total value to Shell of $41.27 per pound of catalyst used internally. (*Id.* at 686, 688-89, 692. Consequently, Union Carbide's damages expert testified that a reasonable royalty base would be $20.63 per pound for Shell's internal infringing catalyst use, based upon a even sharing of the benefit to Shell. [FN15] (*Id.* at 697)

> FN15. Union Carbide's damages theory that a reasonable royalty base would be fifty percent of benefit Shell received from use of the infringing catalysts was supported by evidence of certain of Union Carbide's joint ventures. (D.I. 626 at 738) The fifty percent figure was also supported by UCCPTC's practice of not licensing its catalyst technology due to the effect such licensing would have on Union Carbide's competitors' cost structures. (*Id.* at 610-12)

**\*14** With respect to external sales, the jury heard evidence that Shell generated an average profit of $12.82 per pound of its S-863, S-880 and S-882 catalysts. (*Id.* at 701) The jury also heard evidence that Shell had sold nearly 9,862,290 pounds of the infringing catalysts. (*Id.* at 674-75; PTX 1096) Consequently, based upon a fifty percent share of Shell's profits from its external sales, Union Carbide's expert testified that a reasonable royalty would be $6.41 per pound of catalyst sold. (D.I. 625 at 702-03)

Although Union Carbide sought a reasonable royalty in the amount of fifty percent of Shell's profits from external sales and fifty percent of the estimated benefit from internal use, the jury awarded $13.62 per pound used internally and $4.23 per pound sold to third parties. (D.I. 629 at 1603)

The crux of Shell's argument is that some of the factors considered by Union Carbide's damages expert, and presented to the jury, were either irrelevant, improper and/or prejudicial. In particular, Shell contends the following should not have been considered as factors in a hypothetical negotiation: (1) harm to Union Carbide Corporation ("UCC") as opposed to Union Carbide Chemicals & Plastics Technology Corporation ("UCCPTC"); (2) evidence pertaining to Shell's profits for MEG production; (3) evidence related to third parties' use of Shell catalysts; and (4) evidence of Shell's external leases of catalysts.

The present case presented a problem of first impression

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1305849 (D.Del.)
(Cite as: 2004 WL 1305849 (D.Del.))

for this court, namely, the extent to which the impact on a nonexclusive licensee may be a factor considered in a reasonable royalty analysis where the nonexclusive licensee is the parent corporation of the patent holder and the patent holder is solely a technology holding corporation. [FN16] Shell argues that such a factor, even if a pertinent consideration, is unduly prejudicial. The court recognizes the risk that such evidence may permit a patent holder, not entitled to lost profits as a remedy, to nevertheless seek damages based in part upon lost profits. At trial, Shell objected to testimony from Union Carbide's damages expert that inaccurately portrayed the hypothetical negotiation to be between Union Carbide and Shell rather than UCCPTC and Shell. (D.I.626 at 654) The court sustained the objection and required Union Carbide to correct the record before the jury and to inform them that the expert's analysis included no numbers associated with Union Carbide's potential lost profits. (*Id.* at 655-57) In reviewing the record, the court finds that the damages expert's analysis was properly based on a substantial number of factors and the impact on UCC, as a factor a hypothetical patent holder would consider, was only one component thereof. See *Rite-Hite Corp. v. Kelley Co., Inc.* 56 F.3d 1538, 1555 (Fed.Cir.1995) ("The language of the statute requires 'damages adequate to compensate,' which does not include a royalty that a patentee who does not wish to license its patent would find unreasonable.").

> FN16. This issue has appeared more than once and in more than one form over the course of the two trials in this case. (D.I. 561 at ¶ 35)

**\*15** The remainder of Shell's objections also relate to what factors were relevant to the determination of a reasonable royalty rate. [FN17] In the present case, the court finds that the factors relied upon by Union Carbide's damages expert were consistent with the *Georgia-Pacific* standards and, as such, may be properly considered by the jury in determining a reasonable royalty base. The court also concludes that the damages award was supported by legally sufficient evidence on which a reasonable jury could rely. Consequently, Shell's motion for judgment as a matter of law will be denied. (D.I. 607; D.I. 655-1)

> FN17. One of these factors, Shell's actual profits from MEG, has repeatedly been the subject of motion practice. (D.I. 269; D.I. 270; D.I. 561 at ¶ 36)

Where a jury's award of damages is clearly unsupported and/or excessive, it is within the court's discretion to reduce the award to the maximum amount a jury could reasonably find. See *Spence v. Board of Educ.,* 806 F.2d 1198, 1201 (3d Cir.1986). See also *Gumbs v. Pueblo Int'l*

*Inc.,* 823 F.2d 768, 772 (3d Cir.1987). In the present case, the court does not find that the jury award is so excessive that it shocks the conscience. In the present case, while Union Carbide presented evidence that in a hypothetical negotiation it would have been entitled to fifty percent of Shell's profits from its use and sale of the infringing catalysts, the jury concluded that thirty-three percent was an appropriate royalty. See *Rite-Hite Corp.,* 56 F.3d at 1555 (holding that it was "not unreasonable for the district court to find that an unwilling patentee would only license for one-half its expected lost profits and that such an amount was a reasonable royalty."). Viewing the evidence in the light most favorable to Union Carbide and giving Union Carbide the benefit of all reasonable inferences thereof, there is legally sufficient evidence to support the jury's award.

Consequently, Shell's motion for remittitur is denied. The court also finds that Shell has failed to establish that the verdict is against the great weight of the evidence such that it shocks the conscience and, therefore, its motion for a new trial will also be denied. (D.I.655-2)

In reviewing the jury's verdict on damages, however, the court found that the total damages awarded by the jury were inconsistent with their determination as to the reasonable royalty rate. [FN18] Based upon the undisputed evidence regarding the number of pounds of catalyst actually sold or used by Shell, the jury's royalty rate and total damages do not bear a mathematical relationship. [FN19] (D.I.2197) While neither party raised this issue in its brief, it is well established the court has the inherent power to correct clerical errors in the record. Fed.R.Civ.P. 60(a). This extends to include errors in jury arithmetic. See *U.S. for and on Behalf of Mississippi Road Supply Co. v. H.R. Morgan, Inc.,* 542 F.2d 262, 269 (5th Cir.1976). Consequently, on its own motion the court will correct the verdict and judgment will be entered in the amount of $111,212,665.02.

> FN18. Question seven of the jury verdict asked what "amount of damages do you find Union Carbide has proved by a preponderance of the evidence?" (D.I.602) The jury responded with the figure of $112,198,893. The jury then responded to questions eight and nine which asked for the reasonable royalty rate in dollars for Shell's internal use and external sales respectively. In response to question eight, the jury responded $13.62 per pound. In response to question nine, the jury responded $4.23. (*Id.*)

> FN19. The evidence showed that Shell used 5,102,436 pounds of catalyst internally and 9,862,290 pounds of catalyst externally.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 13
2004 WL 1305849 (D.Del.)
**(Cite as: 2004 WL 1305849 (D.Del.))**

(D.I.2197) Based upon the royalty rates determined by the jury, the amount of royalties owed by Shell would be $69,495,178.32 for internal use and $41,717,486.70 for external sales. Consequently, total damages based upon the royalty rate determined by the jury would be $111,212,665.02 which is $986,237.98 less than the amount reported on the jury sheet. As there is no rational explanation for this discrepancy, the court can only conclude that this resulted from mathematical error.

## IV. EQUITABLE ISSUES

**\*16** On March 25, 2004, consistent with this court's practice, a bench trial was held on Shell's equitable defenses of laches and estoppel. (D.I.700) Those equitable issues have been fully briefed and are ripe for decision. These are the court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### A. Laches

1. Shell contends that Union Carbide had actual and constructive knowledge of Shell's potentially infringing activities as early as April 1990 and that Union Carbide's delay in bringing suit was inexcusable and prejudicial as to Shell. (D.I.786)

2. Facts of Record. In February 1988, representatives from Shell and Union Carbide met and discussed a new Shell catalyst which was reported to have "broken through the theoretical selectivity barrier" of 85.7%. (D.I. 628 at 1338-40) This high selectivity catalyst, S-879, contained cesium, lithium, rhenium and sulfur. (D.I. 626 at 808; DTX 274 at S334247) Shell disclosed that it did have a new high selectivity catalyst but that its life span was relatively short. (D.I. 628 at 1340-41) Shell did not disclose to Union Carbide at that time, or any other time prior to suit, the composition of the S-879 catalyst. (D.I.1717-19, 1762-63)

3. In May 1998, Shell's European patent application for its rhenium based catalysts was first published, European Patent application 266,015 ("EPA ' 015"). In one of its sixty examples, the EPA '015 discloses a catalyst which exceeds the theoretical selectivity boundary of 85.7%. The preferred embodiment described in EPA '015 was a catalyst containing silver, rhenium and cesium only. (D.I. 700 at 1720-21)

4. Between August 1998 and February 1989, four more U.S. patents owned by Shell issued, including U.S. Patent Nos. 4,761,394, 4,766,105, 4,808,738, and 4,820,675 (the

"U.S. Lauritzen patents"). The Lauritzen patents were all based on applications filed on October 31, 1986. The U.S. Lauritzen patents all disclose catalysts that include rhenium in addition to at least one alkali metal. By at least July 1988, Union Carbide scientists had reviewed EPA '015. (D.I. 700 at 1615-16, 1781-83; DTX 69 at U0093338)

5. Between 1988 and 1995, Union Carbide monitored publicly available information regarding Shell's catalysts and their commercial performance. Union Carbide had information indicating that Shell's rhenium catalysts had longevity problems. (D.I. 700 at 1789-94)

6. The first commercial use of an infringing Shell catalyst, S-880, occurred in July 1993.

7. Representatives of Shell and Union Carbide met in October 1995 and discussed prospects for collaboration. (D.I. 700 at 1799-1801) At that meeting, Union Carbide raised the issue that Shell may be infringing one of three Union Carbide patents. (D.I. 628 at 1345-46) Shell indicated it was aware of the Union Carbide patents and denied infringement. (Id.; D.I. 700 at 1662-63, 1809) Following the meeting, Union Carbide continued to monitor available information about Shell's activities. (D.I. 700 at 1663)

**\*17** 8. In 1996, Union Carbide attended a presentation by a Shell scientist. (Id at 1811-13) It was the impression of the Union Carbide representative that Shell's high selectivity catalysts were achieving efficiencies between 85-88%. (Id. at 1811-14)

9. In 1997, Union Carbide attended Shell's presentation at the Gordon Conference. (PTX 103 at U183745; D.I. 700 at 1814-17) Following the Gordon Conference, Union Carbide believed that the composition of Shell's high selectivity catalysts may infringe one or more Union Carbide patents, including the '243 patent. (D.I. 700 at 1815-18) Union Carbide began internally reviewing the information it had obtained. (Id. at 1664-69, 1818- 19)

10. In October 1998, Union Carbide initiated discussions with Shell toward reaching an amicable resolution of the potential infringement issues. Discussions toward an amicable resolution failed when Shell filed a declaratory judgment suit.

11. Throughout the relevant period, Shell has actively guarded the composition of its catalysts. (Id. at 1765; PTX72 at S076322) CRI's catalyst customers were contractually prohibited from conducting tests on the catalysts. Prior to discovery in this litigation, Union Carbide did not have any access to Shell's catalysts.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1305849 (D.Del.)

(Cite as: 2004 WL 1305849 (D.Del.))

12. Conclusions of Law. It is well established that laches is a defense to a patent infringement suit brought in equity. *See Lane & Bodley Co. v. Locke,* 150 U.S. 193, 14 S.Ct. 78, 37 L.Ed. 1049 (1893); *Wollensak v. Reiher,* 115 U.S. 96, 5 S.Ct. 1137, 29 L.Ed. 350 (1885); *Mahn v. Harwood,* 112 U.S. 354 (1884). *A.C. Aukerman Co. v. R.L. Chaides Const. Co.,* 960 F.2d 1020, 1028 (Fed.Cir.1992). "In a legal context, laches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co.,* 960 F.2d at 1028-29.

13. To prevail on its equitable defense of laches, Shell must prove by a preponderance of the evidence that: (1) Union Carbide delayed filing suit for an unreasonable and inexcusable period from the time that Union Carbide knew or should have known of its infringement claim against Shell; and (2) Union Carbide's delay operated to Shell's prejudice or injury. *Id.* at 1032.

14. The first prong of a laches defense requires proof that the patent holder had either actual or constructive knowledge of infringing activity. *See Johnston v. Standard Min. Co.,* 148 U.S. 360, 370, 13 S.Ct. 585, 37 L.Ed. 480 (1893); *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1559 (Fed.Cir.1997). Constructive knowledge imposes upon patent holders the duty to police their rights. *See Wanless v. General Electric Co.,* 148 F.3d 1334, 1338 (Fed.Cir.1998). Under a constructive knowledge theory of laches, a patentee is charged with "such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Johnston,* 148 U.S. 360 at 370, 13 S.Ct. 585, 37 L.Ed. 480.

\*18 15. The defense of laches focuses on the conduct of the patentee, not the infringer. Nevertheless, the infringer's activities are relevant to whether the patentee's conduct was reasonable, including the infringer's efforts to maintain the secrecy of its processes and its denials of infringement. *See Eastman Kodak Co.,* 114 F.3d at 1559. An infringer can not cloak its activities in secrecy and simultaneously accuse the patent holder of failing to adequately protect its rights. *See, e.g., Fromson v. Western Litho Plate and Supply Co.,* 670 F.Supp. 861, 868-69 (E.D.Mo.1987), *rev'd on other grounds by* 853 F.2d 1568 (Fed.Cir.1988). [FN20]

FN20. Laches, and a property owner's duty to police its rights, are universal concepts in property law. In fact, a patentee's duty to inquire

is directly attributed to trademark law. *Compare Potash Co. v. Int'l Minerals & Chem. Corp.,* 213 F.2d 153, 155 (10th Cir.1954) *with Johnston,* 148 U.S. at 370. The requirement that only activities which are open and notorious can give rise to a subsequent defense of laches insures that a patentee's rights will not be diminished in secret.

16. The court finds that there is no evidence that Union Carbide had actual knowledge that Shell's catalysts infringed the '243 patent. Therefore, Shell can only prevail on its laches defense if it can establish that there were sufficient facts to warrant imputing constructive knowledge of Shell's infringing activities to Union Carbide and that Union Carbide's delay was unreasonable and inexcusable.

17. Where an infringer invokes the defense of laches based upon the patentee's constructive knowledge, the infringer must demonstrate that there were sufficient facts available to the patentee such that a duty to inquire arose. *Wanless,* 148 F.3d at 1338. This duty to inquire commands that a patentee may not fail to police its property rights under circumstances where it has reason to suspect infringement. Circumstances which give rise to a duty to inquire must be "pervasive, open, and notorious" and include "sales, marketing, publication or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities." *Id.* at 1339.

18. A patentee's duty to inquire is subject to a standard of reasonableness. As such, the extent to which a reasonable method of detection of infringement is available to the patentee is relevant. *See Wanless,* 148 F.3d at 1334; *Wanless v. Fedders Corp.,* 145 F.3d 1461, 1467 (Fed.Cir.1998); *Hall v. Aqua Queen Mfg., Inc .,* 93 F.3d 1548, 39 (Fed.Cir.1996); *Imperial Chem. Mfg. Co. v. Stein,* 77 F. 612 (2d Cir.1896).

19. As an initial matter, the court finds that Shell's activities occurring before July 1993, when S-880 was first commercially used, do not give rise to a duty to inquire. Any activities of Shell before that date can not be said to have put Union Carbide on notice as they were not, in fact, infringing activities. Moreover, it is also relevant that Shell's actual infringing activities were concealed.

20. As result of its continuing efforts to remain abreast of its competitors' activities and of advances in technology, Union Carbide was aware that in the early 1990s, Shell was attempting to commercialize a high selectivity catalyst. Based upon Shell's patents, Union Carbide's

Not Reported in F.Supp.2d                                                                                                      Page 15
2004 WL 1305849 (D.Del.)
**(Cite as: 2004 WL 1305849 (D.Del.))**

belief that these were rhenium based and not mixed alkali based was reasonable. The fact that some examples contained in certain Shell patents disclosed mixed alkali catalysts raises only a suggestion and is not sufficient evidence that Shell was infringing the '243 patent. Even when combined with the fact that it was known to Union Carbide that Shell was attempting to commercialize a high selectivity catalyst, these facts are not sufficient evidence by which a reasonable person would conclude that Shell was infringing or was likely infringing the '243 patent. Instead, these facts are at most give rise to a suspicion.

**\*19 21.** Union Carbide's decision to pursue its suspicion by directly inquiring of Shell in 1995 was consistent with a patentee exercising reasonable diligence. It is contrary to principles of equity for Shell to affirmatively represent in 1995 that its activities were noninfringing and then permit it to subsequently assert laches as a defense when Union Carbide, at least in part, relied on Shell's representations. Otherwise, the duty to inquire essentially becomes a duty to sue upon suspicion. While it is true that Union Carbide did not need to know the actual composition of Shell's catalysts to bring suit, that does not mean that its prudence in bringing suit was unreasonable.

22. Under the circumstances of the present case, including the secret nature of Shell's infringing activities, Union Carbide's reasonable diligence in monitoring the market, and Shell's resistance to Union Carbide's efforts to ascertain whether Shell infringed the '243 patent, the court finds that Union Carbide's conduct was not unreasonable.

B. Equitable Estoppel

23. Shell contends that Union Carbide's failure to bring suit misled Shell to believe that Union Carbide would not bring suit and Shell detrimentally relied upon that belief.

24. Conclusions of Law. Equitable estoppel is similar to laches but focuses on the reasonableness of the infringer's reliance rather than the unreasonableness of the patentee's delay. To obtain relief from enforcement of a patent under the doctrine of equitable estoppel, the defendant must prove by clear and convincing evidence three elements: (1) the patentee, through misleading conduct, led the infringer to reasonably infer that the patentee did not intend to enforce its patent; (2) reliance by the infringer on the patentee's misleading conduct; (3) material prejudice to the infringer. See A.C. Auckerman Co., 960 F.2d at 1028.

25. Having already concluded that Shell failed to prove that Union Carbide had actual knowledge of Shell's infringing activities, Shell's defense of equitable estoppel

fails. Union Carbide could not have affirmatively misled Shell that it would not enforce its patents, if Union Carbide did not have knowledge of Shell's infringement. Consequently, the court finds that Shell's defense of equitable estoppel fails.

V. PREJUDGMENT INTEREST

Pursuant to 35 U.S.C. § 284, Union Carbide filed a motion for the award of prejudgment interest. (D.I.661) Union Carbide seeks prejudgment interest at the prime rate compounded annually from July 1993 until the entry of judgment.  [FN21] The prime rate for the relevant period ranges from as low as 4% to as high as 9.5%. (D.I 689, ex. A) Both parties seek a further expansion of the evidentiary record on this issue. (Id. at 4; D.I.679 at 1) The court concludes, however, that further evidence is not necessary to resolve the issue.

> FN21. Union Carbide's brief is internally inconsistent on this point, initially asserting that interest should be compounded quarterly but later stating that it should be compounded annually. (D.I. 661 at 1-2, 4)

The rate, if any, of prejudgment interest to be awarded is within the discretion of the court. See Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc., 862 F.2d 1564, 1580 (Fed.Cir.1988). A patent holder need not prove that it borrowed at the prime rate in order to be entitled to prejudgment interest on that basis. See Uniroyal, Inc. V. Rudkin-Wiley Corp., 939 F.2d 1540, 1545 (Fed.Cir.1991). The determination of whether to award simple or compounded interest is within the discretion of the court. See Rite-Hite Corp., 56 F.3d at 1555.

**\*20** The court finds that the appropriate rate of interest to be awarded in the present case is the prime rate. Mindful of its discretion, the court finds that simple interest will adequately compensate Union Carbide in this case. Interest will be awarded for a period beginning on July 1, 1993 and ending on May 31, 2004. Based upon the jury award of $112,198,893, the court finds that Union Carbide is entitled to prejudgment interest in the total amount of $42,403,108.67. [FN22]

> FN22. In calculating the interest, the court relied upon catalysts actually used internally and sold externally during each year beginning in July 1993. (D.I.2204) The court then calculated simple interest for each year based upon the total accrued amount of catalyst used or sold through that year. (D.I. 689 ex. A) For the years 2003 and 2004 the court prorated the interest consistent with number of months for which interest was to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1305849 (D.Del.)
(Cite as: 2004 WL 1305849 (D.Del.))

be applied.

## VI. PERMANENT INJUNCTION

Union Carbide seeks a permanent injunction enjoining Shell from making, using, selling or offering for sale: (1) the Shell catalysts, S-880, S-882 and S-863, for use in a process for the production of ethylene oxide or (2) any other Shell catalyst falling within the scope of claim 4 of the '243 patent. In a patent infringement suit, a district court may grant a preliminary injunction pending trial or a permanent injunction "after a full determination on the merits." *High Tech. Med. Instr., Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1554 (Fed.Cir.1995). Indeed, the Federal Circuit has indicated that once a finding of infringement has been made, an injunction should issue absent a sufficient reason for denying it. *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1247 (Fed.Cir.1989). Courts, therefore, are given wide latitude in framing injunctive relief. See *KSM Fastening Sys., Inc. v. H.A. Jones Co.*, 776 F.2d 1522, 1527 (Fed.Cir.1985). Nonetheless, consistent with the equitable nature of a permanent injunction, the court "must consider all circumstances, including the adequacy of the legal remedy, irreparable injury, whether the public interest would be served, and the hardship on the parties and third parties". *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 659 F.Supp. 92, 94 (D.Del.1987). Additionally, Fed.R.Civ.P. 65(d) requires an injunction to "set forth the reasons for its issuance, be specific in its terms, and shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action." Fed.R.Civ.P. 65(d).

In the present case, the court finds that Union Carbide will suffer irreparable harm without a permanent injunction to prevent Shell from practicing its patented catalytic process for the manufacture of EO. See *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384 (Fed.Cir.1987). Further, the court finds that there are not countervailing equities in the present case to the patentee's right to exclude others from practicing the invention. Accordingly, the court finds that a permanent injunction is warranted.

The parties agree that the scope of the injunction should not include catalysts upon which damages were awarded by the jury. Therefore, the court will order a permanent injunction barring Shell from making, using or selling S-880, S-882 and S-863 catalysts which were not covered by the jury's damages award.

*21 Shell seeks a stay of this injunction pending resolution of Shell's anticipated appeal to the Federal Circuit. (D.I.681) Pursuant to Fed.R.Civ.P. 62(c), it is within the discretion of the court to stay an injunction pending the outcome of an appeal of the judgment. A determination to stay a permanent injunction is guided by four factors: (1) likelihood of success on the merits of the appeal; (2) irreparable injury absent a stay; (3) substantial injury to the other party if the stay is granted; and (4) the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724, (1987); *Standard Havens Products, Inc. v. Gencor Industries, Inc.*, 897 F.2d 511, 512 (Fed.Cir.1990). The four factors often effectively merge as the likelihood of success is weighed with the equities affecting the parties and the public. *Standard Havens Products, Inc.*, 897 F.2d at 513.

With respect to the first factor, the parties have raised complex issues of law, issues which this court and the parties recognize would ultimately be resolved on appeal. Union Carbide can not fairly assert that a permanent injunction would not affect Shell's commercial practices as the record clearly demonstrates that the infringing catalysts are a substantial source of revenue. Further, the court is mindful of the fact that the legal holder of the patent is a technology holding company; there is nothing in the record to suggest that UCCPTC's interests would not be adequately protected through an appeal bond or similar assurance. Finally, the court finds that there are not unique public interests weighing in either party's favor in the present patent dispute. Consequently, the court finds that the equities in the present case substantially weigh in favor of maintaining the status quo. Therefore, the permanent injunction will be stayed pending the outcome of any appeals.

## VII. CONCLUSION

For the reasons discussed above, the court will deny Shell's post-trial motions for judgment as a matter of law or in the alternative for a new trial. (D.I.605, 607, 609, 611, 613, 615, 617, 645, 647, 649, 651, 653, 655, 657) The court will also deny Union Carbide's motion for judgment as a matter of law on its claim of willful infringement. (D.I.662) The court has also found that Shell has failed to prove by clear and convincing evidence its equitable defenses of laches and estoppel. Therefore, the court will enter judgment in favor of Union Carbide for damages in the amount of $111,212,665.02 and prejudgment interest in the amount of $42,403,108.67. Finally, the court will grant Union Carbide's motion for permanent injunction (D.I.665), but will also grant Shell's motion for a stay of the permanent injunction pending the outcome of any appeals. (D.I.681) An order consistent with this opinion shall issue.

ORDER

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1305849 (D.Del.)
(Cite as: 2004 WL 1305849 (D.Del.))

Page 17

At Wilmington, this 9th day of June, 2004, consistent with the memorandum opinion in the above captioned case issued this same day;

IT IS ORDERED that:

1. Defendants' motion to exclude certain testimony of Dr. Parvez H. Wadia is denied. (D.I.704)

*22 2. Defendants' motion for judgment as a matter of law on plaintiff's claim of willfulness is denied as moot per the jury's verdict. (D.I 615)

3. Defendants' motions for judgment as a matter of law or, in the alternative, for a new trial are denied. (D.I. 605; D.I. 607; D.I. 609; D.I. 611; D.I. 613; D.I. 617; D.I. 645-1; D.I. 645-2; D.I. 647-1; D.I. 647-2; D.I. 649; D.I. 651-1; D.I. 651-2; D.I. 653-1; D.I. 653-2; D.I. 655-1; D.I. 655-2; D.I. 657-1; D.I. 657-2)

4. Plaintiffs' motion for judgment as a matter of law is denied. (D.I.662)

5. Plaintiff's motion for prejudgment interest is granted. (D.I.661)

6. Plaintiffs' motion for a permanent injunction is granted. (D.I.665)

7. Defendants' motion for a stay of the permanent injunction is granted. (D.I.681)

8. IT IS THEREFORE ADJUDGED AND DECREED that, within fifteen (15) days after the entry of this order until April 10, 2007, the expiration date of United States Patent No. 4,916,243 ("the '243 patent"), defendants Shell Oil Company, Shell Chemical Company and CRI Catalyst, their officers, agents, servants, employees, and attorneys as well as all persons in active concern or participation therewith are hereby enjoined from: (1) making, using, selling, or offering to sell in the United States the S-880, S-882 and S-863 catalysts used in a process for making ethylene oxide found by the jury in this case to have infringed claim 4 of the '243 patent, except that the injunction against said catalysts shall not apply to the use of any charges of those catalysts that were included in the plaintiffs' evidence at trial to support an award of damages; and (2) making, using, selling or offering to sell in the United States any other Shell catalyst falling within the scope of the catalyst limitations of claim 4 of the '243 patent for use in an ethylene oxide production system in the United States.

9. IT IS FURTHER ADJUDGED AND DECREED that, pursuant to Fed.R.Civ.P. 62, this permanent injunction is hereby stayed during the pendency of any appeals of the judgment in this case. The stay shall be effective until the issuance of the Federal Circuit's mandate of a decision on the merits of any appeal of the judgment of the case.

10. The clerk of the court is directed to enter judgment in favor of plaintiffs and against defendants in the amount of $153,615,773.69.

2004 WL 1305849 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.