Westlaw.

Not Reported in F.Supp.2d                                                                                                 Page 1
2001 WL 1597983 (S.D.N.Y.)
(Cite as: 2001 WL 1597983 (S.D.N.Y.))

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
BIC CORPORATION, Plaintiff,
v.
FIRST PROMINENCE CO., LTD., et al.,
Defendants.
No. 00CIV.7155(SHS)(RLE).

Dec. 10, 2001.
Pennie & Edmonds, LLP, Jonathan A. Marshall, John J. Normile, Brian M. Rothery, John D. Garretson, New York, for plaintiff.

Ms. Tess Lee, First Prominence Co., Ltd., Taipei, Taiwan, Ms. Xin Feng, ERA Intermarketing Co., Inc. and Legend Imports Co., Anaheim, for Defendants.

REPORT AND RECOMMENDATION

STEIN, D.J.

I. INTRODUCTION

*1 This matter was referred for an inquest on damages following an entry of default judgment by the Honorable Sidney Stein against defendant First Prominence Co., Ltd. ("First Prominence") on January 25, 2001, and against defendants ERA Intermarketing Co., Inc. ("ERA") and Legend Imports Co. ("Legend") on March 22, 2001. Based on the following facts presented to the Court by way of a damage report and declaration by plaintiff BIC Corporation ("BIC"), the Court recommends BIC be awarded $26,330,436 against First Prominence, and $330,783.50 each against ERA and Legend, in damages, attorney's fees and costs.

II. BACKGROUND
On September 21, 2000, BIC filed a complaint against First Prominence, ERA, and Legend (collectively, "defendants") alleging patent infringement of United States Patent Numbers 5,096,414 (the " '414") issued in 1992, entitled "cigarette lighter"; 5,002,482 (the " '482"), issued in 1991, entitled "selectively actuatable lighter"; and 5,487,657 (the " '657"), issued in 1996, entitled "selectively actuatable lighter." Complaint (hereinafter, "Compl.") at ¶ 6. BIC alleged that defendants infringed said patents by importing, making, selling, offering for sale and using certain lighter devices covered by the ' 414, '482, and '657 patents. Id. at ¶ ¶ 7, 9. Further, BIC alleges that defendants' infringement was willful, wanton, and deliberate, without license and with full knowledge and awareness of BIC's patent rights. Id. at ¶ ¶ 8, 10.

Defendants did not file proper answers to the complaint. On January 19, 2001, the Court entered a default judgment against First Prominence for infringement of the '414, the '482 and the '657 patents, and permanently enjoined First Prominence from further sale of the infringing lighters. On March 20, 2001, the Court entered a similar default judgment against ERA and Legend. On April 24, 2001, the Court denied a *pro se* motion to set aside the default judgment against ERA and Legend.

III. DISCUSSION
A. Jurisdiction

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1338(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1400(b) as the events complained of took place in the Southern District of New York. Compl. at ¶ 7.

B. Standard on Default Judgment

Following a default judgment, all well-pled factual allegations of the complaint, except those relating to damages, are accepted as true. *Cotton v. Slone,* 4 F.3d 176, 181 (2d Cir.1993); *Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir.1981). A factual allegation will be deemed not well-pled only in "very narrow, exceptional circumstances." *Trans World Airlines, Inc. v. Hughes,* 308 F.Supp. 679, 683 (S.D.N.Y.1969), *modified on other grounds,* 449 F.2d 51 (2d Cir.1971), *rev'd on other grounds,* 409 U.S. 363 (1973).

C. Patent Infringement

The complaint seeks recovery for patent infringement. Compl. at ¶ ¶ 7-10. Accepting as true the allegations set forth in the complaint, defendants infringed BIC's patents.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1. Availability of Lost Profits

*2 A court shall award damages for patent infringement to "compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. To recover lost profits, the plaintiff must show that "but for" the infringement, it would have made the infringer's sales. *BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed.Cir.1993). The *Panduit* test, an acceptable test for determining "but for" causation, is comprised of the following four factors: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3)[ ] manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit [plaintiff] would have made." *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir.1978); *Id.* at 1218.

a. Demand for the Product

A patent owner may satisfy the first prong by demonstrating a significant amount of sales of the infringing product as evidence of demand for the product. *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552 (Fed.Cir.1984). BIC meets this prong of the *Panduit* test. There were substantial sales of the infringing product by the defendants. BIC Corporation's Preliminary Damages Report (hereinafter, "Rep.") at Exhibit ("Exh.") I-1. First Prominence sold 55,675,000 lighters each year from 1995 to 2000, and Era and Legend sold 7,629,253 lighters in 1997. *Id.*

b. Absence of Noninfringing Substitutes

As for the second prong, the patent owner may rely on proof of its established market share rather than proof of an acceptable noninfringing substitute. *State Indus., Inc. v. Mor-Flo Indus.*, 883 F.2d 1573, 1578 (Fed.Cir.1989). Relying on market share, rather than acceptable noninfringing substitutes, allows the plaintiff to recover lost profits by establishing "with reasonable probability sales it would have made 'but for' the infringement." *BIC Leisure Products, Inc.*, 1 F.3d at 1219. BIC also meets this prong. From 1995 to 2000, its market share ranged from 32.4% to 40.7%. Rep. at Exh. I-1.

c. Manufacturing Capacity

BIC meets this prong. It submitted an affidavit confirming that it had the manufacturing capacity to make the additional lighter sales it would have made if the infringers were not in the market. *Id.* at 12; *Id.* at Exh. 1.

d. Amount of Profit

BIC meets this prong. It submitted an affidavit confirming that it would have made an additional, quantifiable profit from additional sales. *Id.*

2. Calculation of Lost Profits

As noted above, BIC's market share was between 32.4% and 40.7% from 1995 to 2000. *Id.* at Exh. I-1. First Prominence's share was between 6.8% and 8.1%, and ERA's and Legend's combined share was approximately 1%. *Id.* BIC's adjusted share of the market without these three entities ranges from 34.9% to 44.7%. *Id.* Based on these figures, BIC would have sold 68,067,137 more lighters "but for" the defendants: 66,361,722 from First Prominence, and 1,705,415 from ERA and Legend. *Id.* at Exh. I-2. After multiplying the total lost unit sales by the average profit per unit for each year from 1995 to 2000, [FN1] BIC's lost profits totaled $8,017,762: $7,857,836 from First Prominence and $159,926 from ERA and Legend combined. *Id.*

> FN1. For example, there were 9,720,361 lost unit sales in 1995. Applying the lost profit rate of $0.109 per unit yields approximately $1,064,106 in lost profits in 1995. Rep. at Exh. I-2.

3. Reasonable Royalties

*3 In addition to lost profits, a plaintiff may recover reasonable royalties on an infringer's sales for which the plaintiff has not established lost profits. 35 U.S.C. § 284. The royalty may be based on an established royalty, if one exists, or the result of hypothetical negotiations between a willing patent owner and a willing prospective licensee at the time of infringement. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed.Cir.1995). An established royalty is generally the best measure of a "reasonable" royalty. *Nickson Indus., Inc., v. Rol Mfg. Co.*, 847 F.2d 795, 798 (Fed.Cir.1988).

BIC recently established 3% as a reasonable royalty rate in a settlement agreement with two other companies. Rep. at 13-14. This Court finds that the established royalty rate of 3% is reasonable in this case. First Prominence sold a total of 334,050,000 infringing lighters. *Id.* at 14. After deducting BIC's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lost profits on 66,361,722 lighters (based on BIC's "but for" market share), 267,688,278 lighters remain. *Id.* The remaining 267,688,278 lighters were sold at $.052 per lighter totaling $13,919,790. *Id.* Multiplying $13,919,790 by a 3% royalty rate yields $417,594 in royalty damages against First Prominence. Although ERA and Legend did not submit data about their lighter prices, it is reasonable to apply First Prominence's low cost per lighter to their sales. ERA and Legend sold 7,629,253 lighters. *Id.* at Exh. I-1. After deducting BIC's lost profits on 1,705,415 lighters (based on BIC's "but for" market share), 5,923,838 lighters remain. Applying a unit price of $.052 to the remaining 5,923,838 lighters totals $308,040. *Id.* Multiplying $308,040 by a 3% royalty rate yields $9,241 in estimated damages against ERA and Legend. *Id.*

4. Prejudgment Interest

"[P]rejudgment interest should be awarded under § 284 absent some justification for withholding such an award." *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 657 (1983). Prejudgment interest is typically included to ensure that damages are "adequate to compensate for the infringement." *Id.* at 655 (quoting 35 U.S.C. § 284). The rate of interest is within the discretion of the district court. *Bio-Rad Laboratories, Inc. v. Nicolet Instrument, Corp.,* 807 F.2d 964, 969 (Fed.Cir.1986). "The district court may 'fix' the interest and select an award above the statutory rate (citations omitted), or select an award at the prime rate." *Lam, Inc. v. Johns-Manville Corp.,* 718 F.2d 1056, 1066 (Fed.Cir.1983). A commonly accepted prejudgment interest rate in patent damages cases is the prime rate. *See, e.g., Uniroyal, Inc. v. Rudkin-Wiley Corp.,* 939 F.2d 1540, 1545 (1991). The base damages (lost profits plus reasonable royalties) are $8,275,430 against First Prominence and $169,167 against ERA and Legend. BIC calculated the cumulative interest rates for each year from 1995-2000 using the prime rate. [FN2] Rep. at Exh. M. Applying the prime rate to the base damages yields a total of $9,721,219 against First Prominence and $206,510 against ERA and Legend. *Id.*

> FN2. For example, the total damages in 1995 were $1,135,795. The cumulative interest rate based on the prime rate was 1.3326. Applying the interest rate to the damages yields $1,513,560 for 1995.

5. Enhanced Damages

*4 In a patent infringement case, a trial court "may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. One of the purposes of increased damages is the deterrence of willful patent infringement. *Avia Group Int'l, Inc. v. L.A. Gear California,* 853 F.2d 1557, 1566 (Fed.Cir.1988). Before increasing damages, the court must first determine if the defendants willfully infringed, and second, the court must decide if the damages should be increased based on the totality of the circumstances. *Mentor H/S Inc. v. Med. Device Alliance, Inc.,* 244 F.3d 1365, 1380 (Fed.Cir.2001). An examination of the totality of the circumstances includes the following: "(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, and (3) the infringer's behavior as a party to the litigation." *Bott v. Four Star Corp.,* 807 F.2d 1567, 1572 (Fed.Cir.1986), *overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1038 (Fed.Cir.1992).

The infringement by the defendants was willful. All three defendants had notice of plaintiff's patent rights, but, none of them sought advice of counsel regarding their apparent infringement. Rep. at 9. Therefore, the base damages award should be tripled under 35 U.S.C. § 285. This results in additional damages of $16,550,860 against First Prominence, and $338,334 against ERA and Legend.

6. Attorney's Fees

A trial court also has the authority to award attorney's fees to the prevailing party "in exceptional cases." 35 U.S.C. § 285. "An express finding of willful infringement is a sufficient basis for classifying a case as 'exceptional,' and indeed, when a trial court denies attorney fees in spite of a finding of willful infringement, the court must explain why the case is *not* 'exceptional' within the meaning of the statute." *Modine Mfg. Co. v. Allen Group, Inc.,* 917 F.2d 538, 543 (Fed.Cir.1990) (emphasis in original). Because the Court has found that defendants willfully infringed, BIC's case is therefore deemed exceptional. BIC submitted a declaration by Robert Mitola indicating that the attorney's fees and costs for this case totaled $175,071.50. Rep. at Exh. I. I therefore recommend that BIC be awarded $175,071.50 in costs and attorney's fees, to be divided equally among the defendants, or $58,357 each.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IV. CONCLUSION

Based on the evidence presented and applicable case law, this Court respectfully recommends that BIC be awarded $7,857,836 in damages for lost profits against First Prominence, and $159,926 against ERA and Legend. In addition, BIC should be awarded reasonable royalty damages at a rate of 3%, resulting in further damages of $417,594 against First Prominence, and $9,241 against ERA and Legend. Applying the prime rate of interest to the base damages ($8,275,430 against First Prominence, and $169,167 against ERA and Legend) yields $9,721,219 in damages against First Prominence, and $206,519 against ERA and Legend. Because of defendants' willful infringement, BIC should be awarded enhanced damages of $16,550,860 against First Prominence, and $338,334 against ERA and Legend. Lastly, BIC should be awarded $175,071.50 for attorney's fees and costs with each defendant paying a one-third share or $58,357. In sum, this Court respectfully recommends that BIC be awarded a total of $26,330,436 against First Prominence, and $330,783.50 each against ERA and Legend.

|  | First Prominence | ERA & Legend |
|---|---|---|
| Lost Profits | $ 7,857,836 | $ 159,926 |
| Reasonable Royalty | 417,594 | 9,241 |
| Base Damages (lost profits and reasonable royalty) | 8,275,430 | 169,167 |
| Base Damage Plus Interest | 9,721,219 | 206,519 |
| Enhanced Damages | 16,550,860 | 338,334 |
| Attorney's Fees and Costs | 58,357 | 116,714 |
| Total | $26,330,436 | $ 661,567 (330,783.50 each) |

*5 Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Sidney H. Stein, 500 Pearl Street, Room 1010, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989) (*per curiam*); 28 U.S.C. § § 636(b)(1) (West Supp.1995); Fed.R.Civ.P. 72, 6(a), 6(e).

2001 WL 1597983 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:00CV07155 _____ (Docket) (Sep. 21, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 1
1999 WL 102798 (N.D.Ill.), 50 U.S.P.Q.2d 1041
(Cite as: 1999 WL 102798 (N.D.Ill.))

▶

**Motions, Pleadings and Filings**

United States District Court, N.D. Illinois, Eastern Division.
C & F PACKING CO., INC., Plaintiff,
v.
IBP, INC. Defendant.
No. 93 C 1601.

Feb. 22, 1999.

MEMORANDUM OPINION AND ORDER

WILLIAMS, J.

*1 The court grants plaintiff's request for calculation of prejudgment interest. The prejudgment interest shall be calculated at the prime rate of interest. The court also denies defendant's post-trial motion for judgment as a matter of law, or in the alternative, for a new trial or remittitur.

Background
Plaintiff C & F filed an amended complaint charging Defendant IBP with various patent and misappropriation of trade secret violations and in early December 1998, C & F's trade secret claims were tried before a jury. On December 9, 1998, the jury found that C & F possessed trade secrets and that IBP misappropriated those trade secrets. The jury assessed actual damages of approximately $10.9 million, but did not find that IBP's misappropriation was willful or malicious. Therefore, no exemplary damages were awarded. Following the verdict, plaintiff submitted its request for prejudgment interest and defendant filed its post-trial motion for judgment as a matter of law and for a new trial or remittitur. The court now addresses both plaintiff's request for prejudgment interest as well as defendant's post-trial motions.

Analysis
Defendant argues that absent an express agreement between the parties or provision in the Illinois Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. 1065/4, the court may not permit C & F to collect prejudgment interest. Plaintiff, in turn, contends that the ITSA does authorize the award of prejudgment interest and in the alternative is warranted under equitable considerations.

Awarding Prejudgment Interest

Just as in *Movitz v. First National Bank of Chicago,* plaintiff is wrong to think that it is presumptively entitled to prejudgment interest. Courts have consistently held that only cases arising under federal law are automatically entitled to prejudgment interest. *Movitz v. First National Bank of Chicago,* 982 F.Supp. 566, 567 (N.D.Ill.1997). This case is a diversity case however, and, like *Movitz,* is controlled by Illinois law. Although originally filed as a patent claim, only claims under the ITSA were actually litigated. "In diversity cases governed by Erie, federal courts look to state law to determine the availability of (and rules for computing) prejudgment interest." *Medcom Holding Co. v. Baxter Travenol Lab., Inc.,* 106 F.3d 1388, 1405 (7th Cir.1997). However, unlike the plaintiff in *Movitz,* C & F is entitled to prejudgment interest under Illinois law.

Illinois law provides that prejudgment interest is generally recoverable only by express agreement or if authorized by statute. *Continental Case. Co v. Commonwealth Edison Co.,* 286 Ill.App.3d 572, 575 (1997). Regardless of statutory authority, however, Illinois courts will only permit "recovery of prejudgment interest...if the amount is a fixed amount or easily computed." *Medcom Holding Co.,* 106 F.3d at 1405. Ordinarily, "the decision to allow statutory interest lies within the sound discretion of the district court." *Id.* "Alternatively, the court can grant prejudgment interest if it is warranted by equitable considerations." *Movitz,* 982 F.Supp. at 568. Plaintiff does not argue that it is entitled to prejudgment interest because of any express agreement between the parties. Nor does plaintiff contend that the Illinois Interest Act provided the source of its prejudgment interest claim. Thus, the first issue before the court is whether plaintiff deserves prejudgment interest in light of the ITSA, the applicable statute, or because of equitable considerations.

*2 Under the ITSA, plaintiff may obtain damages for "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." ITSA, 765 Ill. Comp. Stat. 1065/4 (1998). In addition, damages are available "if neither damages

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nor unjust enrichment caused by the misappropriation are proved by a preponderance of the evidence, the court may award damages caused by misappropriation measured in terms of a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." Defendant would like this court to believe that because the ITSA does not explicitly provide that prejudgment interest is available, C & F is barred from such an award. The court, however, believes defendant's view of the law is far too limited.

A broader reading of the ITSA suggests that prejudgment interest may be awarded to successful plaintiffs. As noted above, the ITSA does specifically provide for unjust enrichment damages caused by misappropriation. A number of courts hearing patent and trademark property cases, close relatives of trade secret litigation, permit prejudgment interest, on the belief that the prejudgment interest award is essentially part of the unjust enrichment damages. law. See _General Motors Corp. v. Devex Corp., 461 U.S. 648, 655 (1983)_ (holding that there is a presumption in favor of prejudgment interest under the patent laws).

These courts award prejudgment interest to hold defendant accountable for the entire benefit it derived from the unlawful use of plaintiff's intellectual property. _Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1250 (Fed.Cir.1989)_(noting that in a patent and misappropriation of trade secret case "prejudgment interest is the rule governing this class of award" and holding that the court saw "no reason why damages for misappropriated trade secrets should be treated differently from damages for patent infringement). In _Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corporation,_ the court held that prejudgment interest is compensatory, not punitive in nature and should be awarded under patent law absent some justification for withholding such an award. _Bio-Rad Laboratories Inc. v. Nicolet Instrument Corporation, 739 F.2d 604, 618 (Fed.Cir.1984)_. See also _Gorenstein Enters. v. Quality Care-USA, Inc., 874 F.2d 431, 436 (7th Cir.1989)_(holding that prejudgment interest is presumptively available to victims of trademark infringement since "without it, compensation to the plaintiff is incomplete and the defendant has an incentive to delay"). Although the ITSA does not expressly provide for prejudgment interest awards, the express provision for unjust enrichment damages necessarily involves such an award.

Other courts agree that prejudgment interest should be awarded in order to make successful plaintiffs whole, as part of the overall compensatory damages. "Prejudgment interest...is part of the actual damages sought to be recovered." _Monessen Southwestern Ry. Co. v. Morgan, 486 U.S. 330, 335 (1988)_. The Seventh Circuit similarly favors the award of prejudgment interest where plaintiff would otherwise suffer incomplete unjust enrichment damages. In an ERISA case, the court held that "the award of prejudgment interest is necessary for full compensation of the victims of wrongdoing....Moreover, the award of prejudgment interest has an independent ground in this case; the principle of unjust enrichment." _Lorenzen v. Employees Retirement Plan of the Sperry and Hutchinson Co., Inc., 896 F.2d 228, 236 (7th Cir.1990)_.

*3 Defendant duly notes that at trial, "C & F sought only money damages from IBP under an unjust enrichment theory. The case was tried to a jury solely on that basis." (Def. Brief at 5.) As part of their unjust enrichment damage, plaintiff deserves prejudgment interest to account for the loss of money, that the jury has determined plaintiff would have received, were it not for defendant's unlawful misappropriation of trade secrets. Any award of unjust enrichment absent prejudgment interest would be incomplete.

Alternatively, defendant maintains that since plaintiff asked for monetary damages and not equitable relief, the court may not award prejudgment interest resulting from equitable considerations. While it is true that C & F sought only monetary damages, this fact does not preclude the award of prejudgment interest. In _Roton Barrier, Inc. v. Stanley Works,_ the Federal Circuit court interpreted the ITSA and upheld the trial court's decision to grant prejudgment interest. The court made plain that since defendant breached a confidential relationship by misappropriating plaintiff's trade secrets, the award was "a matter of fairness and equity." _Roton Barrier, Inc., 79 F.3d 1112, 1123 (Fed.Cir.1996)_. The court concluded that, without prejudgment interest, plaintiff would not have been entirely compensated. _Id._ In this case, IBP breached a confidential relationship as well. [FN1] The fact that C & F did not ask for equitable relief does not mean that the compensatory award resulting from this litigation should not attempt to address concerns of fairness and equity.

> FN1. Plaintiff had the burden of proving that IBP misappropriated C & F's trade secrets. Defendant knows full well that, as part of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
1999 WL 102798 (N.D.Ill.), 50 U.S.P.Q.2d 1041  
(Cite as: 1999 WL 102798 (N.D.Ill.))

Page 3

that burden, C & F had to show that IBP had breached a confidential relationship. Defendant's reading of *Roton Barrier* is misguided. The jury need not find a direct, confidential relationship between IBP and C & F in order for them to reach the conclusion that IBP breached a confidence. Where defendant had notice of a direct confidential relationship between plaintiff and another party, but failed to abide by its obligation to keep information obtained from one of those parties secret, defendant has breached a confidential relationship. See Jury Ins. # 33(M). In rendering a verdict in favor of plaintiff, the jury apparently found that such a breach did occur.

Defendant relies heavily on *Movitz* in support of its argument against prejudgment interest. The instant case, however, can be distinguished from *Movitz*. In that case, Judge Norgle found that defendant did not wrongfully withhold money from plaintiff, use plaintiff's money for its own use or intentionally deceive plaintiff and that defendant's conduct did not warrant an equitable award of prejudgment interest. *Movitz*, 982 F.Supp. at 571. The jury in *Movitz* found defendant liable for negligent management of plaintiff's investment in breach of contract and a fiduciary duty. In strong contrast, the jury in this case found that, as a result of its misappropriation of C & F trade secrets, IBP reaped significant monetary benefits--benefits that would have belonged to C & F, but for the misappropriation. See Jury Ins. 44(M)-1,2.

Thus, the court is persuaded, that even absent an express provision for prejudgment interest under ITSA, C & F should receive prejudgment interest as a matter of fairness and equity. Without prejudgment interest, plaintiff cannot been fully compensated for the defendant's unjust enrichment. Since the court finds that the ITSA does permit an award of prejudgment interest and that equitable concerns also warrant prejudgment interest, the court therefore grants plaintiff's request for an award of prejudgment interest.

Computation of Prejudgment Interest

*4 The amount of prejudgment interest required to properly compensate a plaintiff can vary, depending on particular circumstances of the case. See *Gorenstein Enters.*, 874 F.2d at 436; *Cement Division, National Gypsum v. City of Milwaukee*, 144 F.3d 1111 (7th Cir.1998). The task of calculating prejudgment interest is a matter ordinarily left to the discretion of the district court. *Cement Division*, 144 F.3d at 1114. However, the court should consider that "the essential rationale for awarding prejudgment interest is to ensure that the injured party is fully compensated for its loss." *Cement Division, National Gypsum v. City of Milwaukee*, 515 U.S. 189, 195 (1995).

C & F urges this court to use either IBP's return on investment rate or, in the alternative, the prime rate when calculating the amount of prejudgment interest due. Plaintiff also asks that the interest charged be compound, not simple interest. Defendant contends that, if prejudgment interest is to be awarded, the court must utilize the 5% simple annual interest rate provided under the Illinois Interest Act. [FN2]

> FN2. As the court in *In re Estate of Wernick*, held "the interest rate statute is a remedy separate from the equitable powers of the court to make an injured party whole." *In re Estate of Wernick*, 535 N.E.2d 876, 889 (1st Dist.Ill.1989). Since this court has found that both the ITSA and equitable considerations warrant the award of prejudgment interest in this case, it need not reach the issue of whether plaintiff qualifies for prejudgment interest under the Illinois Interest Act, 815 Ill. Comp. Stat. 205/2 (1993). Accordingly, the five percent interest rate mandated under the Interest Act does not apply.

The court finds plaintiff's arguments in support of alternatives to the prime rate unpersuasive. The ITSA contains no express provision for prejudgment interest that would indicate a statutory interest rate. In an attempt to guide the district court, absent a statutorily prescribed interest rate, the Seventh Circuit has held that "the best starting point is to award interest at the market rate, which means an average of the prime rate for the years in question." *Cement Division*, 31 F.3d 581, 587 (7th Cir.1994). Courts frequently use the prime rate in order to calculate prejudgment interest. The circuit court cases "have consistently indicated...that the district court has the discretion...to use the prime rate for fixing prejudgment interest where there is no statutory interest rate." *Gorenstein Enters.*, 874 F.2d at 436.

Illinois courts have rejected the 5% interest rate suggested for cases falling under the Illinois Interest Act. "The statutory rate for prejudgment interest has not been changed to reflect the escalating interest rates in the market. As a result [it] does not provide

an accurate measure of compensation for money wrongfully withheld." *In Re Estate of Wernick,* 535 N.E.2d 876, 888 (1st Dist.Ill.1989). The *Wernick* court granted prejudgment interest under the prime rate. "The statutory [Illinois Interest Act] rate of 5% is not sufficient to make the petitioners whole, but prime rate of interest...will compensate the petitioners for their loss." *Id.* The court sees no reason to depart from the well-established practice of using the prime rate as the basis of its prejudgment interest calculation.

Briefly, the court will address defendant's argument that because the jury damage award was not liquidated or subject to exact calculation, prejudgment interest cannot be calculated. Under Illinois law, "even if authorized by statute, interest can only be awarded if the damages amount is fixed or easily computed." *U.C. Castings Co. v. Knight,* 754 F.2d 1363, 1376 (7th Cir.1985). Therefore, "if the amount of a claim can be ascertained, or is capable of ascertainment by mere calculation or computation, it is liquidated; if judgment, discretion, or opinion, as distinguished from calculation or computation is required to determine the amount of the claim, it is unliquidated." *First Nat'l Bank Co. of Clinton, Ill. v. Insurance Co. of North America,* 606 F.2d 760, 769-70 (7th Cir.1979). See also *Krantz v. Chessick,* 668 N.E.2d 77, 80 (1st Dist.Ill.1996)(holding that if amount is determinable, interest can be awarded on money payable even when claimed right and amount due require legal ascertainment).

*5 The court finds that interest on damages awarded in this case are ascertainable by mere calculation. Again, as defendant noted in its brief, "C & F sought only money damages from IBP under an unjust enrichment theory." (Def. Brief at 5.) The parties presented only one theory of damages to the jury-unjust enrichment. Therefore no question remains as to the proper basis for determining the damage amount. The jury had limited data upon which a finding for damages could have been based. Both parties in this case spent a good deal of time presenting to the jury detailed calculations of IBP's actual sales of precooked Italian sausage on an annual basis. All damage estimates were calculated on the basis of IBP sales and profits. Thus, the court concludes that the damages amount was sufficiently exact to permit calculation of prejudgment interest damages. [FN3]

> FN3. Additionally, the interest may be compounded. "It is, of course, settled in the case law that compounding of prejudgment interest is acceptable." *In re Oil Spill by the Amoco Cadiz Off the Coast of France,* 954 F.2d 1279, 1337 (7th Cir.1992)(per curiam).

Defendant does not dispute the accuracy of plaintiff's prejudgment interest calculation using the prime rate of interest. The court will therefore adopt plaintiff's figures and assess prejudgment interest damages (calculated at the prime rate of interest) in the amount of $5,131,265.

*Defendant Post-Trial Motions*

Defendant IBP claims that so much of the evidence presented at trial was "unrebutted and fatal to C & F's claim," even when the court draws all permissible inferences in plaintiff's favor, no reasonable jury could have rendered a verdict in favor of C & F. (Def. Mem. at 1.) In the alternative, defendant asks for a new trial or remittitur. In support of these motions, defendant argues that because the verdict is contrary to the weight of the evidence and was the product of various trial errors that unfairly prejudiced it, the court should retry the case or, at a minimum, reduce the amount of damages awarded by the jury. After having thoroughly reviewed the arguments presented, the court denies each of defendant's post-trial motions.

Defendant claims that the jury verdict rendered in favor of C & F was unjustified in light of the evidence presented. First, IBP claims that no reasonable jury could have found it liable for misappropriation of trade secrets. Additionally, defendant insists that the evidence failed to support the jury's finding that: (1) C & F possessed the 11 items proposed as trade secrets; (2) the 11 proposed items were trade secrets; and (3) C & F deserved $10.9 million in damages. (Def. Mem. at 2-3.) In the Seventh Circuit, courts look to state law to determine the applicable standard to a motion for judgment as a matter of law. *Sokol Crystal Products, Inc., v. DSC Communications Corporation,* 15 F.3d 1427, 1431 (7th Cir.1994).

According to Federal Rule of Civil Procedure 50(a), where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the prevailing] party...the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim that cannot under controlling law be maintained or defeated without a favorable finding on that issue." Fed.R.Civ.P. 50(a). Before the court will

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reverse a jury finding, it must conclude that "no reasonable person could have found that [C & F] established the challenged aspects of its claim." *Mangren Research and Development Corp. v. National Chemical Company, Inc.*, 87 F.3d 937, 942-43 (7th Cir.1996)(citing *Mayer v. Gary Partners and Co.*, 29 F.3d 330, 335 (7th Cir.1994). [FN4]

> FN4. Just as in *Mangren*, while plaintiff asserts that defendants misappropriated more than one trade secret or combination of trade secrets, jurors in this case were not asked to make findings as to each trade secret. Therefore, "the verdict must be sustained if the evidence supports either aspect of [C & F's] claim." *Mangren*, 87 F.3d at 942 (FN 3).

*6 In the alternative, defendant asks the court for a new trial under Federal Rule of Civil Procedure 59(a). The standard defendant must meet before the court will grant a new trial is equally onerous. "A new trial is warranted only 'where the jury's verdict is against the weight of the evidence." ' *Mangren*, 87 F.3d at 942.

Contrary to defendant's assertion, the court believes that the evidence was certainly sufficient for any reasonable person to conclude that C & F met its burden on all requirements for a finding that IBP misappropriated trade secrets. In its motion, defendant carts out all the old arguments debated, and ruled upon, in practically every motion in limine or evidentiary objection it posed during the course of this litigation. The court stands on its prior rulings in regard to each of those arguments. Thus, viewing all evidence in a light most favorable to plaintiff, the court denies defendant's motion for judgment as a matter of law.

For the same reasons the court denies defendant's motion for judgment as a matter of law, it denies its request for a new trial. During trial, parties presented ample evidence supporting the jury's verdict.

In one, last-ditch effort, defendant asks the court to reduce the amount of damages awarded to not more than $850,000. Defendant contends that it is entitled to remittitur because the $10.9 million in damages awarded to plaintiff are grossly excessive as a matter of law. Under ITSA, damages "can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." 765 ILCS 1065/4(a). Unjust enrichment is the profits made by others as a result of a defendant's misappropriation and was the sole measure of damages in this case.

Once again, defendant's request for remittitur is grounded in its desire to rehash old arguments this court has heard, thoroughly considered and resolved. The court stands on its prior rulings. At trial, both parties presented evidence purporting to show how much profit C & F's alleged trade secrets generated. The jury accepted plaintiff's evidence and awarded it $10.9 million. The court concludes that there was sufficient evidence to permit a reasonable jury to make such a finding and therefore denies defendant's request for remittitur.

Conclusion

Therefore, for the reasons set forth above, the court awards prejudgment interest damages in the amount of $5,131,265 and denies all of defendant's post-trial motions. [746-1] & [746-2].

1999 WL 102798 (N.D.Ill.), 50 U.S.P.Q.2d 1041

**Motions, Pleadings and Filings (Back to top)**

•     1:93CV01601    (Docket) (Mar. 17, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d  
2001 WL 1104604 (N.D.Ill.)  
(Cite as: 2001 WL 1104604 (N.D.Ill.))

Page 1

**H**  
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.  
CHEMETALL GMBH, Plaintiff,  
v.  
ZR ENERGY, INC., Joseph T. Fraval, and Arnold Berkovitz, Defendants.  
No. 99 C 4334.

Sept. 18, 2001.

*MEMORANDUM OPINION AND ORDER*

SCHENKIER, Magistrate J.

*1 [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

MOTION:

DOCKET ENTRY:

(1) [ ] Filed motion of [use listing in "Motion" box above.]

(2) [ ] Brief in support of motion due _____.

(3) [ ] Answer brief to motion due _____. Reply to answer brief due _____.

(4) [ ] Ruling/Hearing on _____ set for _____ at _____.

(5) [ ] Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) [ ] Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) [ ] Trial[set for/re-set for] on _____ at _____.

(8) [ ] [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) [ ] This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]  
[ ] FRCP4(m) [ ] General Rule 21 [ ] FRCP41(a)(1) [ ] FRCP41(a)(2).

(10)• [Other docket entry] Enter Memorandum Order and Opinion. For the reasons set forth within: Defendant's motion for a judgment as a matter of law or, alternatively, for a new trial, pursuant to Fed.R.Civ.P. 50 and 59 (doc. # 110) is denied. Plaintiff's motion to amend the judgment to include prejudgment and post-judgment interest (doc. # 144) is granted in part. The judgments against ZR Energy, Mr. Faval and Mr. Berkovitz on the trade secret claim are increased to $139,667.88, 2,133.16 and 4,266.33, respectively, to include prejudgment interest to March 12, 2001. Post-judgment interest shall accrue on the judgments against ZR Energy and Mr. Berkovitz at the rate of $16.13 and $.3980 per day, respectively, from March 12, 2001. In all other respects, the motion is denied. Plaintiff's bill of costs is granted in part and denied in part. Plaintiff is awarded $26,102.07 in taxable costs under Rule 54(d).

(11) [ ] [For further detail see order (on reverse side of/attached to) the original minute order.]

/ Notices mailed by judge's staff.

On March 9, 2001, a jury returned a verdict awarding compensatory damages against defendants ZR Energy, Inc. ("ZR"), Joseph T. Fraval and Arnold Berkovitz for trade secret misappropriation; punitive damages against Mr. Berkovitz for willful and malicious trade secret misappropriation; and compensatory damages against Mr. Fraval for breach of contract. On March 12, 2001, the Court entered judgment on those verdicts. All defendants have moved for judgment as a matter of law or, in the alternative, for a new trial, pursuant to Fed.R.Civ.P. 50 and 59 (doc. # 110). For its part, plaintiff Chemetall has moved for prejudgment and post-judgment interest (doc. # 144), and for an award of costs (doc. # 117). For the reasons set forth below, (a) defendants' motion for judgment as a matter of law or new trial is denied; (b) Chemetall's motion for prejudgment and post-judgment interest is granted in part; and (c) Chemetall's bill of costs is granted in part.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

I.

*2 We address the Rule 50 motions first. Rule 50 states in pertinent part:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment-and may alternatively request a new trial or join a motion for new trial under Rule 59.

Fed.R.Civ.P. 50(b). The plaintiff argues that the defendants have waived their Rule 50 motion and, alternatively, that the evidence was sufficient to support the jury's verdicts on their claims. We address these arguments in turn.

A. Waiver.

The plain language of Rule 50(b) requires a party to move for judgment as a matter of law "at the close of all the evidence" to preserve the right to make such motion after trial. The reason for requiring a party to renew a motion for judgment as a matter of law at the close of all the evidence is "to enable the trial court to re-examine the sufficiency of the evidence ... and to alert the opposing party to the insufficiency of his case" before the case goes to the jury. *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 472 (5th Cir.2000). The Seventh Circuit strictly adheres to this requirement. *See, e.g., Eastern Natural Gas Corp. v. Aluminum Co. of America*, 126 F.3d 996, 1000 (7th Cir.1997) ("In *Umpleby*, we ruled unequivocally that in order to preserve a motion for judgment as a matter of law which was not granted by the trial court, the motion must be renewed at the close of all the evidence"); *Umpleby v. Potter & Brumfield, Inc.*, 69 F.3d 209, 212 (7th Cir.1995) ("In order to preserve its motion for judgment as a matter of law, P & B had to renew its motion at the close of all the evidence"); *see also Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1139-40 (7 th Cir.1994) (noting that the practice of not applying this requirement "rigidly" was abandoned in light of the 1991 amendments that make clear the rule is to be applied strictly).

Defendants' Rule 50(b) motion challenges the jury's finding of liability and award of compensatory damages for trade secret misappropriation, the jury's assessment of punitive damages against Mr. Berkovitz, and the jury's finding of liability and award of compensatory damages against Mr. Fraval for breach of contract. Chemetall argues that defendants' Rule 50(b) motion is barred as to all claims, because defendants failed to make the requisite Rule 50(a) motion at the close of all the evidence.

1.

Mr. Fraval and ZR Energy concede that they did not move for judgment as a matter of law at the close of all the evidence as to Chemetall's claim of liability and compensatory damages on the trade secret claim. Defendants argue that it would have been superfluous--and, indeed, "silly" (Defs.' Reply Mem. at 4)--to do so because of the Court's ruling on Chemetall's Rule 50(a) motion at the close of defendants' case. Defendants contend that in denying Chemetall's Rule 50(a) motion, and referring to the denial of the Rule 50(a) motions defendants made at the end of plaintiff's case, the Court "effectively renewed its denials" of defendants' Rule 50(a) motions and thus made further defendants' defense motions "pointless" (Defs.' Reply at 4, 9) (citing Trial Tr. at 1017, 1018). [FN1] Thus, defendants contend that their "post-trial motions relating to [d]efendants Fraval and ZR Energy have not been waived because the purposes of Rule 50 have been fulfilled" (Defs.' Reply Mem. at 7). In support of this argument, the defendants argue that the Seventh Circuit does *not* always "strictly adhere" to Rule 50, but has allowed "a more flexible approach," putting "the substance of Rule 50 ahead of its form when equity demands it" (Defs.' Reply at 3, n. 2) (citing *Pro Football Weekly, Inc. v. Gannett Co.*, 988 F.2d 723, 726 (7th Cir.1993) and *Urso v. United States*, 72 F.3d 59, 61 (7th Cir.1995)).

> FN1. The Court's comments and rulings in response to Chemetall's motion for judgment as a matter of law upon which defendants rely are set forth below:
>
> For the reasons I expressed yesterday when the defense made its motion for a judgment as a matter of law on Count I, I deny the [plaintiff's] motion. As I said yesterday, I think there is evidence which if accepted by the jury could lead them to draw the conclusion [that a trade secret existed and had been misappropriated by the Defendants].
>
> And for the reasons I have already expressed on the record I think both yesterday when the defense moved for judgment as a matter of law on that [breach of contract] claim and during the various instruction conferences we have had, I am going to deny that motion

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[by plaintiff for judgment on the breach of contract claim].

*3 The Court disagrees that, in this case, the purposes of Rule 50 were served in the breach. The Advisory Committee Notes to the 1991 amendment to Rule 50 explain that the requirement of making the motion at the close of all the evidence "assure[s] the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment." In addition, the requirement serves "as a means of defining the appropriate issue posed by the post-verdict motion," since "[a] post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." The Court's comments in denying Chemetall's motion for judgment as a matter of law did not satisfy these purposes, and thus defendants could not have fairly relied on those comments as a license to refrain from making their own Rule 50(a) motion at the close of all evidence. Nor were the Court's comments intended to preempt defendants from making a renewed Rule 50(a) motion, since the Court had no idea whether defendants would make a motion or, if so, what grounds they might advance in support of a renewed motion. And, indeed, even defendants did not view the Court's comments as preempting a renewed Rule 50(a) motion, because (as explained below) they specifically made one on behalf of Mr. Berkovitz on the trade secret claim.

The situational exceptions to strict adherence to this procedural prerequisite, as noted by *Pro Football* and *Urso*, are very narrow and inapplicable here. In *Pro Football*, the Seventh Circuit held that the purposes of Rule 50 were served when the trial judge, after taking argument on an issue at an instruction conference, specifically informed the parties that it considered defendant's argument at that conference to be a motion for directed verdict at the close of the evidence and would take that motion under advisement. In that case, the Seventh Circuit found that an additional, formal motion made in court "at the close of all the evidence" would have been superfluous and unnecessary. 988 F.2d at 726. Here, the Court did not make any such statement to the defendants. The decision in *Urso* is also distinguishable. There, the motion for judgment on a matter of law was made at the close of all the evidence, but the grounds for it were not specified. 72 F.2d at 61. Here, by contrast, ZR Energy and Mr. Fraval made no renewed motion at all.

Given the clear law in this Circuit requiring that Rule 50(a) motions be made at the close of all evidence in order to preserve a Rule 50(b) motion after trial, prudence should have dictated that ZR Energy and Mr. Fraval make a renewed motion on the trade secret claim. They did not do so, and as a result, their Rule 50(b) motion on that claim is waived.

2.

Defendants argue that even if the Rule 50(b) motion on trade secret misappropriation was waived as to defendants ZR Energy and Fraval, the motion was preserved as to Mr. Berkovitz. At the close of all the evidence, defense counsel moved for a judgment as a matter of law as to Mr. Berkovitz, alone, on the basis that there had been no evidence of a knowing misappropriation:

*4 *Mr. Griffin:* Judge, if I may, we have one motion. I don't believe that the general knowledge of ZR, which Mr. Fraval's knowledge could be imputed to, but general knowledge of ZR cannot be imputed to Mr. Berkovitz, nor can Mr. Fraval's knowledge be imputed. There is no evidence to sustain a claim for trade secret misappropriation against Mr. Berkovitz. There has been nothing that is adduced showing his knowing efforts of misappropriation of trade secrets. We move for a directed verdict on that issue.

(Trial Tr. at 1019). Mr. Berkovitz asserts that this motion was sufficient to preserve his post-trial challenge to the trade secret verdict against him, both for compensatory and punitive damages.

We agree that this motion preserved Mr. Berkovitz's present post-trial challenge to the punitive damages award. Mr. Berkovitz's motion at the close of all the evidence expressly sought judgment as a matter of law based on his lack of knowing conduct. In his post-trial motion, Mr. Berkovitz seeks judgment as a matter of law on the punitive damages claim on the theory that the evidence did not permit the jury to find his conduct willful and malicious (Defs.' Mem. at 7-12), a motion that likewise challenges the sufficiency of the evidence concerning his mental state. Mr. Berkovitz's motion at the close of all evidence concerning whether he had the mental state necessary to be liable for trade secret misappropriation subsumed the question of whether, if liable, his mental state was such that he should be assessed punitive damages as well, and thus preserved his challenge to the punitive damages award.

However, a different question is presented with respect to whether Mr. Berkovitz's motion at the

close of all evidence was likewise sufficient to preserve his post-trial motion challenging the sufficiency of the evidence to establish that he committed a trade secret violation. That is because Mr. Berkovitz's current challenge is based on a ground (lack of proof that there was a trade secret at all) that was not argued in Mr. Berkovitz's motion at the close of all evidence. Mr. Berkovitz's oral motion at the close of all the evidence raised one point only-- his purported lack of knowing conduct. The statement that "[t]here is no evidence to sustain a claim for trade secret misappropriation" does not refer to evidence concerning whether there was a trade secret, but rather must be read in context with the preceding and following sentences, which focus solely on the question of knowing conduct by Mr. Berkovitz.

Rule 50(a)(2) states that the motion "shall specify the judgment sought and the law and the facts on which the moving party is entitled to judgment." The commentary to Rule 50 states that this articulation of the basis for a pre-verdict motion for judgment as a matter of law "is necessary to achieve the purpose of the requirement that the motion be made before the case is submitted to the jury, so that the responding party may seek to correct any overlooked deficiencies in the proof." Advisory Committee Notes to 1991 Amendment. And, no doubt, that is why the Committee Notes state that a "post-trial motion for judgment can be granted only on grounds advanced in the preverdict motion." Id. (citing Kutner Buick, Inc. v. American Motors Corp., 848 F.2d 614 (3d Cir.1989)). That purpose would not be achieved if a party could seek a pre-verdict judgment as a matter of law on one ground, and then seek a post-verdict judgment as a matter of law on a different ground. That is what Mr. Berkovitz seeks to do here with respect to the jury award of compensatory damages on the trade secret claim. Accordingly, Mr. Berkovitz's motion attacking the jury verdict of liability and compensatory damages on the trade secret claim has been waived.

*5 Mr. Fraval seeks judgment as a matter of law on the jury's verdict holding him liable for compensatory damages on the plaintiff's breach of contract claim. Mr. Fraval argues that there was no evidence that he owed a duty of confidentiality to plaintiff by virtue of his employment agreement with Morton, or the Asset Purchase Agreement between Morton and Chemetall. Specifically, Mr. Fraval argues that the duty of confidentiality he owed to Morton was not assigned to Chemetall, and thus he could not be held liable for a breach of contract to plaintiff (Defs.' Mem. at 13-15).

At the close of plaintiff's case, defense counsel made the following motion for judgment as a matter of law on the trade secret and breach of contract claim:

> Mr. Griffin: The--and I am not going to get into long detailed analyses. I'm not going to argue the law. The only point I'm arguing, and it's on both the breach of contract and on the trade secrets count is that there has been no evidence introduced--and remember, the plaintiffs withdrew their submission of their expert--that the process utilized by ZR Energy was derived from the process at Morton. There is no credible evidence on that. The only evidence that's been submitted is that it was adduced from the Eagle-Picher report and modified by defendants.
> The Court: ... I will tell you that on the trade secret and the contract claim I will take the motion--I am not going to take it away from the jury. I think that there is evidence here that the jury ought to be entitled to decide.

(Trial Tr. at 814, 815). Plaintiff does not deny that the defendants made this motion at the close of plaintiff's case. However, the plaintiff argues that once denied, this motion was not sufficient to preserve Mr. Fraval's post-trial Rule 50 motion on the breach of contract issue, because the motion was not renewed at the close of all the evidence.

We agree. The Court's denial of Mr. Fraval's motion at the close of Chemetall's case, even if an accurate prediction of how it would rule on the Rule 50 motion at the close of the evidence (i.e., that the jury ought to be entitled to decide the issue), did not obviate the need for Mr. Fraval to renew the motion, thereby apprising plaintiff and the Court of his intention to preserve the legal issue for post-trial consideration. That is particularly so, given that the issue raised in Mr. Fraval's post-trial motion (that the evidence failed to establish that he had a duty of confidentiality that transferred from Morton to Chemetall) is different than the challenge he raised in the motion at the close of plaintiff's case (that there was insufficient evidence of a trade secret).

Defense counsel argues, however, that the following motion, made after closing arguments, is sufficient to preserve Fraval's Rule 50(b) motion on the breach of contract verdict (Pl.'s Resp. at 5):

> Mr. Griffin: Judge, I would like to, at least for the record, make a formal motion at this point, based on the closing statements and the fact that plaintiff has not identified to the jury any causation damages for the contract count and didn't ask for

any damages with respect to the contract count, that that be directed out in favor of defendant Fraval.

*6 *The Court:* I'll deny that motion. The evidence is in the record, and all attorneys choose which evidence they are going to specifically highlight and argue. So I'm not going to convert that into a ruling as a matter of law.

(Trial Tr. at 1134).

Mr. Fraval's motion fails to preserve his current post-trial attack on the breach of contract verdict not only because it did not raise the grounds now urged by Mr. Fraval, but it also came too late. Rule 50(a)(2) requires that a pre-verdict motion be made "before submission of the case to the jury." Here, the "formal motion" that Mr. Fraval made "for the record" on the contract claim came only after the lawyers argued to the jury, the Court gave its instructions of law, and the jury was sent out to commence its deliberations. A motion made so late plainly does not preserve a post-trial motion. Thus, Mr. Fraval's Rule 50(b) challenge to the verdict on the contract claim is waived.

B. Sufficiency of the Evidence.

The parties agree that when assessing the sufficiency of the evidence under Rule 50, the standard is whether any rational (or reasonable) jury could find for the plaintiff (Pl.'s Resp. at 6-7; Defs.' Reply at 3, n. 1). See Mayer v. Gary Partners and Co., Ltd., 29 F.3d 330, 335 (7th Cir.1994); Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 630 (7th Cir.1996). [FN2] In the interest of completeness, the Court will address both the one Rule 50 challenge that has been preserved (attacking the punitive damages award), and those challenges that have been waived.

> FN2. The plaintiff correctly points out that the standards governing defendants' Rule 50 motion are supplied by federal, rather than state, law. *Compare* Defs.' Mem. at 3 and Pl.'s Resp. at 6 (citing *Mayer v. Gary Partners and Co., Ltd.,* 29 F.3d 330, 335 (7th Cir.1994)). The defendants contend that they are entitled to judgment as a matter of law, regardless of whether Illinois or federal law applies, because no reasonable jury could have found for the plaintiff (Defs.' Reply at 3, n. 1). *Cf. C & F Packing Co., Inc. v. IBP, Inc.,* 224 F.3d 1296, 1301 (Fed.Cir.2000) (citing *Reboy v. Cozzi Iron & Metal, Inc.,* 9 F.3d 1303, 1307 (7th Cir.1993)).

1.

The defendants' primary attack on the trade secret claim was that the plaintiff's zirconium metal powder manufacturing process ("ZMP process") is not proprietary information that constitutes a trade secret, because "much" of this process has been "available in the public domain for many years in the form of a report known as the Eagle-Picher report"--long before plaintiff acquired its ZMP process from non-party Morton International ("Morton") (Defs.' Mem. at 4). The defendants' attack rests on the notion that because many of the same elements in the ZMP process used by plaintiff are present in the process outlined in the Eagle-Picher report, the plaintiff's process is not a trade secret and thus could not be misappropriated by ZR Energy (Defs.' Mem. at 4-5). In the Court's view, defendants' argument misconceives both Chemetall's burden of proof, and the evidence introduced at trial.

As a legal matter, it was not plaintiff's burden to show that *every* step in its ZMP process is private, and not in the public domain. In order to establish that plaintiff possessed "secret" information, it was enough for plaintiff to prove that certain information used in plaintiff's ZMP process, or the sequential steps of the process as a whole, are valuable and are not known outside plaintiff's business. *Mangren Research and Dev. Corp. v. Nat'l. Chem. Co., Inc.,* 87 F.3d 937, 942 (7 th Cir.1996). *See also* Instruction No. 17. [FN3] In fact, in ruling on the motion for a permanent injunction, the Court has already found that "the testimony does not indicate that Element Nos. 3, 6, 8, and 10 were in the public domain--at least, not in the specific manner in which Morton used them" (Order of April 6, 2001 (citing PX 6, 29-30)). To the contrary, information in the public domain suggested that at least one aspect of the process as developed by Morton would not work Thus, the defendants' argument that "much" of plaintiff's ZMP process is in the public domain (Def.'s Mem. at 4) is a non-starter, because "much" is not all.

> FN3. Defendants do not challenge the sufficiency of plaintiff's evidence concerning the steps they employed to maintain the secrecy of the information.

*7 As a factual matter, although the general verdict reached by the jury did not specify which element or elements in the plaintiff's ZMP process it found to be a trade secret, the verdict represents the jury's unanimous judgment that at least one element in this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 1104604 (N.D.Ill.)
(Cite as: 2001 WL 1104604 (N.D.Ill.))

Page 6

process was entitled to protection. The instructions told the jury it could find for plaintiff on the trade secret claim only if the jury found that plaintiff possessed a trade secret, and gave the jury ample guidance on how to make that determination (see Jury Instructions Nos. 15-20). The Court finds that under these instructions (which are unchallenged here), there was sufficient evidence to allow a reasonable jury to find that Chemetall's ZMP process contained trade secret information--and that the defendants misappropriated it.

The plaintiff used PX 135 to compare 15 specific elements of the ZMP manufacturing processes disclosed in the Eagle-Picher report to the processes utilized by plaintiff and by ZR Energy. That exhibit revealed that the ZR Energy process did not track the process disclosed in the publicly-available Eagle-Picher Report (PX6), but instead, tracked the plaintiff's ZMP process in virtually all regards. The evidence showed that the ZR Energy process employed at least one step that the Eagle-Picher Report suggested would not work--a step that the plaintiff's process also employs. A jury might have chalked this up to mere coincidence or some other innocuous reason. But certainly this evidence could have led a jury to reasonably conclude that elements of the plaintiff's process were not in the public domain, but were secret--and that the defendants copied them.

In addition, through the testimony of Mr. Edmonston, the plaintiff pointed out that there is a difference between the chemical formula or reaction for making ZMP, which is commonly known in the public domain, and plaintiff's tested, proprietary process that uses this formula to produce a product for commercial application (Pl.'s Mem. at 11-12 (citing Trial Tr. at 243, 245 and 246)). Mr. Edmonston testified that one "could probably find in the public domain a flow sheet, a single page, that described the chemical reaction that was used to make ZMP, but [one] could not find--at least it was our belief [one] could not find--the detailed recipe that Morton used to make that product." *Id.* (Pl.' s Mem. at 12 (citing Trial Tr. at 243)). Dr. Bick provided similar testimony. In particular, Dr. Bick testified that each of the 15 elements identified in PX 135 was critical to making the ZMP product safely, as well as ensuring that this product had a certain level of purity and burned in a particular fashion (Trial Tr. at 429-32). This evidence, too, afforded the jury a reasonable basis for concluding that the plaintiff's ZMP process contained trade secret information.

The defendants argue now--as they did at trial--that Mr. Edmonston contradicted plaintiff's position when he testified that he could not point to anything in the Morton process manufacturing instructions ("PMIs") that was proprietary (Def.'s Mem. at 5-6; Trial Tr. at 250). However, elsewhere in his testimony, Mr. Edmonston stated that the Morton process for making ZMP which Chemetall acquired, which is set forth in the PMIs, was not in the public domain (Trial Tr. at 243); see also Trial Tr. 245-46) ("I don't think people skilled in the art knew the Morton process as practiced by Morton").

*8 What this highlights is that there was evidence cutting both ways on the issue of whether plaintiff's ZMP process was "secret." It is, or course, common in a jury trial to have conflicts in the evidence. It is the job of the jury to resolve those conflicts. Here, it was up to the jury to decide what weight to give to Mr. Edmonston's testimony, in light of all the evidence. The jury reasonably could conclude that Mr. Edmonston's answer to the lone question cited by defendants did not override all the other evidence indicating that plaintiff's ZMP process contained trade secret information. [FN4]

> FN4. The same is true for defendants' evidence that plaintiff could have developed every step of their process using information in the public domain (e.g., the Eagle-Picher Report), or by merely regenerating the Eagle-Picher process in reverse (Defs.' Mem. at 6). The jury reasonably could have concluded that the Morton process was sufficiently different from the process disclosed in the Eagle-Picher Report that it was not the product of that public information. The Court also rejects defendants' argument that the ZMP process Morton sold to plaintiff cannot be a trade secret because Mr. Edmonston testified that he believed "Morton is now free to utilize the very process that it sold to Chemetall and the very process that Chemetall now asserts is a trade secret" (Defs.' Mem. at 6). Plaintiff correctly points out that Mr. Edmonston's testimony, "fairly read ... does not evidence that Morton is now free to use the same process it sold to Chemetall, but only that Morton would be free to return to the zirconium metal powder business" at the end of the five year non-compete agreement (Pl.'s Mem. at 13). Plaintiff also correctly points out that even if the jury understood

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 1104604 (N.D.Ill.)
(Cite as: 2001 WL 1104604 (N.D.Ill.))

Page 7

Mr. Edmonston to be saying that Morton could use its own process again after five years, the jury's verdict would still stand because it reasonably could have accepted as more credible Dr. Bick's understanding of the non-compete agreement, which was that Morton could compete after five years but could not use the same process it had sold to plaintiff (Pl.'s Mem. at 13-14). Moreover, the Morton/Chemetall contract is in the record (PX39), and the Court agrees that it "corroborates Dr. Bick's testimony and further supports the verdict" (Pl.'s Mem. at 14).

The Court concludes that there was substantial evidence from which the jury rationally could find that plaintiff's ZMP process contained trade secret information. Thus, even if not waived, defendant's Rule 50(b) challenge to the jury verdict finding trade secret misappropriation must be denied on the merits.

2.

The jury's verdict on the trade secret count against both Mr. Fraval and Mr. Berkovitz reflects that the jury found that each of them played a part in the trade secret misappropriation. The question with regard to punitive damages, however, was whether any defendant acted "willfully and maliciously" in misappropriating the trade secret information, and whether punitive damages should be awarded. The question presented by Mr. Berkovitz's Rule 50(b) motion is whether there was sufficient evidence for a reasonable jury to reach the conclusion that he should be assessed punitive damages.

The jury was instructed that:
It would also be improper if defendants learned the trade secret from another who used improper means to acquire the information, or who breached a duty of confidentiality in disclosing the information, when the defendant knew or should have known that it [was] acquiring a trade secret belonging to another. Improper means also includes inducing another to use improper means to acquire the information or to breach a duty of confidentiality that person owed to plaintiff.
(Jury Instruction No. 22). The jury was also instructed that if it found a defendant's conduct "willful and malicious," the jury could award punitive damages. The instructions defined "willful and malicious" conduct as including "an intentional misappropriation as well as a misappropriation resulting from the conscious disregard of the rights of another" (Jury Instruction No. 30). While the question is a close one, the Court finds that a jury, following these instructions, reasonably could assess punitive damages against Mr. Berkovitz.

Mr. Berkovitz testified that he asked Mr. Fraval three times whether the information concerning the ZMP process was confidential, and received assurances each time that it was not. [FN5] However, there also was evidence that would support a reasonable inference that despite those assurances, Mr. Berkovitz "should have known" that he was acquiring trade secret information belonging to another, which would support an award of punitive damages under a "conscious disregard" theory. For example, Mr. Berkovitz admitted that ZR Energy's process for manufacturing ZMP was deemed confidential and not for public distribution and that the document outlining this process (PX 83) was stamped "ZR Energy Company private" (Trial Tr. 462-63). Mr. Berkovitz also described the ZR Energy process for making ZMP to be a "valuable business asset" (Id. at 499-500). Based on this testimony, the jury could reasonably infer that Mr. Berkovitz knew or should have known--in spite of Mr. Fraval's assertions to the contrary--that the ZMP process used by Morton likewise was a confidential process and that Mr. Fraval was not authorized to use or disclose it.

> FN5. We reject defendants' argument that in reciting this testimony in closing argument, Chemetall made a judicial admission. Judicial admissions are "formal concessions in the pleadings, or stipulations by a party or its counsel." *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.,* 106 F.3d 1388, 1404 (7 th Cir.1997) (quoting *Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7 th Cir.1995). We do not consider Chemetall's arguments about the significance of testimony to rise to the level of judicial admissions.

*9 Moreover, the Business Plan prepared by Mr. Berkovitz (PX 53) states that ZR Energy was hiring the person who had 20 years of experience at Morton, which had used a process to produce ZMP "perfectly." The jury reasonably could have inferred that this plain reference to Mr. Fraval showed that Mr. Berkovitz relied on the experience and knowledge Mr. Fraval gained at Morton to enable ZR Energy to manufacture the ZMP product "perfectly"-- as Morton did. Mr. Berkovitz argues that the Business Plan shows that ZR got the process from a consultant (the author of the Eagle-Picher Report)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2001 WL 1104604 (N.D.Ill.)  
(Cite as: 2001 WL 1104604 (N.D.Ill.))

Page 8

and not from Mr. Fraval. But even accepting that reading, the Business Plan reveals that Mr. Fraval would supply the know-how on how to apply the process to manufacture ZMP, utilizing his experience at Morton. The Business Plan, as well as the testimony outlined above, provides sufficient evidence for a reasonable jury to find that Mr. Berkovitz consciously disregarded the trade secret rights of another.

The jury also reasonably could have found that Mr. Berkovitz "induced" Mr. Fraval to join ZR Energy for the purpose of using this confidential information and knowledge in creating the ZR Energy ZMP process, and that Mr. Berkovitz turned a blind eye to what he knew or should have known when he hired Mr. Fraval to manage the manufacturing of ZR Energy's process, namely, that Mr. Fraval would use his confidential experience and knowledge with the Morton process. To uphold the jury's verdict on punitive damages, it is not necessary to find that Mr. Berkovitz expressly knew that Mr. Fraval was breaching an independent duty of confidentially in passing on the Morton ZMP process information to ZR Energy, because there is enough evidence for the jury to have reasonably concluded that he should have known such information would be confidential. [FN6]

> FN6. Mr. Berkovitz argues that paragraph 4 of the May 7, 1997 Business Plan letter cuts against the punitive damages award because it provides evidence of a motivation to compete, not evidence of willful malice or conscious disregard of another's trade secret rights (Defs.' Reply Mem. at 17). The Seventh Circuit has drawn a distinction between the motivation to compete and malice. *See, e.g., Roton Barrier, Inc. v. The Stanley Works,* 79 F.3d 1112, 1120 (Fed.Cir.1996). But the Court finds this distinction unhelpful here. While there is no doubt that Mr. Berkovitz sought to compete with plaintiff, the question presented is whether the jury reasonably could have concluded that he chose to do so by improperly obtaining and using information that he knew or should have known was trade secret, in conscious disregard of plaintiff's rights. On this point, the Business Plan does not provide Mr. Berkovitz with a silver bullet against punitive damages.

Finally, we address defendants' argument decrying the alleged "absurdity" of the jury assessing punitive damages against Mr. Berkovitz when it declined to do so against Mr. Fraval (Defs.' Reply Mem. at 16). Defendants reason that (a) because the jury did not assess punitive damages against Mr. Fraval, the jury must have found that the evidence failed to support such an award; and (b) if the evidence was insufficient to support an award of punitive damages against Mr. Fraval, it also was insufficient to support a punitive damages award against Mr. Berkovitz. This argument fails for two reasons.

*First*, the foregoing discussion explains why the Court concludes that the evidence permitted the jury to award punitive damages against Mr. Berkovitz. While it may seem unusual for the jury to have assessed punitive damages against Mr. Berkovitz, who received the trade secret information, and not against Mr. Fraval, who took the information from Morton, the evidence permitted (although it certainly did not require) the jury to make that distinction. The jury had the opportunity to see both Mr. Fraval and Mr. Berkovitz, and to assess their credibility as they testified. The jury was entitled to credit Mr. Fraval's assertion that he believed (albeit mistakenly) that the information he possessed about the ZMP manufacturing process was not confidential or a trade secret. The jury reasonably may have concluded that Mr. Fraval was more experienced and talented in technical rather than in business matters, and that as a result he may have genuinely held the belief that the information was not trade secret or confidential. A jury reaching these conclusions reasonably could find that while Mr. Fraval's mistaken beliefs did not absolve him from liability for trade secret violations, it did make the imposition of punitive damages unwarranted.

*10 By contrast, the jury reasonably could have concluded that Mr. Berkovitz, who was experienced in business affairs, should have known that the information that Mr. Fraval wanted to bring to the new business they would create was trade secret or confidential, despite Mr. Fraval's protestations that he did not have a confidentiality agreement: after all, ZR Energy treated its own PMI's as confidential information that would not be disclosed to the public. The jury thus could have found that Mr. Berkovitz enabled the trade secret misappropriation by inducing Mr. Fraval to join him for the very purpose of using Mr. Fraval's experience to replicate the ZMP production process that the ZR Energy Business Plan described as allowing the production of "this exact product perfectly."

*Second*, contrary to defendants' assertion, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2001 WL 1104604 (N.D.Ill.)  
(Cite as: 2001 WL 1104604 (N.D.Ill.))

Page 9

decision not to assess punitive damages against Mr. Fraval does not necessarily mean that the jury deemed the evidence insufficient to support such an award. The instructions informed the jury that if it found willful and malicious conduct, the jury "may" award punitive damages. The instructions did not automatically require the jury to award punitive damages on a finding of willful and malicious conduct, but rather allowed the jury to do so in its discretion. "[I]t is the jury's function to make the difficult and uniquely human judgments that defy codification and that 'buil[d] discretion, equity, and flexibility into a legal system." ' *McCluskey v. Kemp,* 481 U.S. 279, 291 (1987) (quoting H. KALVEN & H. ZEISEL, THE AMERICAN JURY, 498 (1996)). Thus, the jury here may have found the evidence insufficient to establish willful and malicious conduct by Mr. Fraval, as defendants contend. Or, the jury may have found that even though Mr. Fraval's conduct met that standard, the jury would exercise its discretion to assess punitive damages only against the person who induced and enabled Mr. Fraval to use the trade secret information--Mr. Berkovitz.

By these comments, we do not suggest that we are able to divine the specific path of reasoning employed by the jury in deciding the punitive damages questions; nor do we seek to do so. The Court offers this analysis only to show that the evidence at trial offered a reasonable basis for the jury to award punitive damages against Mr. Berkovitz, and to do so at the same time it declined to award punitive damages against Mr. Fraval. On the Rule 50(b) motion, the question presented to the Court is not what award the Court would have made in the first instance, had it been the fact finder, but whether the evidence would permit a reasonable jury to make the award that it did. The punitive damages award in this case against Mr. Berkovitz meets that standard.

3.

At trial, the Court instructed the jury on the law applicable to the plaintiff's breach of contract claim:

For plaintiff to prove that it is entitled to enforce a confidentiality obligation between Mr. Fraval and Morton, concerning Morton's zirconium powder information, plaintiff must prove that there was an intent for plaintiff to become the assignee or successor to that confidentiality obligation.

*11 (Jury Instruction No. 32). The Court finds that the relevant documents provided sufficient evidence to permit reasonable jurors to find that Chemetall has the assignee or successor to Mr. Fraval's confidentiality obligation: On November 20, 1989, Mr. Fraval signed an Employee Trade Secret and Patent Agreement with Morton ("the Fraval Agreement"). That document provides, in relevant part:

EMPLOYEE acknowledges that he ... occupies a position of trust and confidence with the COMPANY and will have access to and may develop Confidential Information of actual or potential value to or otherwise useful to the COMPANY; and agrees that during and after said employment, he ... will treat as confidential and will not, without express authorization from the COMPANY, disclose or use in whole or in part any Confidential Information that he ... may acquire while in said employment regarding or relating to the ... products, operations, processes ... of the COMPANY, or know-how relating to such. EMPLOYEE'S obligation not to disclose or use any such Confidential Information of the COMPANY after termination of employment with the COMPANY will continue so long as (i) such Confidential Information is not, or has not by legitimate means become, generally known and in the public domain, and (ii) is to be maintained as confidential by the COMPANY.

\* \* \*

The above conditions shall apply to all work performed by EMPLOYEE for COMPANY including any of its past, present or future affiliates or subsidiaries, and shall be binding upon EMPLOYEE'S assigns, executors, administrators and other legal representatives. *This agreement shall inure to the benefit of the successors and assigns of COMPANY.*

(PX15 (emphasis added)). The Asset Purchase Agreement between plaintiff and Morton further states in Paragraph 18b:

All of Seller's employees who have been active in the Business, at any time before the Closing Date, shall be bound to a secrecy undertaking in accordance with paragraph 18a.

(PX39). Taken together, these documents indicate that Mr. Fraval agreed to maintain the secrecy of confidential information about Morton's process, that he agreed that the Fraval Agreement would run to the benefit of Morton's successors, and that Morton and Chemetall agreed that Morton employees such as Mr. Fraval would be bound to secrecy.

The trial testimony provides further direct evidence that plaintiff was intended to be the assignee of and/or successor to Morton's rights to enforce Mr. Fraval's confidentiality agreement. For example, Mr. Edmonston, a representative of Morton during the